IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| DONATO APONTE NAVEDO, BELKIS ISABEL SANTIAGO MARTÍNEZ, AND THEIR COMMUNITY OF ASSETS AND GAINS,<br><br>Apontes,<br><br>v.<br><br>NALCO CHEMICAL COMPANY, JOSÉ SERRANO AND HIS WIFE JANE DOE (1), AND THEIR COMMUNITY OF ASSETS AND GAINS, JORGE CASTILLO AND HIS WIFE JANE DOE (2), AND THEIR COMMUNITY OF ASSETS AND GAINS, ASHOK PAUL DUGGAL AND HIS WIFE JANE DOE (3), AND THEIR COMMUNITY OF ASSETS AND GAINS AND ABC INSURANCE,<br><br>Defendants. | Case No. 09-cv-01232-JA<br><br>Magistrate Judge Marcos E. López |

**DEFENDANTS' STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Nalco Company ("Nalco") and Ashok Paul Duggal ("Duggal") (collectively "Defendants") pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, submit this Statement of Uncontested Facts[1] in support of their motion for summary judgment.

**Parties, Jurisdiction and Venue**

1.      Plaintiff, Donato Aponte Navedo is a resident of Mayaguez, Puerto Rico (Aponte Dep. at 11,17).  Aponte was born on November 17, 1964 in Bayamon, Puerto Rico (Aponte Dep. at 17).

---

[1] The facts in this Statement are assumed to be true for summary judgment purposes only.

12892323v.2

2.     Nalco Chemical Company is a corporation organized under the laws of Delaware and registered to do business in the Commonwealth of Puerto Rico (Answer ¶7).

**Aponte's Educational and Professional Background**

3.     Aponte attended the University of Puerto Rico, Mayaguez Campus from 1982 to 1988 and obtained a Bachelors of Science in Chemical Engineering (Exhibit A, Deposition of Plaintiff Donato Aponte Navedo ( hereinafter "Aponte Dep.") at 20).  Aponte did not take any coursework in marketing or commercial sales (Aponte Dep. at 20-21)

4.     Upon graduating from college, Aponte obtained a job in Data Entry for Utical. During his employment at Utical, Aponte did not have any responsibility for selling products (Aponte Dep. at 21)

5.     After approximately one year, Aponte obtained a job with the Puerto Rico Aqueduct and Sewer Authority (PRASA).  Aponte's job at PRASA was of a technical nature and did not involve the sale of products or services (Aponte Dep. at 21-22).

6.     Approximately nine months later, Aponte began working as a Shift Chemist with the Puerto Rico Electric Power Authority (PREPA).  Aponte's responsibilities at PREPA were also of a technical nature and Aponte was not responsible for selling products or services at PREPA (Aponte Dep. at 23-24, 26).

**Aponte's Employment with Nalco**

7.     Nalco is in the business of selling water treatment chemicals and providing technical service and solutions to its clients in a highly competitive industry (Aponte Dep. at 61).

8.     Aponte was hired as an Applications Engineer for Nalco in June 1996 (Aponte Dep. at 14, 28-29).

9.      Aponte understood that his employment with Nalco was at will and that he could be terminated with or without cause, and with or without notice, at any time (Aponte Dep. at 32-

34) (Aponte Dep. Ex. 1).

10.     Aponte's duties as an Applications Engineer were technical and did not directly involve sales (Aponte Dep. at 29).  As an Application Engineer, Aponte did not collect commissions (Aponte Dep. at 31, 39).

11.     When Aponte was hired, the other Applications Engineers were Ashok Duggal (Canadian) and Jorge Ortiz (Puerto Rican) (Aponte Dep. at 34-35).  Aponte developed a personal relationship with Duggal.  In June 2003, when Aponte married Belkis Santiago, he asked Duggal to give a toast at his wedding and Duggal did so (Aponte Dep. at 25-26).

12.     Aponte understood that employees who began working as Applications Engineers could become District Representatives who, in addition to providing technical assistance to customers, are responsible for generating sales of company products (Aponte Dep. at 38-39).

13.     On or about 1997, Aponte became a District Representative for Nalco (Aponte Dep. at 44).

14.     As a District Representative, Aponte was responsible for "ensur[ing] order and revenue growth of Company products and services to assigned customer and prospect accounts by analyzing and meeting customer needs" (Aponte Dep. at 45; Aponte Dep. Ex. 4).  Aponte's responsibilities included calling on existing customers, servicing assigned accounts by analyzing needs and requirements and recommending solutions, establishing selling strategy and tactics, establishing new accounts and achieving annual sales targets (Aponte Dep. at 45-46; Aponte Dep. Ex. 4).

15.     Aponte understood that he was responsible for maintaining good client service and relationships so that the client would not go to a competitor (Aponte Dep. at 50, 60-62).

16.     Aponte further understood that he was responsible for cultivating new clients and

establishing new accounts (Aponte Dep. at 45-46, 79; Aponte Dep. Ex. 4)

17. Aponte was responsible for responding to client requests for information about Nalco products and services (Aponte Dep. at 55). Aponte was also responsible for preparing various different types of reports, including reports summarizing his findings following client visits and other reports to keep management informed of his activities (Aponte Dep at 55-56; Aponte Dep. Ex. 4). Regular client reports were usually due within several days or, at most, one week after client visits (Aponte Dep. at 55-56).

18. When Aponte became a District Representative in 1997, he had an annual sales target of approximately $350,000 (Aponte Dep. at 49). At the time, Aponte was responsible for the Pfizer- Barceloneta and Abbott accounts (Aponte Dep. at 46-47).

19. On or about 1999, while Aponte was the District Representative for the Abbot account, Abbott ceased to be a Nalco customer (Aponte Dep. at 50).

20. In 2000, Aponte transferred back to a technical role within Nalco to a position as an Applications Engineer. In this capacity, Aponte was no longer responsible for selling or meeting sales targets and he was not eligible for commission (Aponte Dep. at 51-52).

21. Starting in January 2005, when Duggal was promoted to Area Manager, Aponte began reporting directly to Duggal. Duggal in turn reported to Jorge Castillo (Colombian), Sales Manager (Aponte Dep. at 43, 56- 57; Exhibit B, Affidavit of Ashok Duggal (hereinafter "Duggal Aff.") ¶4). Castillo was based in Colombia. (Duggal Aff. ¶4)

22. On or before 2007, Aponte returned to the position of District Representative in which he was once again responsible for generating sales and eligible to earn commission. (Aponte Dep. at 62, 81).

23. In 2007, Aponte's sales goals included increasing annual sales by approximately

11 to 12% (Aponte Dep. at 63).

24. In 2007, Aponte was the District Representative responsible for the Lilly PR-2, Lilly PR-5; Lilly PR-6, Smurfit-Stone, Amgen, Warner Chilcott, Baxter-Guayama, and Chevron Phillips client accounts (Aponte Dep. at 62).

**Aponte is Repeatedly Counseled regarding Performance Problems**

25. On or about February 2007, Aponte met with Duggal to discuss Aponte's performance (Aponte Dept. at 73). During the meeting, Duggal told Aponte that he was concerned because several customers had reported that they were dissatisfied with Aponte's level of service (Aponte Dep. at 73) (Duggal Aff. ¶5).

26. In an email dated February 17, 2007, Duggal notified Aponte that he had not received the monthly reports for January and that it was imperative that Aponte submit monthly reports no later than the 3rd day of every month. Duggal advised Aponte that he was on probation (Aponte Dep. at 83-85; Aponte Dep. Ex. 7; Duggal Aff. ¶6; Duggal Aff. Ex. 1)

27. In March 2007, Nalco received a survey response received from Chevron Phillips, one of the accounts Aponte was responsible for servicing. The survey indicated that Chevron Phillips was very displeased with Nalco's services citing a lack of consistency, the failure to submit timely reports and a lack of attention to special projects. On March 24, 2007, Duggal advised Aponte via email that Chevron Phillips's survey indicated that Nalco was at high risk of losing the Chevron Phillips account (Aponte Dep. at 90; Aponte Dep. Ex. 8; Duggal Aff ¶7, Duggal Aff. Ex. 2).

28. Duggal further advised Aponte that he was concerned because many of Aponte's clients were weak. He asked Aponte to send surveys to his clients and conduct business reviews of all his accounts (Aponte Dep. at 91; Aponte Dep. Ex. 8; Duggal Aff. ¶7; Duggal Aff. Ex. 2). Despite asking Aponte for his comments or suggestions as to how to address the issues raised by

5

Chevron Phillips, Duggal did not receive a response from Aponte (Duggal Aff. ¶7).

29.     On or about May, 2007, Duggal had a meeting with Wilfredo Guardiola, Daniel Resto and Albert Koett from Warner Chilcott (WC).  Guardiola, Resto and Koett informed Duggal that they were not satisfied with the level of service they were receiving from Nalco and that they were being aggressively approached by Chemtreat, one of Nalco's competitors (Duggal Aff. ¶8).

30.     Following this meeting, on May 21, 2007, Duggal sent an email to Aponte concerning his meeting with Warner Chilcott.  In his email, Duggal advised Aponte that Warner Chilcot was "not too happy with the Nalco Service and Chemtreat [wa]s aggressively trying to get in.  It is important to give them the love and attention they are looking for immediately." Duggal gave Aponte various suggestions on how to improve service to Warner Chilcott, including helping the client create a procedure to operate a deaerator, checking boiler parameters and making calculations and reports concerning the savings Warner Chilcott could achieve by using certain products.  Duggal advised Aponte that it was critical that he resolve urgent items immediately and that he was "counting on [Aponte] to stabilize th[e] [Warner Chilcott] account." (Aponte Dep. Ex. 6; Duggal Aff. ¶8, Duggal Aff. Ex. 3).

31.     By August, 2007, two months later, Aponte had failed to resolve several of the points raised by Duggal in the May 21, 2007 email concerning Warner Chilcott.  Warner Chilcott reported to Duggal that Aponte's visits were inconsistent, that he failed to submit reports in a timely manner and sometimes not at all.  Warner Chilcott further reported that chemical inventories were low and that Aponte had taken an excessive amount of time to resolve a Cooling Tower controller issue and had likewise taken too long to provide the results of a deposit sample (Duggal Aff. ¶9).

32. On or about mid-2007, Duggal learned that Baxter, another one of Aponte's accounts, was displeased with Aponte's level of service. Baxter reported that Aponte did not visit on a consistent basis and did not submit routine visit reports in a timely manner, and sometimes did not submit them at all. Baxter also reported that Aponte had taken an excessive amount of time to resolve a Cooling Tower controller issuer and that chemical inventories were too low (Duggal Aff. ¶10).

33. On August 14, 2007, Duggal met with Aponte to discuss his failure to meet his sales targets and overall client satisfaction issues, particularly the service deficiencies with Baxter and Warner Chilcott (Aponte Dep. at 70-74; Aponte Dep. Ex. 5; Duggal Aff. ¶11, Duggal Aff. Ex. 4). Duggal discussed with Aponte that:

- Baxter was very close to terminating Nalco's contract and switching to Chemtreat because Aponte's service visits were not consistent, routine reports were not being submitted on time or at all, he had taken an excessive amount of time to resolve a CT controller issue and chemical inventories were to low for the taste for Jorge Morales, the Baxter utilities supervisor. (Aponte Dep. at 74-74).

- Warner Chilcott also reported that Aponte's service visits were not consistent and Aponte did not let them know if he was unable to visit them; Aponte had not submitted routine client reports to Warner Chilcott on a timely manner, and sometimes not at all; chemical inventories were too low; Aponte had taken too long to resolve a CT controller issue and to submit result for a deposit sample. Although Duggal had asked Aponte to prepare an action plan for Warner Chilcott to counter attack Chemtreat's proposals, he had failed to do so. (Duggal Aff. ¶11, Duggal Aff. Ex. 4).

- As of June 30, 2007, Aponte's year to date sales were down 11% or approximately $30,000 when compared to 2006. (Duggal Aff. ¶11, Duggal Aff. Ex. 4).

- Even though he was expected to submit administrative, expense and other reports on a timely manner, Aponte had not submitted the monthly District Reports for January, February, March or June; he had been on the Nalco credit card delinquency report once; and he was consistently late in submitting expense reports. (Duggal Aff. ¶11-12; Duggal Aff. Ex. 4).

34. As a result of these concerns, Aponte was placed on a Performance Improvement

7

Plan. Aponte acknowledged that "his failure to meet and sustain the performance objectives and expectations outlined above w[ould] result in further disciplinary action up to and including termination (Aponte Dep. Ex. 5; Duggal Aff. ¶11-12; Duggal Aff. Ex. 4).

35. As part of the Performance Improvement Plan, Duggal counseled Aponte to conduct business reviews for all his clients within 45 days and send customer feedback surveys to all his clients and follow up on their completion. Duggal further advised Aponte that he must meet a minimum 10% net sales growth and that he could not lose any accounts during 2007; that he must improve client rapport and service by adapting to client needs and responding to their requests in a timely fashion; and that he needed to submit all monthly administration, expense and other reports on time (Aponte Dep. Ex. 5; Duggal Aff. ¶12; Duggal Aff. Ex. 4).

36. In 2007, Warner Chilcott cancelled Nalco's contract and gave it to a competitor . Aponte admits the lost the Warner Chilcott account. The Warner Chilcott account was worth approximately $60,000 (Aponte Dep. at 68-69; Duggal Aff. ¶13).

37. On May 3, 2008, following a visit to Amgen, another one of Aponte's clients, Duggal advised Aponte that Amgen was complaining of a decline in service and asked Aponte to take immediate action by: visiting the client on a weekly basis and if that was not possible, to immediately advise the client; submitting weekly reports and discussing them in person with the client representative; following up on value added projects and discussing them with the client; reacting promptly to any request for help or information from the client and documenting client requests; and maintaining a positive can-do attitude at all times. Duggal counseled Aponte that he needed to refrain from discussing personal problems with the client, that he could not appear negative, impatient or complain and that rather, he needed to address client needs and propose solutions in a timely manner. Duggal warned Aponte that it was critical for him to improve and

to prevent the loss of customer accounts (Aponte Dep. at 96-98; Aponte Dep. Ex. 10; Duggal Aff. ¶14; Duggal Aff. Ex. 5).

38.     On May 23, 2008, Duggal sent Aponte an email inquiring as to his failure to submit monthly reports for various clients. Aponte did not respond (Aponte Dep. Ex. 12; Duggal Aff. ¶15; Duggal Aff. Ex. 6).

39.     On May 30, 2008, Duggal asked Aponte to make several changes to a special report for Wyeth (Aponte Dep . at 108-110; Aponte Dep. Ex. 13). Aponte did not respond. It took Aponte over two months to provide a complete report for Wyeth (Duggal Aff. ¶16).

40.     Duggal sent several emails to Aponte in June 2008 concerning his failure to submit timely client reports. Aponte did not respond (Duggal Aff. ¶17; Duggal Aff. Ex. 8).

41.     Duggal sent an email to Aponte advising him that he was very displeased with his performance and that he was not performing to the level that was expected of a Nalco sales representative of his experience. Duggal noted that although he had sent Aponte various emails requesting an action plan detailing how Aponte would improve his quality of service he had failed to receive a response from Aponte (Aponte Dep. Ex. 15; Duggal Aff. ¶18, Duggal Aff. Ex. 18).

42.     On June 19, 2008, Jorge Ortiz, Account Manager had a meeting with Kenneth Colon and Roberto Picou, Utilities personnel from Amgen. During the meeting, Colon and Picou informed Ortiz that they we dissatisfied with Nalco's services, specifically that:

- They did "not perceive from [Aponte] a professional level of service at the high standard that Nalco was supposed to deliver";

- "They feel [Aponte] has not been effective in providing a solution for the White Rust problem," that he had had submitted a report on the issued six months after it was requested. Ortiz further stated that Amgen had contacted Chemtreat, a Nalco competitor, for a recommendation on how to handle the issue and Chemtreat had supplied them with a comprehensive and complete report the very next day;

9

- The felt that they were only buying chemical products from Nalco, instead of service or solutions;

- They did not feel like Aponte was "taking care of their equipment and systems," that his "communication and reporting ha[d] been very low to none";

- They had requested a report from [Aponte] several times concerning recommendations for chemical treatment changes needed for the boiler system and that nothing had been received;

- They "recognize[d] the technical knowledge that [Aponte] might have, but [noted that] with such poor communication and reporting skills, and the poor response time when something is requested, [Aponte's] service [wa]s not valuable to [Amgen]."

Aponte at 98-101; Aponte Dep. Ex. 11; Duggal Aff. ¶19; Duggal Aff. Ex. 10).

43. Via email dated June 23, 2008, Ortiz advised Duggal of the concerns raised by Amgen. Ortiz advised Duggal that as an immediate action plan to attempt to salvage the Amgen relationship, Aponte had been removed from the Amgen account (Duggal Aff. ¶19; Duggal Aff. Ex. 10). Ortiz told Aponte not to visit Amgen anymore (Aponte Dep. at 101).

44. On or about June 2008, Duggal recommended to Human Resources personnel at Nalco's corporate headquarters in Naperville, Illinois that Aponte be discharged due to his poor performance. Duggal sent an email to Stephanie Glasshagel, Human Resources, listing various instances of poor performance which led him to recommend terminating Aponte (Duggal Aff. ¶20; Duggal Aff. Ex. 11).

**Aponte's Termination of Employment**

45. On July 23, 2008, Duggal and Ortiz met with Aponte and informed him that his employment was terminated. They told Aponte that he was being terminated his poor performance including losing client business, not following up or responding to client requests for information, and not submitting reports in a timely fashion (Aponte Dep. at 64-65, 67-69).

46. On the day of his termination, Aponte understood he was being terminated for

performance reasons including losing client business, putting half a million dollars in business at risk, not following up on client requests and failure to timely submit reports (Aponte Dep. at 67-69). Aponte admits that prior to his termination, he had been counseled concerning problems he had with clients (Aponte Dep. at 70).

47. Aponte admits that his sales as of June 2007, were approximately $30,000 or 11% down when compared to prior year (Aponte Dep. at 78-79). Aponte admits the he did not generate sales and was better technically. He claims that he was unable to generate sales because he was too busy providing technical service and that, he was the most technical of all the district representatives, and helped others generate sales (Aponte Dep. at 79- 80).

48. Aponte asked Duggal to postpone the termination until after his wife, who was eight months pregnant, delivered the baby (Aponte Dep. at 66). Duggal told him they could not because a decision had already been made (Aponte Dep. at 66-67).

49. During the termination meeting, neither Duggal nor Ortiz said anything to Aponte about his age, national origin, any health conditions or about any male stereotypes (Aponte Dep. at 83).

**Nalco's Anti-Harassment Policy and Aponte's Failure to ever Complain of Discrimination or Harassment**

50. On or about December 9, 2008, Aponte filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). As part of his charge, Aponte alleged sex, national origin, age and disability discrimination . (Exhibit C, Plaintiff's EEOC Charge).

51. Nalco maintains an Equal Employment Opportunity and Harassment policy which prohibits unequal treatment of employees on the basis or their age, race, national origin, disability or any other protected characteristic. The policy provides that any employee who feels that he or she has been the subject of discrimination or harassment "should report the behavior to

his or her immediate supervisor, the appropriate EEO/HR contact or any Nalco officer" (Aponte dep. at 120-121; Aponte Dep. Ex. 18).

52.     Aponte was aware of Nalco's Equal Employment Opportunity and Harassment policy throughout his employment and he could access the policy on the Company's intranet (Aponte Dep. at 121).

53.     At no time during his employment did Aponte submit any report of discrimination or harassment pursuant to the policy (Aponte Dep. at 122-123, 125-126).

**Plaintiff's Diabetes**

54.     Aponte was diagnosed with Type II diabetes on August 26, 2005 (Aponte Dep. at 126-127).

55.     Aponte tests his blood at least once a day and takes medication to control his diabetes daily (Aponte Dep. at 135-136).  Aponte controls his diabetes by following a diet, eating snacks and having sufficient rest (Aponte Dep. at 193-194).

56.     Since he was diagnosed with diabetes, Aponte is able to get out of bed in the morning, brush his teeth, shower, shave and get dressed (Aponte Dep. at 136).  Aponte is able to drive a car, vacuum, do laundry, make his bed, perform work around the house, buy groceries and prepare meals and work on his computer (Aponte Dep. at 137).  Aponte is also able to play with his children and does so by taking them swimming, flying kites in El Morro, and riding bicycles (Aponte Dep. at 137). Aponte is able to work and he also grows Bonsai trees as a hobby (Aponte Dep. at 136-137).

57.     Aponte testified he sometimes gets tired (Aponte Dep. at 136) and indicated that stress and other medications may affect his diabetes (Aponte Dep. at 193).

58.     Aponte claims that he would sometime have to leave meetings because he had to eat.  Aponte also claims that on other occasions, when food would be brought in for meetings,

"they would bring the things that precisely [he] couldn't eat, and [he] had to eat them because it was going to be worse if [he] didn't eat anything." (Aponte Dep. at 194)

**Plaintiff's Testimony Concerning An Alleged Hostile Work Environment**

59. Aponte alleges Castillo was responsible for creating a hostile work environment and that he began to feel discriminated against when Jorge Castillo arrived in 2001 (Aponte Dep. at 123).

60. Castillo travelled to Puerto Rico every two to three months or approximately five times a year and his visits typically lasted about one week (Aponte Dep. at 58-59). Aponte would see Castillo approximately four times per trip because he often picked Castillo up at the hotel and drove him to Nalco's office or other meetings. Aponte estimated that, on the days they saw each other, he spent about two to three hours with Castillo (Aponte Dep. at 146-149, 151).

61. When he joined Nalco, Castillo stated that he wanted everyone working together as a team and to support each other to develop Nalco sales and to ensure that Nalco did not lose any clients (Aponte Dep. at 60-61).

62. Castillo was concerned about employees being overweight and he once brought an employee to give a talk about cholesterol (Aponte Dep. at 210-111). Aponte testified that Castillo asked him about his weight (Aponte Dep. at 207-208). Aponte testified that Castillo spoke to all employees, except for two, about their weight because he wanted Nalco district representatives to have a certain image (Aponte Dep. at 209, 212-213). Whenever Castillo asked Aponte about his weight, Aponte testified that Castillo also stroked his belly. On these occasions, Castillo's hand remained on Aponte's belly for no more than four to five seconds (Aponte Dep. at 209-210).

63. On approximately seven times (over a period of 4 to 5 years), Castillo directed the phrases "no seas hueva" or "eres una hueva" to Aponte (Aponte Dep. at 213, 216-218). Aponte

13

interpreted these phrases to mean "don't be an asshole" (Aponte Dep. at 216). Castillo directed these phrases to others whenever someone would not do something that he wanted (Aponte Dep. at 217-219). Ortiz, Duggal, Casanova and Lara also began using those phrases at meetings with the entire group (Aponte Dep. at 224)

64. Castillo once asked Aponte about his age, telling him that despite the fact that he (Castillo) was older than Aponte, he (Castillo) had more energy that Aponte did (Aponte Dep. at 173-174). Castillo told all members of the organization that they should have a positive attitude when they went out to visit clients (Aponte Dep. at 114)

65. Aponte testified that Castillo talked to him about going out dancing, drinking, and with women (Aponte Dep. at 151-152). Aponte testified that on several occasions Castillo asked him "if this hot girl would put it in [his] face, wouldn't[he] just eat it up." On these occasions, Aponte answered no, told him he was not interested and change the topic. (Aponte Dep. at 157-158)

66. No one ever ordered Aponte to drink, but he claims that Nalco required him to drink alcoholic beverages (Aponte Dep. at 141-142). Aponte claims that at a company event in Colombia in May 2007, someone instructed that no one should have an empty glass and that everyone's glasses should be filled with rum the entire night (Aponte Dep. at 143-144). On some occasions, Aponte had one drink at company events, on some occasions he had more than one drink, and other times he had none (Aponte Dep. at 142-143, 145). It was Aponte's choice what type of beverage to have and how much of it to consume (Aponte Dep. at 142-143). Plaintiff testified he rarely drank alcoholic beverages (Aponte Dep. at 142).

67. Aponte claims that Castillo forced him to dance against his will but admits he only danced at two or three company events (Aponte Dep. at 153, 159-161,172-173):

- In 2005 or 2006, the entire sales force went out on a boat ( the "Duck") around San Juan harbor. Everyone in the group was dancing in a circle and people would get in the middle of the circle and clown around (Aponte Dep. at 159-161). Everyone was having a good time and clapping. Aponte did not want to dance in the middle of the circle but he felt pressured to do so (Aponte Dep. at 160). Aponte danced in the middle of the circle for approximately 10 seconds and then jumped out (Aponte Dep. at 162).

- On another occasion Aponte voluntarily danced with Sandra, a friend who he knew from work and whom he had no sexual interest in (Aponte Dep. at 155, 172). Aponte enjoyed dancing with Sandra (Aponte Dep. at 154-155, 171-173).

- Aponte enjoys dancing merengue and bolero and occasionally danced with his ex-wife (Aponte Dep. at 152-153).

68. Castillo told Aponte that he wanted him to become more a part of the organization so he could network with people (Aponte Dep. at 149).

69. Aponte testified that many of his conversations with Castillo were business related, and concerned topics like projects and client, as well as family and people that they both knew (Aponte Dep. at 148-149, 158-159).

**Aponte's Evidence Of Discrimination**

70. In 2007, the Nalco District Representatives were Jorge Ortiz, Edward Bray, Francisco Casanova, Pedro Lara and Dennis Lopez, all of whom are Puerto Rican (Aponte Dep. at 88, 92-93; Duggal Decl. ¶23). Aponte does not know how many hours any one of the other district representatives worked at any given months or at any given year (Aponte Dep. at 88-89).

71. Aponte claims that only two employees, Edward Bray and Francisco Casanova Puerto Rican), received more favorable treatment than he did (Aponte Dep. at 197- 207). Aponte claims Bray had problems with clients and had lost several accounts but he was permitted to resign from Nalco in 2008 and form his own company which currently provides services to Nalco (Aponte Dep. at 199-200). Aponte, however, admits he has no personal knowledge of the

15

alleged problems Bray may have had with clients and is not aware whether Bray was ever on probation (Aponte Dep. at 200). Aponte claims Casanova was treated more favorably because he lost large client accounts but was not discharged (Aponte Dep. at 205). Aponte admits he has no personal knowledge of Casanova's performance but admits that Casanova was good at selling Nalco products and services (Aponte Dep. at 204-206). Aponte does not believe that Bray or Casanova were treated more favorably on account on their age or nationality (Aponte Dep. at 205)

72. Aponte alleges he was replaced by Jaime Suarez (Colombian). (Aponte Dep. at 188). Aponte is not aware of what position Suarez was hired into and has no personal knowledge of Suarez' performance (Aponte Dep. at 188-189). Unlike Aponte, Suarez had a masters degree in Mechanical engineering (Aponte Dep. at 190).

73. Suarez was hired on July 14, 2008, approximately two weeks before Aponte's termination, as an Applications Engineer (Duggal Decl. ¶22). Suarez did not replace Aponte. rather Aponte's duties were absorbed by the other representatives in the district (Duggal Decl. ¶22)

74. All but one of the 4 district representative or account managers presently working at Nalco and reporting to Duggal are Puerto Rican.(Duggal Decl. ¶24)

**DATED:  June 21, 2011**                     Respectfully submitted,
                                              NALCO COMPANY, ASHOK DUGGAL


                                              By:    s/ Natascha B. Riesco
                                                     One of Their Attorneys

*Attorneys for Defendants*

Arturo Diaz-Anguiera
James W. McCartney (USDC-PR No. 211511)
**CANCIO, NADAL, RIVERA & DÍAZ, P.S.C.**
PO BOX 364966
San Juan, PR  00936-4966
(787) 767-9625

Mark Lies II (admitted *pro hac vice*)
Natascha B. Riesco-Farinas (USDC-PR No. 222112)
**SEYFARTH SHAW LLP**
131 S. Dearborn Street, Suite 2400
Chicago, IL  60603
(312) 460-5000

12892323v.2

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he caused a true and correct copy of the foregoing **DEFENDANTS' STATEMENT ON UNCONTESTED FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** to be served upon the following attorneys via the CM/ECF filing system on this 21st day of June, 2011.

| | |
|---|---|
| Miguel A. Cuadros-Pesquera<br>Cuadros & Cuadros<br>701 Ponce de Leon Ave.<br>Suite 215<br>Miramar<br>San Juan, PR 00907<br>787-725-2652<br>Fax: 787-724-3820<br>Email: macuadros@cuad-law.com | William E. Melendez-Menendez<br>410 Park Avenue<br>15th Floor #1223<br>New York, NY 10022<br>718-725-7387<br>Email: we.melendez@e-lex.us |

                                                                                                                                                   _____s/Natascha B. Riesco_____