# Exhibit A

# Deposition Of Plaintiff Donato Aponte And Selected Exhibits

# Part 1

# Transcript of the Testimony of **Donato Aponte-Navedo**

**Date:** October 12, 2010
**Volume:**

**Case:** Donato Aponte-Navedo, et als. v. Nalco Chemical Company, et als.

Printed On: June 20, 2011

Vega Reportage, Inc.
Phone:(787) 764-6386
Fax:
Email:vegareportage@onelinkpr.net
Internet:

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DONATO APONTE-NAVEDO, et al,   :   CIVIL NO.: 09-CV-01232(GAG)

    Plaintiff(s)    :

vs    :   RE: TITLE VII VIOLATION, AGE,

NALCO CHEMICAL COMPANY,   :   GENDER AND NATIONAL ORIGIN

JOSÉ SERRANO, JANE DOE   :   DISCRIMINATION, AMERICANS WITH

and the CONJUGAL PARTNERSHIP   :   DISABILITIES ACT, AND TORTS

SERRANO-DOE, JORGE CASTILLO,   :   PLAINTIFFS DEMAND TRIAL

JANE DOE and the CONJUGAL   :   BY JURY

PARTNERSHIP CASTILLO-DOE,   :

ASHOK PAUL DUGGAL,   :

JANE DOE and the CONJUGAL   :

PARTNERSHIP DUGGAL-DOE, and   :

ABC INSURANCE,   :

    Defendant(s)    :

------------------------------

TAKING OF THE DEPOSITION OF:
MR. DONATO APONTE-NAVEDO

DATE : October 12, 2010

TIME : 9:00 A.M.

PLACE : Cancio, Nadal, Rivera & Díaz
    403 Muñoz Rivera Avenue
    San Juan, Puerto Rico 00918

## Page 2

1    A P P E A R A N C E S

2 FOR DEFENDANTS:  MARK A. LIES, ESQ.

3    Seyfarth Shaw, LLP

4    131 South Dearborn Street

5    Suite #2400

6    Chicago, Illinois 60603

7    NATASCHA B. RIESCO, ESQ.

8    JAMES MC CARTNEY, ESQ.

9    Cancio, Nadal, Rivera & Díaz

10    403 Muñoz Rivera Avenue

11    San Juan, Puerto Rico 00918

12 FOR PLAINTIFFS:  MIGUEL A. CUADROS-PESQUERA, ESQ.

13    701 Ponce De León Avenue

14    Suite #215

15    San Juan, Puerto Rico 00907

16 OTHERS PRESENT:  MR. ASHOK PABLO DUGGAL

17    Nalco Representative

18    MS. BELKIS ISABEL SANTIAGO-MARTÍNEZ

19 NOTARY PUBLIC:  LUIS NOLLA, ESQ.

20 DEPONENT:  MR. DONATO APONTE-NAVEDO

21 INTERPRETER:  MS. CARLOS LAO-DÁVILA

22 COURT REPORTER:  MS. GREGORIA ECHEVARRÍA

23    Vega Reportage

## Page 3

1    I N D E X

2

3 MS. DONATO APONTE-NAVEDO

4 DIRECT EXAMINATION:

5    By Attorney Lies:    11

6

7 EXHIBIT    DESCRIPTION    PAGE NO.

8 Exhibit 001

9    Copy of two 2)) page document,

10    Nalco Chemical Company,

11    Employment Agreement,

12    RE: Mr. Donato Aponte-Navedo,

13    06/10/1996.    32

14 Exhibit 002

15    Copy of three (3) page document,

16    RE: Job Profile,

17    Title: Application Engineer II/Grade 65,

18    12/23/2002.    37

19 Exhibit 003

20    Copy of one (1) page document,

21    Primary Career Paths,

22    Sales/Field Service/Industry Support,

23    RE: Organization Chart,

24    Date unknown.    38

25 Exhibit 004

## Page 4

1    Copy of three (3) page document,

2    RE: Job Profile,

3    Title: Application Engineer II/Grade 75,

4    12/23/2002.    45

5 Exhibit 005

6    Copy of two (2) page document,

7    Memorandum from Mr. Ashok P. Duggal

8    to Mr. Donato Aponte-Navedo,

9    RE: Performance Improvement,

10    08/14/2007.    71

11 Exhibit 006

12    Copy of two (2) page document,

13    E-mail from Mr. Ashok P. Duggal

14    to Mr. Donato Aponte-Navedo,

15    RE: Warner Chilcott Visit,

16    05/21/2007. ***    77

17 Exhibit 007

18    Copy of two (2) page document,

19    E-mail from Mr. Ashok P. Duggal

20    to Mr. Donato Aponte-Navedo,

21    RE: Monthly Reports,

22    02/17/2007. ***    84

23 Exhibit 008

24    Copy of one (1) page document,

25    E-mail from Mr. Ashok P. Duggal

1 (Pages 1 to 4)

Donato Aponte-Navedo

| Page 5 | |
|---|---|
| 1 | to Mr. Donato Aponte-Navedo, |
| 2 | RE: CP |
| 3 | 03/24/2007.                    90 |
| 4 | Exhibit 009 |
| 5 | Copy of six (6) page document, |
| 6 | E-mail from Mr. Ashok P. Duggal |
| 7 | to Mr. Donato Aponte-Navedo, et al, |
| 8 | RE: Game Rules for Support, |
| 9 | 04/24/2008. |
| 10 | E-mail from Mr. Donato Aponte-Navedo |
| 11 | to Mr. Ashok P. Duggal, |
| 12 | RE: Games Rules for Support, |
| 13 | 04/25/2008. |
| 14 | E-mail from Mr. Ashok P. Duggal |
| 15 | to Mr. Donato Aponte-Navedo, et al, |
| 16 | RE: Game Rules for Support, |
| 17 | 04/25/2008. ***            92 |
| 18 | Exhibit 010 |
| 19 | Copy of two (2) page document, |
| 20 | E-mail from Mr. Ashok P. Duggal |
| 21 | to Mr. Donato Aponte-Navedo, et al, |
| 22 | RE: Game Rules for Support, |
| 23 | 04/25/2008. ***            96 |
| 24 | Exhibit 011 |
| 25 | Copy of three (3) page document, |

| Page 6 | |
|---|---|
| 1 | E-mail from Mr. Jorge Ortíz-Soldevila |
| 2 | to Mr. Ashok P. Duggal, et al, |
| 3 | RE: Amgen Pharmaceutical Complaint, |
| 4 | 06/23/2008. |
| 5 | Letter from Mr. Jorge Ortíz-Soldevila |
| 6 | to Mr. Ashok P. Duggal, |
| 7 | RE: Amgen Pharmaceutical Complaint, |
| 8 | 06/23/2008.                98 |
| 9 | Exhibit 012 |
| 10 | Copy of two (2) page document, |
| 11 | E-mail from Mr. Dennis J. López |
| 12 | to Mr. Donato Aponte-Navedo, |
| 13 | RE: Reports, |
| 14 | 05/22/2008. |
| 15 | E-mail from Mr. Ashok P. Duggal |
| 16 | to Mr. Donato Aponte-Navedo, |
| 17 | RE: Reports, |
| 18 | 05/23/2008. ***            107 |
| 19 | Exhibit 013 |
| 20 | Copy of two (2) page document, |
| 21 | E-mail from Mr. Ashok P. Duggal |
| 22 | to Mr. Donato Aponte-Navedo, |
| 23 | RE: Presentation, |
| 24 | 05/30/2008. ***            108 |
| 25 | Exhibit 014 |

| Page 7 | |
|---|---|
| 1 | Copy of two (2) page document, |
| 2 | E-mail from Mr. Ashok P. Duggal |
| 3 | to Mr. Donato Aponte-Navedo, |
| 4 | RE: Chevron Phillips Chemical Puerto Rico, |
| 5 | Cooling Tower, |
| 6 | 06/08/2008. ***            110 |
| 7 | Exhibit 015 |
| 8 | Copy of page one (1) document, |
| 9 | E-mail from Mr. Ashok P. Duggal |
| 10 | to Mr. Donato Aponte-Navedo, |
| 11 | RE: Service Report, |
| 12 | 06/21/2008. |
| 13 | E-mail from Mr. Dennis López |
| 14 | to Mr. Ashok P. Duggal, |
| 15 | RE: Service Report, |
| 16 | 06/21/2008.                111 |
| 17 | Exhibit 016 |
| 18 | Copy of six (6) page document, |
| 19 | Series of e-mail, |
| 20 | RE: Nalco CA Carbonate Fouling Inhibitor for Superfund, |
| 21 | 05/05/2008 - 06/21/2008.         114 |
| 22 | Exhibit 017 |
| 23 | Copy of one (1) page document, |
| 24 | Letter from Mr. Ashok P. Duggal |
| 25 | to Ms. Stephanie Glashagel, |

| Page 8 | |
|---|---|
| 1 | RE: Donato Aponte Termination, |
| 2 | 07/01/2008.                117 |
| 3 | Exhibit 018 |
| 4 | Copy of four (4) page document, |
| 5 | Nalco, |
| 6 | RE: Communicating Our Commitment to Equal |
| 7 | Employment Opportunity, |
| 8 | Date unknown.                120 |
| 9 | Exhibit 019 |
| 10 | Copy of multi-page document, |
| 11 | Civil Case #09-CV-01232(GAG), |
| 12 | RE: Plaintiffs' Answers to Nalco's |
| 13 | First Set of Interrogatories and |
| 14 | Requests for Production of Documents, |
| 15 | 11/02/2009.                146 |
| 16 | ***: DOCUMENT ACCOMPANIED BY CERTIFICATE TRANSLATION. |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

2  (Pages 5 to 8)

Donato Aponte-Navedo

Page 9

1         PROCEEDINGS
2              (9:10 A.M.)
3      ATTORNEY LIES: Let the record show that this is the
4   deposition of Mr. Donato Aponte. It's being taken here
5   pursuant to Notice, in accordance with Federal Rules of
6   Civil Procedure and the Local Rules of the Federal District
7   Court.
8      Ms. Reporter, I think we need to swear in the Witness,
9   as well as the Interpreter.
10     COURT REPORTER: Okay, in Puerto Rico, the Notary is one
11  of the lawyers, so you need one of the lawyers to take the
12  oath of everyone.
13     ATTORNEY NOLLA: Good morning, gentlemen... ladies and
14  gentlemen. My name is Luis Nolla, and I'm acting as the
15  Notary Public, and I will be taking the sworn...
16     COURT REPORTER: The oath.
17     ATTORNEY NOLLA: ... yeah... of the Transcriber and the
18  Deponent and the Interpreter. Please raise your right hand.
19  State your name for the record.
20     COURT REPORTER: Gregoria Echevarría, Court Reporter.
21     ATTORNEY NOLLA: Ms. Echevarría, do you swear to
22  solemnly transcribe all what is said and asked and answered
23  by the Deponent in this deposition?
24     COURT REPORTER: Yes, I do.
25     ATTORNEY NOLLA: So help you God.

Page 10

1      (Whereupon,
2         MS. GREGORIA ECHEVARRÍA
3   was duly sworn as the official Court Reporter of the proceedings
4   held during the act of taking of deposition.)
5      ATTORNEY NOLLA: Now, we're taking the sworn statement
6   (sic) for the Interpreter of the Deponent. Please raise your
7   right hand and state your name for the record.
8      INTERPRETER: Carlos Lao-Dávila.
9      ATTORNEY NOLLA: Mr. Dávila, do you solemnly swear to
10  translate all the questions and answers, the questions by
11  the attorney and the answers by the Deponent, in this
12  deposition?
13     INTERPRETER: I do.
14     ATTORNEY NOLLA: So help you God.
15     (Whereupon,
16        MR. CARLOS LAO-DÁVILA
17  was duly sworn as the official Interpreter of the proceedings
18  held during the act of taking of deposition.)
19     ATTORNEY NOLLA: Please raise your right hand and,
20  Deponent, state your name for the record.
21     DEPONENT: Donato Aponte-Navedo.
22     ATTORNEY NOLLA: Mr. Navedo, do you solemnly swear to
23  tell the truth and nothing but the truth to all questions
24  asked to you in this deposition?
25     DEPONENT: Yes, I swear.

Page 11

1      ATTORNEY NOLLA: So help you God.
2      ATTORNEY MC CARTNEY: May we ask that Mr. Nolla be
3   excused, if there's no objection?
4      ATTORNEY CUADROS-PESQUERA: No objection.
5      ATTORNEY NOLLA: Thank you. Have a good day.
6      (Whereupon,
7          MR. DONATO APONTE-NAVEDO
8   after having been duly sworn, was examined and, through the
9   Interpreter, testified upon his oath as follows:)
10        DIRECT EXAMINATION
11  BY ATTORNEY LIES:
12     Q  Okay, would you state your name for the record, please?
13     A  Donato Aponte-Navedo.
14     Q  Mr. Aponte... is that the correct pronunciation?
15     A  Uh huh.
16     Q  Okay, I'm going to be asking you a series of questions.
17  If, at any time, you don't understand my question, please tell me
18  to rephrase it. Do you understand that?
19     A  Yes.
20     Q  You have to give all your questions (sic) verbally. You
21  can't give an answer with a head nod or a shake because of the
22  Court Reporter. You have to give a verbal answer. Do you
23  understand that?
24     A  Yes, I understand.
25     Q  Okay, if you don't understand a question, tell me and

Page 12

1   I'll rephrase it. Do you understand that?
2      A  Yes, that's right.
3      Q  Are you taking any type of medicine today that would,
4   in any way, affect your ability to hear my question or to answer
5   my question?
6      A  I'm taking medication, but none that would affect. But,
7   at some point, I need to take a break because I'm taking some
8   medication that makes me go to the bathroom. So, at some point, I
9   need to take a break to go to the bathroom.
10     Q  Okay, please tell us when you need to take a break and
11  we'll take a break. Do you understand that?
12     A  Yes.
13     Q  Do you have any mental or emotional condition today
14  that will, in any way, affect your ability to understand my
15  questions and to answer those questions?
16     A  Not right now, no.
17     Q  Okay, all right, have you ever been hospitalized for a
18  mental or emotional condition?
19     A  No.
20     Q  Have you ever been diagnosed by a... well, strike that.
21  Have you ever gone to see a psychiatrist for treatment?
22     A  No.
23     Q  Have you ever gone to see a psychologist for treatment?
24     A  Yes.
25     Q  And, what's the name of the psychologist?

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

## Page 13

1    A   Right now, I don't remember, but I can get the
2    information.
3    Q   Okay, when did you go see the psychologist?
4    A   The beginning of this year.
5    Q   And, are you still seeing the psychologist?
6    A   No.
7    Q   How many times did you see the psychologist?
8    A   I don't remember well, but around six times.
9    Q   Did the psychologist recommend that you receive any
10   type of medication for a mental or emotional condition?
11   A   No.
12   Q   And, are you taking any medication right now for a
13   mental or emotional condition?
14   A   No.
15   Q   Are you taking anti-depressants?
16   A   No.
17   Q   Have you ever attempted suicide?
18   A   Attempted it, no, but thought about it, yes.
19   Q   Okay, when did you think about it?
20   A   I don't understand.
21   Q   You said you thought about suicide. What time or when
22   did you think about suicide?
23   A   From July, 2008 till December, 2008.
24   Q   Have you had any thoughts about suicide since December
25   of 2008?

## Page 14

1    A   No.
2    Q   You started working at Nalco in 1996, didn't you?
3    A   Yes, that's right.
4    Q   Since 1996 until today... or while you were working for
5    Nalco, did you keep a diary of what happened everyday?
6    A   I don't understand.
7    Q   Do you know what a diary is?
8    A   Yes.
9    Q   Did you keep a personal diary of your own for what you
10   did between the time you started working for Nalco and until the
11   end of the time you worked for Nalco?
12   A   A diary, no.
13   Q   Did you keep any notes, during the time that you were
14   working for Nalco, about the things that you were doing on a day
15   to day basis for Nalco?
16   A   With the reports, yes.
17   Q   What do you mean by "reports"?
18   A   We had to do reports, Visit Reports and Service
19   Reports, and that's how you would know what you had done during
20   the day.
21   Q   Okay, all right, have you ever been involved in a
22   lawsuit before?
23   A   No.
24   Q   You were previously involved in a divorce when you were
25   married to Elizabeth Ramírez-Rivera, were you not?

## Page 15

1    A   Yes.
2    Q   Okay, was there a trial in that divorce?
3    A   It was through mutual consent.
4    Q   Did you take... did you give a deposition in that case?
5    A   No.
6    Q   You were also married to Belkis Santiago, were you not?
7    A   That's right.
8    Q   Okay, and that marriage ended in divorce, did it not?
9    A   Yes.
10   Q   Did you testify in that case?
11   A   No.
12   Q   Was that divorce through mutual consent?
13   A   Yes.
14   Q   Have you ever given a deposition like this... oh, wait
15   a minute, she's... wait, wait, wait.
16            PAUSE
17   BY ATTORNEY LIES:
18   Q   Have you ever given a deposition like what we're doing
19   here today?
20   A   No.
21   Q   Did you review any documents to prepare for this
22   deposition?
23   A   Yes.
24   Q   What documents did you review?
25   A   The same documents that Nalco sent as evidence.

## Page 16

1    Q   Okay, well, tell me what type of documents they were?
2    What did... what were the particular documents?
3    A   E-mails, memoranda.
4    Q   When did you review the documents?
5    A   When I was going to do the past deposition.
6    Q   And, have you talked to anybody to prepare for this
7    deposition?
8    A   No.
9    Q   Did you speak to Belkis about the deposition?
10   A   Yes, she had to be in the deposition.
11   Q   Okay, did you talk to Belkis about what happened,
12   during your employment with Nalco, in preparation for this
13   deposition?
14   A   Not really because she already knew everything that was
15   happening.
16   Q   Did you and Belkis come together to this deposition
17   today?
18   A   Yes.
19   Q   Did you drive together?
20   A   Yes, she had an accident and she doesn't have a car.
21   Q   Did you talk to your attorneys in preparation for this
22   deposition?
23   A   Yes.
24   Q   Which attorney did you talk to?
25   A   With Miguel Cuadros.

4  (Pages 13 to 16)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

### Page 17

1    Q    Okay, did you talk to anyone else, besides your
2  Attorney and Belkis, in preparation...
3        ATTORNEY LIES: Is that the right pronunciation, by the
4  way, Belkis?
5        ATTORNEY CUADROS-PESQUERA: Belkis, yes.
6        ATTORNEY LIES: That's right, okay.
7  BY ATTORNEY LIES:
8    Q    Did you speak to anyone else, besides Belkis and your
9  Attorney, in preparation for the deposition?
10   A    No.
11   Q    Okay, what's your date of birth?
12   A    November 17, 1964.
13   Q    Okay, and where were you born?
14   A    In Bayamón, Puerto Rico.
15   Q    Where do you live now?
16   A    I live in Mayaguez.
17   Q    Okay, what is the street address for your home?
18   A    #1911 Lalisa Street, Alturas de Mayaguez, Mayaguez,
19  Puerto Rico, 00682, if I'm not mistaken.
20   Q    And, how long have you lived there?
21   A    It's already been around a year and six months.
22   Q    Is that an apartment, is that a home? What is it?
23   A    I rent a room in a house.
24   Q    And, where does Belkis live?
25   A    Belkis lives in Toa Baja.

### Page 18

1    Q    What's the street address?
2    A    Estancias de la Fuente, #3 Ducal Street. Do you want
3  the complete postal address?
4    Q    Whatever the street address is, that's fine.
5    A    Then that would be Toa Baja.
6    Q    Okay, and does Belkis work?
7    A    Yes.
8    Q    Where does Belkis work?
9    A    The Department of the Family.
10   Q    Is she a nutritionist?
11   A    Yes.
12   Q    Do you know what her job is?
13   A    Well, she's a... I don't remember right now... she's a
14  home economist.
15   Q    How long has she been working for the Department of the
16  Family?
17   A    Around three or four years right now.
18   Q    And, do you have any children with Belkis?
19   A    Yes.
20   Q    What are their names?
21   A    Daniel Alejandro Aponte-Santiago, Alejandra Sofia
22  Aponte-Santiago.
23   Q    And, what are their ages?
24   A    Five and two.
25   Q    For which ones?

### Page 19

1    A    Daniel, five, Alejandra, two.
2    Q    Okay, and do you have any other children?
3    A    Yes, I have another child.
4    Q    What's the name of your other child?
5    A    Armando Iván Aponte-Ramírez.
6    Q    And, who is that child's mother?
7    A    Elizabeth Ramírez.
8    Q    Okay, and how old is Armando?
9    A    Twenty.
10   Q    Do you provide support to him?
11   A    That's right.
12   Q    How much support do you provide to him per month?
13   A    Nine hundred and fifty.
14   Q    Did you ever provide more support than that?
15   A    Yes, when I worked in Nalco.
16   Q    And, how much did you provide in monthly support for
17  that child while you were working for Nalco?
18   A    Thirteen hundred.
19   Q    And, how much monthly support are you providing to
20  Belkis for the two children that you have with her?
21   A    It's six hundred and sixty-eight bi-weekly.
22   Q    Is that per child or both?
23   A    For both.
24   Q    Do you provide any other money to Belkis?
25   A    No, I can't.

### Page 20

1    Q    Did you attend highschool?
2    A    Yes.
3    Q    What highschool?
4    A    José S. Alegría, in Dorado.
5    Q    When did you graduate?
6    A    May, '82.
7    Q    Did you go to college?
8    A    Yes, that's right.
9    Q    Where did you go to college?
10   A    The University of Puerto Rico, Mayaguez Campus.
11   Q    During what years?
12   A    '82 to '88.
13   Q    Did you get a degree?
14   A    Yes, that's right.
15   Q    And, what is the degree?
16   A    Chemical Engineering.
17   Q    Is that a Bachelor of Science?
18   A    Yes, that's right.
19   Q    Okay, did you get any type of a post-graduate degree
20  after you got your under-graduate degree?
21   A    No.
22   Q    Did you ever take any courses in college in Marketing?
23   A    No.
24   Q    Okay, did you ever take any courses in college on
25  commercial sales of products in industry?

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 21

1    A   No.
2    Q   Okay, what was your first job after you graduated from
3    the University of Puerto Rico?
4    A   Data Entry.
5    Q   For what company?
6    A   Utical.
7        COURT REPORTER: Spell it.
8    A   U-T-I-C-A-L.
9        COURT REPORTER: Thank you.
10   BY ATTORNEY LIES:
11   Q   And, what was your job in Data Entry? What did you do?
12   A   It was a health insurance auditing company, and I took
13   the evaluations of the doctors and I entered them into the
14   database, and I prepared the reports.
15   Q   Did you have any responsibility for selling any
16   services on behalf of Utical?
17   A   No.
18   Q   How long were you working for Utical?
19   A   Let me remember. Like a year.
20   Q   And, why did you leave Utical?
21   A   Because I found a job as an Engineer.
22   Q   And, where did you find a job as an Engineer?
23   A   In the Puerto Rico Aqueduct and Sewer Authority, in the
24   Pre-treatment area.
25   Q   Is that otherwise known as PREPA?

Page 22

1    A   No.
2    Q   Okay, all right.
3    A   PRASA.
4    Q   Give me the name then of the second job. I though it
5    might be PREPA. I got ahead of myself. What is it?
6    A   The Puerto Rico Aqueduct and Sewer Authority, PRASA.
7    Q   Okay, I understand. And, what was your job for the
8    Puerto Rico Aqueduct and Sewer Company?
9    A   I worked in the Pre-treatment. My job was to do the
10   inspections in the industry regarding the Discharge Permit. My
11   job was to draft it and prepare it, and give follow-up to the
12   compliance of the permit.
13   Q   So, your job was technical? Is that right?
14   A   Yes.
15   Q   Okay, in the job for the Puerto Rico Aqueduct and Sewer
16   Company, you were not responsible for selling any products or
17   services, were you?
18   A   No.
19   Q   Who was... who did you report to at the Puerto Rico
20   Aqueduct and Sewer Company? Who was your Supervisor?
21   A   Madeline Colón and Carl Axel P. Soderbergh.
22   Q   How do you spell that? The Court Reporter can ask
23   anyway.
24   A   Soderbergh, I don't know.
25   Q   Soderbergh?

Page 23

1        ATTORNEY MC CARTNEY: I know, if you want to know. It's
2    S-O-D-E-R-B-E-R-G-H.
3    BY ATTORNEY LIES:
4    Q   And, Madeline Colón, C-O-L-Ó-N? Is that right?
5    A   Yes.
6    Q   Okay, thank you. And, how long did you work at the
7    Puerto Rico Aqueduct and Sewer Company?
8    A   Around nine months.
9    Q   And, why did you leave the Sewer Company?
10   A   I found a better job.
11   Q   And, what was your next job?
12   A   In PREPA.
13   Q   Okay, just so we have a complete record, what is the
14   full name of that company, for the record?
15   A   The Puerto Rico Electric Power Authority.
16   Q   Okay, and who was your Supervisor there?
17   A   It was Paul Ruíz.
18   Q   C-R-I-S, Cris?
19       INTERPRETER: No, Ruíz, R-U-Í-Z.
20       ATTORNEY LIES: Got you.
21   BY ATTORNEY LIES:
22   Q   And, what were your job duties at the Puerto Rico
23   Electric Company?
24   A   First, I was in the Safety area, and then I was at the
25   Palo Sector plant.

Page 24

1    Q   Could you explain that a little more?
2    A   Which one?
3    Q   I understand safety. What was the other one?
4    A   Okay, I was the Shift Chemist, and I was in charge, in
5    the plant, of the demineralization of water, of the waste water
6    Treatment Plant, of the cooling towers, of the boilers and also
7    the NPDS permits.
8    Q   So, your responsibilities were in a technical nature?
9    Is that right?
10   A   That's correct.
11   Q   Including compliance with the environmental permits to
12   keep operating? Is that right?
13   A   Correct.
14   Q   Okay, so, when you were working for the Puerto Rico
15   Electric Company, you weren't involved with selling any services
16   or products for the Puerto Rico Electric Company, were you?
17   A   No.
18   Q   Did the Puerto Rico Electric Company issue you a
19   company credit card?
20   A   No.
21   Q   While you were working for the Puerto Rico Electric
22   Company, you got to know Mr. Ashok Duggal, did you not?
23   A   Yes.
24   Q   In fact, Mr. Duggal made calls on your company, did he
25   not? He made sales calls on your company, did he not?

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

## Page 25

1    A    Well, he came... well, somebody else came to the Sales
2    area. And, then, when the service was going to be provided, then
3    he came.
4    Q    Let me correct that. Mr. Duggal came to make service
5    calls to see how the products were working? Is that right?
6    A    He came to provide service of some equipment of
7    reversed osmosis, and he was the operator.
8    Q    What do you mean by "he was the operator"?
9    A    Well, the relationship was that he installed the
10   equipment, the equipment for the work that we needed, and he was
11   the person in charge of doing the analysis of the water and
12   providing me.
13        I needed six hundred gallons of reversed osmosis water.
14   And, he was in charge of making sure that the equipment was
15   working properly.
16   Q    While Mr. Duggal visited you at the time you were
17   working for the Puerto Rico Electric Company, did you develop a
18   personal relationship with him?
19   A    Yes.
20   Q    And, at some point in time, you and Mr. Duggal a
21   personal friendship, did you not?
22   A    Yes, that's correct.
23   Q    And, in fact, you invited him to be at your wedding,
24   your second wedding, did you not?
25   A    Yes, that's right.

## Page 26

1    Q    And, you asked him to give a toast at the time that you
2    got married? Is that right?
3    A    Yes.
4    Q    Okay, did he give a toast?
5    A    Yes.
6    Q    Okay, how long did you work for the Puerto Rico
7    Electric Company?
8    A    Around six years.
9    Q    And, what was your final position or title with the
10   Puerto Rico Electric Company?
11   A    Shift Chemist.
12   Q    And, as a Chief (sic) Chemist, you were not responsible
13   for selling any services or products on behalf of PREPA, were
14   you?
15   A    No.
16        ATTORNEY RIESCO: Shift Chemist.
17        ATTORNEY LIES: Oh, I thought he said "Chief Chemist".
18   A    No, no, no.
19        ATTORNEY RIESCO: No, "shift".
20        ATTORNEY LIES: Ah, strike that.
21   BY ATTORNEY LIES:
22   Q    As the Shift Chemist for the Puerto Rico Electric
23   Company, you were not responsible for selling any products or
24   services, were you?
25   A    No.

## Page 27

1    Q    When did you leave the Puerto Rico Electric Company?
2    A    In 1996, in June.
3    Q    And, what was the reason that you left the Puerto Rico
4    Electric Company?
5    A    The reason was that it was taking too much time from my
6    personal life. And, Pablo Santiago was the Manager for Nalco, and
7    he talked to me and made me an offer.
8    Q    What do you mean that the job at the Puerto Rico
9    Electric Company was "taking too much time" from your personal
10   life?
11   A    In my last year in the Puerto Rico Electric Power
12   Authority, if I worked my seven hours and a half and Saturdays
13   and Sundays and the holidays, then, well, I would have worked
14   seventeen months in twelve.
15   Q    So, you were working seven days a week while you were
16   working for the Puerto Rico Electric Company? Is that right?
17   A    Practically.
18   Q    And, for how long were you working seven days a week
19   for the Puerto Rico Electric Company?
20   A    Like a year and a half.
21   Q    And, when you were working for the Puerto Rico Electric
22   Company, were you receiving a salary plus commissions or just a
23   salary?
24   A    A salary, but I would be paid every hour that I'd be
25   working.

## Page 28

1    Q    So, you were paid on an hourly basis? Is that right?
2    A    Correct.
3    Q    Now, you told us a few minutes ago that you knew Pablo
4    Santiago, at Nalco.
5    A    Uh huh.
6    Q    Is that right?
7    A    I met him when he approached me.
8    Q    Okay, and who was Pablo Santiago?
9    A    He was the District Manager in Puerto Rico.
10   Q    For Nalco?
11   A    That's right.
12   Q    Did you meet Mr. Santiago, while you were working for
13   the Puerto Rico Electric Company, in the course of your job
14   duties or did you meet him on a social basis?
15   A    He visited me one day, but I didn't even pay attention
16   to him because I was too busy, and he just left his card. It was
17   later that he called me on the phone.
18   Q    And, did he offer you a job and, if so, what kind of
19   job was it?
20   A    Yes, he offered me a job.
21   Q    And, what type of job was it?
22   A    First, it was as Applications Engineer to then go into
23   the Sales area.
24   Q    And, did you apply for a job at Nalco as an
25   Applications Engineer?

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 29

1    A   Yes, just like everybody would come into the company.
2    Q   Okay, and did you understand that the job duties of an
3  Applications Engineer were technical?
4    A   Yes.
5    Q   An Applications Engineer for Nalco is not involved with
6  Sales, are they?
7    A   Not directly, indirectly, yes.
8    Q   Tell me what his... well, strike that. When did he
9  start working for Nalco?
10   A   You mean me?
11   Q   No, when did you...
12       INTERPRETER LIES: Meaning him. I have to ask the question
13  to you for him.
14   A   June, '96.
15  BY ATTORNEY LIES:
16   Q   And, who hired him? Was it Mr. Santiago?
17   A   Yes, with Gary Grant.
18   Q   And, as an Applications Engineer, was he going to
19  receive a salary, and was he also going to receive commissions?
20  What was his understanding?
21       INTERPRETER: Counsel, the Interpreter needs to remind
22  you to ask the questions directly.
23       ATTORNEY LIES: Okay.
24       INTERPRETER: You're asking them in an...
25       ATTORNEY LIES: Okay.

Page 30

1        INTERPRETER: Directly to him, that's fine.
2  BY ATTORNEY LIES:
3    Q   When you started as an Applications Engineer, were you
4  on a salary?
5    A   Yes.
6    Q   Okay, when you started as an Applications Engineer, you
7  didn't receive a commission, did you?
8    A   No.
9    Q   When you started working at Nalco, who was your
10  Supervisor?
11   A   Pablo Santiago.
12   Q   And, at some point in time, did Mr. Duggal start
13  working at Nalco?
14   A   Yes, two weeks before I did.
15   Q   And, do you know what position Mr. Duggal was hired
16  into?
17   A   If I'm not mistaken, also for Applications Engineer.
18   Q   Was there anyone else that was hired at Nalco around
19  the time that you were hired?
20   A   Yes.
21   Q   Who else was hired?
22   A   Jorge Ortíz-Soldevila.
23   Q   I'm sorry, Jorge Ortíz what?
24   A   Soldevila.
25   Q   And, what was your understanding of the job that Mr.

Page 31

1  Ortíz was hired into?
2    A   For the same one.
3    Q   Was it your understanding that all three of you were
4  going to be reporting to Mr. Santiago?
5    A   Yes.
6    Q   Okay, and did Mr. Santiago tell you what your duties
7  were as an Applications Engineer?
8    A   Yes.
9    Q   And, what was your understanding of what your
10  responsibilities were as an Applications Engineer?
11   A   To visit clients, to check the systems, to do the
12  analyses, any type of troubleshooting that needed to be done, any
13  support that the Sales persons would do.
14       Any special studies that were needed to be done,
15  Applications were the ones who would do that.
16   Q   Was it your understanding that your job was of a
17  technical nature when you were an Applications Engineer?
18   A   Yes.
19   Q   So, you weren't selling any Nalco products at the time
20  that you were an Applications Engineer? Is that correct?
21   A   Not directly, indirectly, yes. If we sold anything, we
22  wouldn't collect commission.
23   Q   And, it was your understanding that Mr. Duggal, as well
24  as Mr. Ortíz, had the same job that you did at that time? Is that
25  correct?

Page 32

1    A   Yes.
2        PAUSE
3  BY ATTORNEY LIES:
4    Q   I've handed you, sir, what's been marked... I guess
5  you'll have to share it with the Interpreter... what's been
6  marked as Exhibit 001 to this deposition.
7        ATTORNEY LIES: And, for the record, it has a title of
8    Employment Agreement, and it's two pages in length.
9  BY ATTORNEY LIES:
10   Q   And, I'm going to ask you whether or not you've ever
11  seen this document before?
12       (Whereupon, the above-referenced document was marked as
13  Exhibit 001 of the deposition.)
14       PAUSE
15       (Revision of document by Deponent.)
16   A   Yes.
17  BY ATTORNEY LIES:
18   Q   Okay, and did you read the document before you signed
19  it?
20   A   Yes, that's correct.
21   Q   And, in fact, is your signature on the document?
22   A   That's right.
23   Q   On the second page of the document? Is that correct?
24   A   Yes, that's right.
25   Q   All right, and can... would you please read for me the

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)          1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Page 33

1  paragraph that's right above where your signature is, where it
2  starts "In Witness Whereof..."? Please read that out loud on the
3  record.
4      A   "In Witness Whereof: Employee has read, understood and
5      has duly executed this instrument and Nalco has caused this
6      instrument to be duly executed by its authorized officer."
7      Q   Okay, and did you, sir, read that paragraph before you
8  signed the document, on June 10th of 1996?
9      A   Yes.
10     Q   Okay, and did you read paragraph number fifteen, on
11 page two, before you signed the agreement?
12     A   Yes.
13     Q   Okay, and can you read paragraph fifteen for us into
14 the record?
15     A   "This Agreement and its terms are applicable from the
16     date Employee's employment with Nalco began. It is
17     understood and agreed to by both Employee and Nalco that
18     this Agreement does not create or provide for any period of
19     employment of Employee by Nalco, that said employment of
20     Employee shall be at-will and said employment can be
21     terminated with or without cause, and with or without
22     notice, at any time by either Employee or Nalco."
23     Q   Thank you. And, did you meet with Mr. Santiago, on June
24 10th of 1996, when you signed Exhibit 001? Is that when you met
25 with him and you signed it that day?

Page 34

1      A   Yes.
2      Q   Okay, and you said that Mr. Duggal was hired as an
3  Applications Engineer around the same time you were, two weeks
4  before. Is that correct?
5      A   Yes.
6      Q   Do you know what Mr. Duggal's national origin is or his
7  nationality is?
8      A   Yes.
9      Q   And, what is it?
10     A   Canadian.
11     Q   Do you know where his mother was born?
12     A   If I'm not mistaken, in Holland.
13     Q   Okay, and do you know where his father was born?
14     A   Yes, if I'm not mistaken, in India.
15     Q   Okay, and do you know what the national origin or
16 nationality of Mr. Jorge Ortíz is?
17     A   Yes.
18     Q   And, what is it?
19     A   Puerto Rico.
20     Q   Okay, and do you know what the national origin or
21 nationality of Mr. Santiago is or was?
22     A   Yes.
23     Q   What was it?
24     A   Puerto Rico.
25     Q   When you were hired as an Applications Engineer, who

Page 35

1  were the other Applications Engineers?
2      A   Ashok Duggal, Jorge Ortíz and I.
3      Q   Okay, there were no other Applications Engineers?
4      A   No.
5      Q   At the time you were hired, were there any District
6  Representatives?
7      A   Yes.
8      Q   And, what were their names?
9      A   Rolando Pérez, Gordon Martin. There was another one who
10 was Cuban. I don't remember the name.
11     Q   Okay, and what was the nationality or national origin
12 of Mr. Pérez?
13     A   Puerto Rico.
14     Q   Okay, and what was the national origin or nationality
15 of Mr. Gordon Martin?
16     A   He was from the United States. José Sánchez, that was
17 the other one.
18     Q   And, what is the national origin or nationality of Mr.
19 José Sánchez?
20     A   José Sánchez, Cuban.
21     Q   What is your understanding of what Mr. Duggal's
22 educational background is?
23     A   Chemist.
24     Q   So, is that your understanding that that's a technical
25 background?

Page 36

1      A   Yes.
2      Q   And, what was the educational background of Jorge
3  Ortíz, if you know?
4      A   Chemical Engineer.
5      Q   Is that your understanding that that is a technical
6  educational background?
7      A   Yes, that's correct.
8      Q   Do you need a break?
9      A   Yes, five minutes.
10     Q   Oh, you just have to tell me. That's all. Any time you
11 want to take a break, tell your Attorney, then he'll tell us...
12 any time.
13         ATTORNEY LIES: Okay, let's take a break.
14             (Off the record.)
15             (Brief recess.)
16             (Back on the record.)
17         ATTORNEY LIES: Back on the record.
18 BY ATTORNEY LIES:
19     Q   Before we took the break, I asked you what your first
20 job was working for Nalco, and you said it was an Applications
21 Engineer II. Is that right?
22     A   Applications Engineer, yes, correct. Well, II, I don't
23 remember right now because there were three levels, and I don't
24 remember if it was I, II, III or III, II, I. So, I don't remember
25 right now.

9 (Pages 33 to 36)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 37

1     Q   You have in front of you what's been marked as Exhibit
2  002.
3         ATTORNEY LIES: And, for the record, it is a three page
4     document. The first pages bears the heading "Job Profile",
5     for the title of Applications Engineer II, that reports to
6     the District Manager.
7         (Whereupon, the above-referenced document was marked as
8  Exhibit 002 of the deposition.)
9  BY ATTORNEY LIES:
10    Q   Do you have that in front of you, sir?
11    A   Yes, I do.
12    Q   Okay, and, if you don't remember whether you started as
13 an Applications Engineer II or III, would you at least look at
14 the document and tell me whether or not the job duties that you
15 see on here are the job duties you understood you would be
16 performing as an Applications Engineer, whether it was a II or a
17 III?
18    A   I'm going to look at them.
19    Q   Please do.
20              PAUSE
21         (Revision of document by Deponent.)
22    A   Yes.
23 BY ATTORNEY LIES:
24    Q   Do you recall receiving a job description like this at
25 the time that you started your job as an Applications Engineer?

Page 38

1     A   Not this exact same one, but something similar.
2     Q   I'm going to hand you what's been marked as Exhibit
3  003.
4         ATTORNEY LIES: And, for the record, it's a one page
5     document, and it bears the heading "Primary Career Path:
6     Sales, Field Service and Industry Support".
7         (Whereupon, the above-referenced document was marked as
8  Exhibit 003 of the deposition.)
9  BY ATTORNEY LIES:
10    Q   Do you see that, sir?
11    A   Yes, I see it.
12    Q   Okay, and when did you first see an Organization Chart
13 like this while you were working for the company?
14    A   Like this one, I never saw it.
15    Q   Okay, have you ever seen Organization Chart for the
16 organization structure at Nalco that you were working for?
17    A   For the District, yes.
18    Q   If we look at Exhibit 003, we see positions here for
19 Applications Engineers, do we not?
20    A   Yes.
21    Q   Okay, was it your understanding that employees who
22 started working as Applications Engineers, as they became
23 Engineer I, II and III, would, at some point in time, then be
24 able to move over to become a District Representative?
25    A   Yes, that's correct. That's the idea.

Page 39

1     Q   Okay, and the District Representatives were the
2  positions where the employee who was a District Representative
3  would be responsible not only for providing technical assistance,
4  but also sales of company products to the customers? Is that
5  correct?
6     A   Yes, that's correct.
7     Q   And, you, as you sit here today, don't recall whether
8  you started as an Application Engineer III or II? Is that
9  correct?
10    A   That's correct.
11    Q   Okay, and, as an Application Engineer, you didn't
12 receive any commissions, did you?
13    A   No.
14    Q   Okay, were you provided with a company car?
15    A   Yes, that's correct.
16    Q   Okay, did you... were you provided with a company
17 credit card?
18    A   No.
19    Q   At some point in time, did the company provide you with
20 a company credit card?
21    A   Yes.
22    Q   Was that when you became a District Representative?
23    A   No.
24    Q   When did you receive a company credit card?
25    A   If I'm not mistaken, that was when Frank López was

Page 40

1  District Manager. It's close to the beginning of 2000.
2     Q   All right, now, when you started working as an
3  Application Engineer, you said that the District Manager was
4  Frank López. Is that right or was that Mr. Santiago?
5     A   Santiago.
6     Q   Okay, and what was your understanding of what Mr.
7  Santiago's responsibilities were?
8     A   Well, according to what I understood, the District
9  Manager was in charge of all the accounts and the personnel of
10 the District.
11    Q   Okay, and how... what was included in the District,
12 what countries or what areas?
13    A   If I'm not mistaken, at that time, it was the Dominican
14 Republic and Puerto Rico.
15    Q   Did that ever change?
16    A   Yes.
17    Q   When did it change?
18    A   The specific time I don't remember, but, at a certain
19 point, the Dominican Republic was separated.
20    Q   Who was the District Manager at the time that the
21 Dominican Republic was separated?
22    A   If I'm not mistaken, Frank López.
23    Q   And, when you started working for the company and Mr.
24 Santiago was the District Manager, who was Mr. Santiago's boss?
25    A   Gary Grant.

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                          1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 41

1  Q   And, what was his title?

2  A   If I'm not mistaken, it was Sales Manager.

3  Q   Looking at Exhibit 003, do you see that position on

4  there?

5  A   Yes.

6  Q   Okay, is that above the Area Manager and the District

7  Manager?

8  A   Yes.

9  Q   And, what was your understanding of what Gary Grant was

10  responsible for?

11  A   If I'm not mistaken, he had Jamaica and the Caribbean,

12  including Trinidad and Tobago. And, I think there was also

13  somebody in Central America.

14  Q   All right, and how long did Mr. Grant stay in that

15  position?

16  A   '96 like up to '98. Then, he was moved... well, Puerto

17  Rico was moved into another area.

18  Q   And, who took Mr. Grant's position?

19  A   José Medina.

20  Q   And, what is Mr. Medina's nationality or national

21  origin?

22  A   Venezuelan.

23  Q   After... excuse me... how long was José Medina in that

24  position?

25  A   Like two years.

Page 42

1  Q   And, who took Mr. Medina's position?

2  A   In 2000, there was a merger with Calgon, and we were

3  reporting directly to José Serrano.

4  Q   Okay, what did you say that gentleman's name was, José

5  what?

6  A   José Serrano.

7  Q   And, what was Mr. Serrano's title? Was it the same or

8  did it change?

9  A   Well, the title I don't remember right now, but he was

10  the boss of all the northern part of Latin America. He was in

11  Brazil.

12  Q   Okay, was he a General Manager?

13  A   It could be, yes.

14  Q   Did you ever meet him?

15  A   Yes.

16  Q   How many times?

17  A   Like maybe ten, twelve.

18  Q   And, when did you meet him, over what period of time?

19  A   From 2000 to 2008.

20  Q   Okay, was he the General Manager at the time you were

21  terminated?

22  A   Yes.

23  Q   Did you ever speak to Mr. Serrano about your

24  termination?

25  A   No, I did not have the opportunity.

Page 43

1  Q   You did not report to Mr. Serrano on a daily basis, did

2  you?

3  A   No.

4  Q   You reported to Mr. ... at the time of your

5  termination, were you reporting to Mr. Duggal on a daily basis?

6  A   Yes.

7  Q   Where were Mr. Serrano's offices?

8  A   Brazil.

9  Q   Did you ever go to his offices, in Brazil?

10  A   No.

11  Q   When you met with Mr. Serrano the ten to twelve times

12  that you said you met with him, where were these meetings?

13  A   In Puerto Rico, in Mexico, in the Dominican Republic

14  and in Columbia.

15  Q   And, when you met with Mr. Serrano, was this at a Sales

16  Meeting?

17  A   Sales Meetings and District Meetings and trainings,

18  yes.

19  Q   Do you have any notes of any meetings that you might

20  have had with Mr. Serrano?

21  A   No.

22  Q   Did you ever send any e-mails to Mr. Serrano?

23  A   No, you have to follow the chain of command.

24  Q   And, Mr. Serrano, what is his national origin or

25  nationality, if you know?

Page 44

1  A   Mexican.

2  Q   Do you know what his educational background is?

3  A   If I'm not mistaken, it's in Economy or Business. I

4  mean it's not something technical.

5  Q   Do you know how old Mr. Serrano was at the time of your

6  termination?

7  A   No.

8  Q   How old was Gary Grant? When you were working with him,

9  how old was he?

10  A   He was older than me, but I don't know his age.

11  Q   So, he was older than forty?

12  A   Close.

13  Q   When did you... well, strike that. How long were you an

14  Applications Engineer?

15  A   When I began in Nalco?

16  Q   How many... after you became an Engineer, Applications

17  Engineer at Nalco, how long did you stay as an Applications

18  Engineer?

19  A   It was like a year.

20  Q   And, what was your next position?

21  A   District Representative.

22  Q   So, would you have become a District Representative

23  sometime around 1997 or 1998?

24  A   Yes, that's correct.

25  Q   And, did you move up to the position of a District

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 45

1    Representative III from being an Applications Engineer?
2       A   Yes.
3       Q   I've handed you what's been marked as Exhibit 004.
4          ATTORNEY LIES: For the record, it's a three page
5    document, a Job Profile for District Representative III.
6          (Whereupon, the above-referenced document was marked as
7    Exhibit 004 of the deposition.)
8    BY ATTORNEY LIES:
9       Q   And, I ask you, sir, whether or not you have ever seen
10   a job description for the position of District Representative
11   III?
12                  PAUSE
13          (Revision of document by Deponent.)
14      A   Well, when I was moved to District Representative III,
15   I wasn't given one of these sheets, but this what's done.
16   BY ATTORNEY LIES:
17      Q   Now, in the position of District Representative, under
18   the General Summary, it says "Ensures order and revenue growth of
19   Company products and services to assigned customer and prospect
20   accounts." Do you see that?
21      A   Yes.
22      Q   Okay, so you were now responsible for selling products
23   and services of the company. Is that correct?
24      A   Yes, that's correct.
25      Q   Okay, and, if we look at... under paragraph number two,

Page 46

1    sub-part one, it says "Achieves annual sales targets by working
2    with the District Manager and senior District Sales personnel to
3    establish selling strategy and tactics.". Do you see that?
4       A   Yes.
5       Q   So, you were now going to be given sales targets by the
6    District Manager that you were responsible for meeting as part of
7    your job? Is that right?
8       A   That's correct.
9       Q   Okay, and you were also responsible to call on existing
10   and potential sales customers, as we see in the third line of
11   Exhibit 004? Is that right?
12      A   Yes.
13      Q   And, in paragraph number two, you were supposed to meet
14   or exceed "the required minimum daily sales calls as set by the
15   assigned group." Do you see that?
16      A   Yes.
17      Q   And, so you were given... when you became a District
18   Sales Representative, you were given certain accounts that you
19   were supposed to be calling on and making minimum numbers of
20   daily sales calls? Is that right?
21      A   That's correct.
22      Q   Okay, so, when you became a District Sales
23   Representative in sometime around 1997 or 1998, what accounts
24   were you assigned at that time?
25      A   At that time, I had two accounts.

Page 47

1       Q   And, what were the names of the two accounts?
2       A   Pfizer, Barceloneta, and Abbott.
3       Q   Okay, and, as part of your job as a District
4    Representative, were you supposed to make calls on Pfizer and
5    Abbott?
6       A   Yes, that's correct.
7       Q   And, when you became a Sales Representative, did the
8    company provide you with a car? I meant District Representative.
9    That was my mistake.
10         When you became a District Representative, did the
11   company provide you with a car?
12      A   Yes, the same one I had.
13      Q   Okay, and was it at that point in time that you also
14   had a company credit card?
15      A   No.
16         When did you get a company credit card?
17      A   It was close to early 2000. It was in early 2000.
18      Q   And, who was the company... strike that. Who did you
19   make sales calls on at Pfizer?
20      A   No, I don't understand the question.
21      Q   When you went to make a sales call at Pfizer, who did
22   you meet at Pfizer?
23      A   Utilities Supervisors, Utilities Engineers, Engineering
24   Managers.
25      Q   Do you remember the name of the... strike that. Was

Page 48

1    there a client or company contact at Pfizer that you were
2    supposed to be working with directly, since that was now one of
3    your accounts?
4       A   Yes, but, right now, I don't remember the name.
5       Q   What was the person's job title?
6       A   There were two, the Utilities Engineer and the
7    Utilities Supervisor.
8       Q   Now, when you went to Abbott, who was the person you
9    were supposed to meet there?
10      A   It was the same, the Utilities Supervisor and the
11   Utilities Engineer and the Utilities Manager.
12      Q   Okay, do you remember the name of the primary contact
13   at abbot that you were supposed to meet with when you went to
14   call on Abbott?
15      A   Yes.
16      Q   And, what was that individual's name?
17      A   Efraín Ruíz, Utilities Manager.
18      Q   Okay, now, when you were... became a District
19   Representative... we just talked about annual sales targets...
20   who provided you with the sales targets?
21      A   Pablo Santiago.
22      Q   And, was there a range of the percent for sales targets
23   that you were told you had to reach? Was it somewhere between
24   eleven and thirteen percent per year for a sales target?
25      A   I really don't remember well.

12 (Pages 45 to 48)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 49

1    Q   Okay, what were... what sales targets do you remember
2    that you were supposed to meet when you were a District
3    Representative, what increase in the sales per year?
4    A   During... while I was District Representative or during
5    this time?
6    A   While you were a District Representative, when you were
7    starting out as a District Representative, in 1997 or 1998, as
8    you told us, do you remember what your sales targets were that
9    were given to you at that time?
10   A   At that time, it was something like three hundred and
11   fifty thousand dollars.
12   Q   Please explain what you mean by "three hundred and
13   fifty thousand"? That was the total amount of your sales, that
14   was the increase you were supposed to have? What does three
15   hundred and fifty thousand dlls mean?
16   A   Those are the total sales.
17   Q   And, were you supposed to receive a commission then
18   based on those total sales?
19   A   Yes.
20   Q   And, what was the percent that you were supposed to
21   receive on the total sales?
22   A   Well, there was a formula for that. It was two point
23   five percent for ninety percent, four percent for a hundred
24   percent and, from a hundred to a hundred and ten, it was five,
25   and, from a hundred ten on, it was seven.

Page 50

1    Q   So, is it your testimony that you were supposed to
2    receive a percent of seven percent on the three hundred and fifty
3    thousand? Please explain.
4    A   No, it wasn't seven percent. It was two point five of
5    the ninety percent of the three hundred and fifty thousand.
6    Q   Now, was another part of your job as a District
7    Sales... as a District Representative, I should say, to maintain
8    the client relationship so that the client would not go to a
9    competitor?
10   A   Yes, that's correct.
11   Q   And, the year 2000, is that when Abbott stopped buying
12   goods and services from the company and went to another
13   competitor?
14   A   No.
15   Q   When did Abbott stop being a customer of Nalco?
16   A   If I'm not mistaken, in '99.
17   Q   And, in 1999, you were the District Representative for
18   Abbott. Is that correct?
19   A   Yes, that's correct.
20   Q   And, in 2000, were you put...
21   A   Abbott changed companies because it was a corporate
22   decision that all the plants were going to switch companies, and
23   the first one was Abbott/Chicago, which was in Nalco's hands, and
24   the last one was Abbott/Puerto Rico.
25   Q   But, in 1999, Abbott no longer was a client of Nalco.

Page 51

1    Is that correct?
2    A   Correct.
3    Q   Okay, now, at some point in time, did you move back
4    into the position of Applications Engineer?
5    A   Yes, that's correct.
6    Q   And, was that in 2000?
7    A   Yes, that's correct.
8    Q   So, you moved back into Applications Engineer, and you
9    weren't responsible for selling or meeting sales targets, were
10   you?
11   A   Yes, that's correct.
12   Q   Okay, and you weren't getting commissions at that point
13   in time when you moved back to Applications Engineer. Is that
14   correct?
15   A   Correct.
16   Q   So, your job went back to being a technical job in
17   advising the company regarding the equipment and the use of the
18   company's products? Is that correct?
19   A   Yes, that's correct.
20   Q   And, who was the District Manager at that time?
21   A   We had two.
22   Q   And, what were the names of the District Managers?
23   A   Pablo Santiago and Luis Lugo. That's the time when the
24   merger with Calgon occurred. Luis Lugo and Pablo Santiago spoke
25   to me because, at that time, there was a lot of salespersons, but

Page 52

1    not a lot of people who provided service.
2    Q   So, when you became a... went back to becoming an
3    Applications Engineer, was the amount of your compensation
4    reduced?
5    A   Yes, I didn't have the commissions.
6    Q   Did you still have the car?
7    A   Yes.
8    Q   Could we have the spelling of Luis, his last name?
9    A   Lugo, L-U-G-O.
10   Q   And, do you know what Mr. Lugo's nationality or
11   national origin is?
12   A   Yes.
13   Q   And, what was it?
14   A   Puerto Rico.
15   Q   How long did you have two District Managers?
16   A   For about four or five months. Then, Nalco fired Pablo
17   Santiago and two of the senior salespersons.
18   Q   Okay, and who were those senior salespersons?
19   A   Rolando Pérez, and the other person I don't remember
20   the name right now.
21   Q   And, how old was Mr. Pérez, if you know, at the time of
22   the termination?
23   A   He was in his forties.
24   Q   Okay, now, after Mr. Santiago was no longer your
25   District Manager, did Mr. Lugo stay as the District Manager?

13  (Pages 49 to 52)

Electronically signed by Gregoria Echevarría (401-409-341-5259)        1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 53

1    A   Yes.
2    Q   And, how long was Mr. Lugo the District Manager?
3    A   Three or four years.
4    Q   So, that would take us up to approximately 2004. Is
5    that correct?
6    A   Yes.
7    Q   And, who became the District Manager after Mr. Lugo?
8    A   Frank López.
9    Q   And, how long was Mr. López the District Manager?
10   A   Two or three years.
11   Q   So, that would take us to 2007?
12   A   Approximately. I remember the name of the other person
13   who was fired.
14   Q   What was the name of the other person?
15   A   If I'm not mistaken, Raúl Avilés.
16   Q   And, what was Mr. Avilés' nationality or national
17   origin, if you know?
18   A   I think he was Puerto Rican.
19   Q   Are you sure of that?
20   A   I'm not sure.
21   Q   Okay, I can't recall if I asked you this, so I'm just
22   going to ask you again. What was Mr. López' national origin?
23   A   You hadn't asked, and he was Cuban.
24   Q   Okay, now, when you were a District Representative and
25   you went out to call on a client, tell us what you would do when

Page 54

1    you would go out for a typical call? What would happen?
2    A   Usually, you had a day to do visits during the week.
3    So, you would visit the plant. And, I had the custom of, usually
4    before visiting... going up to the client, I would do a walk-
5    through through the equipment and utilities.
6        Then, I would tell the contact or contacts that were in
7    the plant. I would go and check on the equipment and do analyses,
8    if I had to do so, calibrations.
9        And, after I had all the details, then I would hold a
10   small meeting with the contact or the contacts or whichever
11   person was designated by the contact, and I would discuss the
12   findings and any corrective action that needed to be taken, and
13   the report would be discussed.
14       A report had to be made. And, for certain clients,
15   there was a log in which the findings, the analyses and the
16   recommendations had to be placed.
17   Q   Now, when you met with the client contact from time to
18   time, did sometimes they ask you for questions about company
19   products and for you to send information on company
20   products?
21   A   Yes.
22   Q   Okay, and, sometimes when you met with the company
23   representatives or the company contacts, did they give you
24   complaints that they might have about the company's services or
25   the products?

Page 55

1    A   It wasn't common, but sometimes, yes.
2    Q   Okay, now you mentioned that clients sometimes had
3    questions about products.
4        Did clients sometimes send you e-mails asking for
5    information about Nalco products and services?
6    A   Yes, sometimes, yes.
7    Q   And, in our job as a District Representative, it was
8    your responsibility to respond to those e-mails? Isn't that true?
9    A   Yes.
10   Q   Now, you mentioned a few moments ago that, after you
11   made a visit, you were also discussing with the contact a report.
12   What do you mean by a "report"? A report on what?
13   A   There were different types of reports. Each system had
14   a different report.
15       For boilers, there was a report made for the boiler
16   parameters which included analyses, explanations and actions to
17   be taken or which were taken.
18   Q   And, what did you... what were you told by the company
19   that... strike that.
20       How soon were you supposed to prepare these reports
21   after you made the visit to the client?
22   A   Well, many times that was supposed to be arranged with
23   the client. In some, once you would place it in the log, that was
24   instantaneous. On other occasions, after discussing the report,
25   that would be one, two days or maybe up to a week.

Page 56

1    Q   And, it was your understanding that you were supposed
2    to send these reports back to the client contact that you had met
3    with? Is that correct?
4    A   Yes, or to the person that the contact had designated.
5    Many times it would be sent to the Group Leader of Utilities and
6    the Supervisors.
7    Q   Who was the District Manager at that time that you were
8    terminated?
9    A   There was really no District Manager. There was an Area
10   Manager.
11   Q   Okay, who was the Area Manager?
12   A   Duggal.
13   Q   When did Mr. Duggal become the Area Manager?
14   A   Well, I'm not sure, but it was close to 2006, 2007.
15   Q   So, he succeeded... who did Mr. Duggal take over from?
16   I want to make sure I understand all the people that were in
17   these positions. Who did Mr. Duggal take over from?
18   A   Okay, Frank López took over for Luis Lugo. Then, Frank
19   López was taken out of the area and Pablo Santiago came in...
20   excuse me... Ashok Duggal.
21   Q   So, Mr. Duggal assumed the job after Mr. López? Is that
22   correct?
23   A   Yes.
24   Q   And, when Mr. Duggal was the Area Manager, who was the
25   Sales Manager?

14 (Pages 53 to 56)

Page 57

1       INTERPRETER: The Interpreter needs repetition.
2       ATTORNEY LIES: I'm sorry.
3   BY ATTORNEY LIES:
4       Q   When Mr. ... strike that. When Mr. Duggal took over as
5   the Area Manager, who was the District Manager?
6       A   If I'm not mistaken, Frank López was already out, so
7   there wasn't anybody.
8       Q   Who was the Sales Manager?
9       A   Jorge Castillo.
10      Q   When did Jorge Castillo become the Sales Manager?
11      A   In 2001, 2002.
12      Q   And, do you know what Mr. Castillo's educational
13  background was?
14      A   If I'm not mistaken, he's a Chemical Engineer.
15      Q   And, what is his nationality or national origin?
16      A   Columbian.
17      Q   When did you first meet Mr. Castillo?
18      A   It was in the offices that there were in Caparra, the
19  offices that belonged to Calgon and became Nalco's.
20      Q   Did you have a conversation with him when you met him
21  for the first time?
22      A   He held a meeting, and all the work group was in that
23  meeting.
24      Q   Did you have a conversation with him?
25      A   He spoke to everybody.

Page 58

1       Q   Okay, did you have a conversation one-on-one with Mr.
2   Castillo?
3       A   Yes.
4       Q   And, what did you say to Mr. Castillo and what did he
5   say to you?
6       A   Everything, we talked about everything.
7       Q   What does "everything" mean?
8       A   From personnel to work. We discussed clients and
9   prospects and the work area. Sometimes we would argue on
10  different types of business missions.
11          On the personal side, he would ask me about my family.
12  On several occasions, we all had dinner with our families.
13          On other occasions, he also was looking for a place to
14  go dancing.
15      Q   I was asking... and maybe my question wasn't clear...
16  how long was your first conversation with him when you met him
17  the first time?
18      A   The first one?
19      Q   Yes. How long did you talk to him one-on-one?
20      A   The first time was the first day, and it was maybe ten
21  minutes.
22      Q   Okay.
23      A   He wanted to meet each one of us separately.
24      Q   When was the next time you met with him?
25      A   He began to come practically every two or three months

Page 59

1   to Puerto Rico.
2       ATTORNEY CUADROS-PESQUERA: Counsel, if I may interrupt?
3       ATTORNEY LIES: Yeah, you want to take a break?
4       ATTORNEY CUADROS-PESQUERA: No, the word "discutiamos"
5   has been translated as "argue". It could be "discussed". I'm
6   not sure whether the translation is appropriate.
7       ATTORNEY LIES: Okay, well, I was just trying to find
8   out what happened in the first conversation anyway. It was
9   only ten minutes.
10      ATTORNEY CUADROS-PESQUERA: Okay.
11      ATTORNEY LIES: I'm trying to get started somewhere.
12  Let's take a five minute break. Okay? Can we do that?
13      And, then what time do you want to break for lunch,
14  twelve, thirty, something like that? And then, we'll go for
15  another hour, and then take a break.
16      I know you have to eat, probably have to eat. And, then
17  come back at... what... one... take forty-five minutes for
18  lunch or is that too short? Take a half
19  hour, forty-five minutes, whatever people want to do?
20      ATTORNEY CUADROS-PESQUERA: What's available for lunch
21  around here?
22          (Off the record.)
23          (Brief recess.)
24          (Back on the record.)
25      ATTORNEY LIES: Okay, let's go back on the record.

Page 60

1   BY ATTORNEY LIES:
2       Q   You said that Mr. Castillo and you initially met for
3   about ten minutes the first time you met him.
4       A   Uh huh.
5       Q   And, it was a discussion with the entire sales
6   organization. Is that correct?
7       A   Correct... well, he met with each one of us for ten
8   minutes each. With the whole organization, he held a meeting that
9   lasted about three or four hours.
10      Q   Let's turn to the meeting that lasted three or four
11  hours.
12          During the course of the meeting for three or four
13  hours, did Mr. Castillo tell you that he wanted to have all of
14  the people in the organization working together as a team?
15      A   Yes.
16      Q   And, at that meeting, did you understand that to mean
17  that Mr. Castillo wanted you all to support each other in terms
18  of trying to develop Nalco sales of products and services?
19      A   Yes, that was the way to work.
20      Q   And, did Mr. Castillo also tell you that he wanted to
21  make sure that all the people in the organization were providing
22  the best technical services to all of the clients of Nalco?
23      A   Yes, that's correct.
24      Q   And, did Mr. Castillo tell the group and was it your
25  understanding that he told the group to do everything you could

15 (Pages 57 to 60)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                          1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 61

1    to support each other so that Nalco would not lose any clients?
2       A   Yes.
3       Q   And, was that your understanding of what your
4    responsibilities were in your job, to provide service to the
5    team, to put in as much time as was necessary, and to try to keep
6    the company from losing clients?
7       A   Yes.
8       Q   Okay, now you worked for Nalco from 1996 to 2008. Is
9    that correct?
10      A   Yes.
11      Q   And, Nalco was in the industry of... was in the
12   business of selling chemicals and providing technical services to
13   its clients during that time? Is that right?
14      A   Yes, to sell solutions.
15      Q   And, the industry that Nalco was in is a very
16   competitive industry with other companies, isn't it?
17      A   Yes.
18      Q   Okay, what were the names of some of the other
19   competitors of Nalco during the time period that you were working
20   for Nalco, from 1996 to 2008?
21      A   Calgon, Chemtreat, Besst, B-E-S-S-T, if I'm not
22   mistaken, and a little bit more. I don't remember the others.
23   Those are the larger ones.
24      Q   Okay, and was it your understanding, during the time
25   you were working for Nalco, that these companies that you've just

Page 62

1    named would try to take clients away from Nalco by providing
2    better services to... or offering better services to the Nalco
3    clients?
4       A   Yes, but the bigger problem was a lower price.
5       Q   When a client of Nalco comes to work for Nalco (sic),
6    the relationship is based on the price of the product, but also
7    the value of the services. Isn't that true?
8       A   Service, equipment, yes.
9       Q   And, was it your understanding, during the time that
10   you were working with Nalco, that it was a constant part of your
11   job responsibilities to provide services and equipment to the
12   clients so that the clients would not leave Nalco and go to
13   another company?
14      A   Yes.
15      Q   And, in 2007, can you tell us the names of the clients
16   of Nalco that you were responsible for in your job position?
17      A   Lily, P.R. 2, Lily, P.R. 5, Lily, P.R. 6, Smurfit
18   Stone, Amgen, Warner Chilcott, Baxter, Guayama, Chevron Phillips.
19   If I'm not mistaken, those were it, from what I can remember.
20      Q   Okay, and, in 2007, what was your job title with the
21   company? What was your position?
22      A   District Representative.
23      Q   And, was that III or II?
24      A   I think it was III.
25      Q   And, as we looked at the exhibit before, in 2007, were

Page 63

1    your job duties the same as we see in Exhibit 004?
2       A   Yes.
3       Q   In 2007, do you remember what your sales target was,
4    the percent of increase?
5       A   I'm not sure, but I think it was like ten percent.
6       Q   Would eleven to twelve percent refresh your
7    recollection?
8       A   NO AUDIBLE RESPONSE FROM DEPONENT.
9           ATTORNEY LIES: I'm sorry, did he answer?
10      A   No, no.
11          INTERPRETER: No, he hasn't answered.
12      A   It must have been close to that, yes.
13   BY ATTORNEY LIES:
14      Q   Close to eleven to twelve percent?
15      A   Yes.
16      Q   And, is it your understanding that everyone who was
17   involved with sales had approximately the same sales target,
18   eleven to twelve percent, in 2007?
19      A   I'm not sure that they did have it in 2007. I'm not
20   sure.
21      Q   But, it's his (sic) recollection that his sales target
22   was eleven to twelve percent? Strike that.
23          But, it's your recollection that your sales target was
24   approximately eleven to twelve percent? Is that correct?
25      A   Yes.

Page 64

1       Q   Okay, and who gave you that sales goal?
2       A   That, the District Manager.
3       Q   And, that was Mr. Duggal?
4       A   The one in charge, yes.
5       Q   You told us earlier that you were terminated by the
6    company. Is that correct?
7       A   Yes.
8       Q   What day were you terminated?
9       A   July 23, 2008.
10      Q   And, where did the termination take place?
11      A   In Caguas.
12      Q   When you say "Caguas", do you mean the company offices?
13      A   Yes, that's correct.
14      Q   And, what time of the day were you terminated?
15      A   It was in the morning, according to my best
16   recollection. That day, if it was up to me, I would erase it.
17      Q   Who terminated you?
18      A   Duggal and Jorge Ortíz.
19      Q   Okay, did the three of you meet?
20      A   Yes.
21      Q   Okay, was it in Mr. Duggal's office?
22      A   Yes.
23      Q   Okay, and how long was the meeting in which you were
24   told you were terminated?
25      A   It was five or ten minutes.

16 (Pages 61 to 64)

Donato Aponte-Navedo

Page 65

1    Q   And, as best you can recall, what did Mr. Duggal say,
2  what did Mr. Ortíz say, and what did you say at that meeting?
3    A   Well...
4    Q   If we could do this, to make it easier, if you would
5  tell me, sir, what Mr. Duggal said, what you said, and what Mr.
6  Ortíz said, and tell the Interpreter that, so we can have the
7  conversation as each person is talking. That might help.
8        ATTORNEY LIES: Counsel, you don't have a problem with
9  that, do you?
10       ATTORNEY CUADROS-PESQUERA: No problem.
11       ATTORNEY LIES: That might be the easiest way for us to
12  get the conversation. I'm not trying to cut the Reporter
13  (sic) off, and you can certainly tell me what he just said.
14       But, typically, it's "I said this.", "He said this.",
15  "I said this.", "He said this.", so that we have the
16  conversation. Whatever is easier for you, sir.
17    A   That's how I was going to do it.
18  BY ATTORNEY LIES:
19    Q   Oh, then we agree. Just tell us. Just tell us what you
20  said, what Mr. Duggal said, and what Mr. Ortíz said, so that we
21  have the entire conversation.
22       INTERPRETER: The Interpreter doesn't know what to do.
23  The Witness did testify something that the Interpreter
24  didn't...
25       ATTORNEY LIES: Okay, tell us what he said before that.

Page 66

1        INTERPRETER: Okay.
2        ATTORNEY LIES: I want a complete record.
3        INTERPRETER: Okay.
4    A   Well, my best recollection is that Mr. Duggal told me
5  that the decision had been made to terminate my employment.
6  BY ATTORNEY LIES:
7    Q   Okay, did Mr. Duggal say anything else?
8    A   From what I can remember, no. At that time, when I
9  sw... well, Belkis was in her eighth month of her pregnancy, and
10  I asked to please hold off the execution until after her labor.
11       Ashok told me that that couldn't be done because the
12  decision had already been made.
13       Jorge Ortíz told me that there was an agreement there
14  with some money, and that I should sign so that I could have the
15  money to work out the situation.
16    Q   Was that a Severance Agreement?
17    A   Yes.
18    Q   Was that thirteen thousand dollars?
19    A   Yes, that's correct.
20    Q   And, what was the thirteen thousand dollars based on,
21  if you know?
22    A   I didn't know.
23    Q   Okay.
24    A   But, there's something missing in the conversation.
25    Q   What... all right, just to make sure we have this.

Page 67

1  First of all, Mr. Duggal told you a decision had been made to
2  terminate you?
3    A   Yes, yes.
4    Q   Did Mr. Duggal tell you the reason for the termination?
5    A   Did I remember? Well, I really don't have a
6  recollection of him telling me directly why the employment had
7  been terminated.
8    Q   Did you ask why your employment was being terminated?
9    A   No, at that time, I wasn't thinking. I wasn't in the
10  right mind set to start asking anything about it.
11    Q   So, as you sit here today, you don't remember what they
12  may have told you about termination? You don't remember if they
13  told you or not? Is that correct?
14    A   No.
15    Q   Okay, did they say anything... does it refresh your
16  recollection that they said anything to you about having lost
17  client business as a reason for the termination?
18    A   Well, after reading all the e-mails and all the
19  evidence that Nalco sent us, I believe that's why, the reason
20  why.
21    Q   After reading all the evidence that Nalco turned over,
22  what is your understanding of the reasons for the termination?
23    A   According to the e-mail that was sent from Human
24  Resources, Duggal said it was because of losing clients and
25  losing business, of putting at risk half a million dollars in

Page 68

1  business. That that was the reason for the termination.
2    Q   Is that your... sorry, did you finish your answer? Did
3  you finish your answer? I don't want to cut you off.
4    A   But, after reading the evidence and knowing how Nalco
5  works, I don't believe so. Because I mean I did lose an account,
6  a sixty thousand dollar account, which was Warner Chilcott.
7        It was because the competition offered forty or fifty
8  dollars lower than us. And, I spoke to the person in charge of
9  that account before the termination. I spoke to that person, and
10  the person told me that they were happy with what Nalco was doing
11  at the plant, but it was merely an issue of price.
12       That they were going with the lower price. But, if it
13  didn't work, that they would come back to Nalco, and it was forty
14  or fifty percent.
15    Q   Were you also... after looking at the Nalco documents,
16  did you learn that another reason for the termination was that
17  you did not follow up on e-mails that clients had sent you asking
18  for information about Nalco products?
19    A   Yes, that was something else that could be read from
20  the e-mail.
21    Q   Okay, and, looking at the materials that Nalco turned
22  over to you regarding the termination, did you also learn that
23  one of the reasons for the termination was failure to submit
24  Technical Reports that clients had asked you to submit to them
25  after you had made visits to their facilities?

17  (Pages 65 to 68)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Page 69

1    A    That's what they allege.
2    Q    And, was another reason that you learned, from looking
3  at the Nalco documents for the termination, that you failed to
4  submit your company required Expense Reports on a timely fashion?
5    A    That's what they allege. The reports were sent.
6  Besides, I wasn't the only person who would fall behind in
7  submitting the Expense Reports on time.
8    Q    Who was the person you said you spoke to at Warner
9  Chilcott?
10    A    It wasn't Warner Chilcott. It was with the competition.
11    Q    So, you never spoke to Warner Chilcott about the reason
12  why they decided to move their business somewhere else? Is that
13  correct?
14    A    No, not me directly, no.
15    Q    And, for how long had Warner Chilcott been a client of
16  Nalco prior to the time that they stopped being a client of Nalco,
17  how many years?
18    A    I'm really not sure. It could be fourteen, fifteen
19  years.
20    Q    Okay, and how long had Abbott been a client of Nalco
21  before Abbott left Nalco, as we talked about earlier in this
22  deposition today, how many years?
23    A    About fifteen years.
24    Q    So, while you were the... while you were a District
25  Representative for Nalco, they lost Abbott and Warner Chilcott.

Page 70

1  Is that correct?
2    A    Yes.
3    Q    Were there also complaints about your service to other
4  clients that you found out in the Nalco materials that you
5  reviewed, that Nalco turned over?
6    A    Complaints of other clients, yes.
7    Q    Now, at some point in time, did the company tell you
8  that you were having problems with clients. At some time prior to
9  the termination, did they tell you you were having problems with
10  your clients?
11    A    Yes, there was a meeting.
12    Q    And, who was at that meeting?
13    A    Ashok Duggal.
14    Q    Who else?
15    A    Nobody else.
16    Q    Okay, where did that meeting take place?
17    A    In the Nalco office, in Caguas.
18    Q    And, do you recall when that meeting was?
19    A    I'm sorry?
20    Q    Do you recall when that meeting was?
21    A    I really don't remember the date.
22    Q    Okay, I'm going to hand you what's been marked as
23  Exhibit 005.
24        ATTORNEY LIES: For the record, it purports to be a two
25  page document, and it's date August 14th of 2007. It's from

Page 71

1    Mr. ... to you from Mr. Duggal.
2        (Whereupon, the above-referenced document was marked as
3  Exhibit 005 of the deposition.)
4  BY ATTORNEY LIES:
5    Q    And, I'll ask you if you've ever seen this document
6  before?
7              PAUSE
8        (Revision of document by Deponent.)
9    A    Yes.
10  BY ATTORNEY LIES:
11    Q    Okay, and, if you look at page two, it appears to have
12  your signature and the date of August 14th of 2007. Is that
13  correct?
14    A    Yes, that's correct.
15    Q    And, did you, in fact, sign Exhibit 005 on or about
16  August 14th of 2007?
17    A    Yes.
18    Q    Okay, and, looking at this document, do you now recall
19  that you met with Mr. Duggal on or about August 14th of 2007, at
20  the Nalco offices?
21    A    Yes.
22    Q    And, did Mr. Duggal hand you Exhibit 005 during the
23  course of the meeting that you had with him on August 14th of
24  2007?
25    A    Yes, if I signed it.

Page 72

1    Q    Okay, and how long was the meeting with Mr. Duggal, on
2  August 14th of 2007?
3    A    Fifteen, twenty minutes.
4    Q    And, did you have an opportunity to read Exhibit 005
5  before you signed it?
6    A    Yes.
7    Q    Now, it references a meeting, if you look under the
8  Introduction, on page one. It references a meeting on February
9  24th of 2007. Do you see that?
10    A    Yes, I see it.
11    Q    Do you recall having a meeting with Mr. Duggal, on or
12  about February 24th of 2007, discussing your mid-year review and
13  problems with your performance for 2007?
14    A    Well, I really don't remember that meeting.
15    Q    Do you recall having a discussion in early 2007, with
16  Mr. Duggal, to talk about your mid-year review and other problems
17  with your performance? If it wasn't February 24th, do you recall
18  having a meeting on or about February of 2007?
19    A    Well, many times meetings would be scheduled with the
20  group or one-on-one. But, many times, because of a client or
21  because of work, these meetings were suspended.
22        I do remember that, in the beginning of the year, a
23  review is made, but it's a review regarding 2006, not 2007.
24    Q    So, you recall having a meeting with Mr. Duggal in
25  early 2007 to talk about your performance for 2006? Is that what

Electronically signed by Gregoria Echevarría (401-409-341-5259)                                                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 73

1   you're telling us?
2       A   That's a Nalco SOP to do that in the beginning of the
3   year.
4       Q   For the prior year or the coming year?
5       A   For the past year.
6       Q   So, do you recall having a meeting with Mr. Duggal
7   around February of 2007 to discuss problems with your performance
8   in 2006?
9       A   Well, not problems per se, but rather to discuss
10  performance.
11      Q   Okay, now you gave... or you received... excuse me...
12  Exhibit 005 from Mr. Duggal, did you not?
13      A   Yes.
14      Q   If you look at the paragraph right above where the
15  signature lines are, could you read that to me, under
16  Consequences? Could you read that out loud for us, please?
17      A   "We will be evaluating your performance again November
18      1, 2007. Your failure to meet and sustain the performance
19      objectives and expectations outlined above will result in
20      further disciplinary action up to and including
21      termination."
22      Q   And, did you read that before you signed the document?
23      A   Yes, yes.
24      Q   And, did you read the line right under that? Could you
25  read that for us? There's a line that says "This document...".

Page 74

1       A   "This document does not alter the employment-at-will
2   relationship."
3       Q   All right, now did you ever submit a response to Mr.
4   Duggal concerning the points that are in Exhibit 005?
5       A   No.
6       Q   Now, let's talk about Baxter. In the report... or
7   Exhibit 005, it says "They were very near to terminate our
8   contract and switch to Chemtreat.". Do you see that?
9       A   Yes.
10      Q   And, Chemtreat was one of the Nalco competitors. Is
11  that correct?
12      A   Yes, that's correct.
13      Q   Okay, and Mr. Duggal was telling you there was problems
14  with the service visits, that they were not consistent, and you
15  didn't let them know when you could not visit them. Is that what
16  he was telling you?
17      A   That's what Duggal told me. And, he was told that I
18  went once a week, just as it was stated in the contract.
19      Q   Now, looking at paragraph 'D', it says "Chemical
20  inventories have been too low for Jorge Morales' taste.". Do you
21  see that?
22      A   Yes, I see it.
23      Q   Who is Jorge Morales?
24      A   Jorge Morales was the Utilities Supervisor.
25      Q   For Baxter?

Page 75

1       A   That's right.
2       Q   And, would Mr. Morales be the individual who was in
3   charge of maintaining the chemical inventories that were coming
4   in from Nalco?
5       A   No.
6       Q   Who was the client contact at Baxter for the chemical
7   inventories?
8       A   Well, the contact is really the... it's the District
9   Representative who's... since it was a closed contract... is the
10  person in charge of those levels.
11      The levels of those tanks, well, the levels in those
12  tanks have to reach a minimum. And, when it reaches that minimum
13  is when an order has to be placed for those chemicals.
14      Because, if an order is made before it reaches the ten
15  gallons, which is the minimum level for that tank, then, when the
16  new chemicals come in, that chemical won't fit within the tank.
17      And, that was explained to Jorge Morales, and he
18  understood that the tank had to reach the level of ten gallons.
19  Because, if I ordered... if a new order was placed for thirty
20  gallons, it wouldn't fit in the tank.
21      Q   Now, let's turn to Warner Chilcott. That was another
22  one of your clients that you were supposed to service. Isn't that
23  correct?
24      A   Yes.
25      Q   Okay, and did you become aware that there was a meeting

Page 76

1   that Mr. Duggal had at Warner Chilcott, in May of 2007, regarding
2   client problems?
3       A   Yes, I found out when I saw the e-mail.
4       Q   Okay, and who is Wilfredo Guardiola?
5       A   Wilfredo Guardiola, if I'm not mistaken, was the
6   Engineering Manager.
7       Q   For who?
8       A   For Warner Chilcott.
9       Q   Who's Daniel Resto, R-E-S-T-O?
10      A   He was the Utilities Engineer, if I'm not mistaken.
11      Q   And, who is Lisandro Rivera?
12      A   He was the Utilities Supervisor.
13      Q   And, who is Albert Koett?
14      INTERPRETER: Can you show the Interpreter the name?
15      ATTORNEY LIES: K-O-E-T-T.
16      INTERPRETER: Albert.
17      ATTORNEY LIES: Albert Koett.
18      A   Koett, I don't remember the name.
19  BY ATTORNEY LIES:
20      Q   Okay, I'm going to hand you what's been marked as
21  Exhibit 006.
22      ATTORNEY LIES: For the record...
23      A   No, I don't know that one.
24  BY ATTORNEY LIES:
25      Q   "I don't know" what? I didn't even...

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 77

1       ATTORNEY LIES: Oh, he doesn't know Albert Koett. Thank
2  you.
3  BY ATTORNEY LIES:
4       Q   I'm going to hand you what's been marked as Exhibit
5  006.
6       ATTORNEY LIES: And, for the record, it's a one page
7  document... oh, it's a two page document. One is the
8  original e-mail, and the second one is a translation, a
9  certified translation.
10      (Whereupon, the above-referenced document was marked as
11  Exhibit 006 of the deposition.)
12 BY ATTORNEY LIES:
13      Q   And, I'll ask you if you've ever seen the version of
14  the e-mail that is in Spanish?
15            PAUSE
16      (Revision of document by Deponent.)
17      A   Yes.
18 BY ATTORNEY LIES:
19      Q   And, in this e-mail, Mr. Duggal is telling you about a
20  meeting that he had with Wilfredo Guardiola, Daniel Resto,
21  Lisandro Rivera and Albert Koett concerning problems with Warner
22  Chilcott, is he not?
23      A   Yes.
24      Q   And, in Exhibit 005, Mr. Duggal is telling you about
25  the meeting that he had with Warner Chilcott?

Page 78

1       A   Yes.
2       Q   Now, turning your attention back to Exhibit 005, in
3  paragraph number three, Mr. Duggal is telling you that, as of
4  June 30, 2007, your sales were down eleven percent, Year-To-Date,
5  versus the previous year, isn't he?
6       A   Yes.
7       Q   And, that is what happened, isn't it? Your sales were
8  down eleven percent, weren't they?
9       A   Yes.
10      Q   And, he's telling you, in paragraph number four, that
11  you were thirty thousand dollars down Year-To-Date, YTD, versus
12  2006, is he not?
13      A   Yes.
14      Q   And, that is that your sales were down, weren't they?
15      A   Yes, they were down.
16      Q   All right, he's also telling you, in paragraph number
17  five, about a...
18      A   Excuse me. The sales were down, but that was because of
19  the economy, and the clients had stopped any expansion projects
20  that they had.
21      And, Amgen, who was my largest client, well, service
22  couldn't be provided to Amgen because its two buildings, the
23  largest buildings, in which processed services were provided
24  there they had stopped production. So, if there's no production,
25  then there's no sales.

Page 79

1       Q   So, part of your job, as a District Representative, was
2  to go out and find new accounts or new business when the company
3  would lose business because a client decided to change their
4  operations. Isn't that true?
5       A   That's true. But, if you spend your time providing
6  service to the accounts of other colleagues, then there's no time
7  really to go get new business.
8       I mean you would work ten, twelve hours, Saturdays,
9  Sundays. Amgen was a very demanding client requiring special
10  tests and other things to be done.
11      So, there was no time really to spend looking for other
12  client's and looking for new business when you were covering the
13  backs of other representatives.
14      Q   Isn't it a fact, sir, that the company had you helping
15  out other District Representatives because you weren't able to
16  generate sales?
17      So, they let you perform technical work for their
18  clients so that you could continue to be employed by the company.
19      A   I provided service because I was the more technical of
20  all the representatives, and the clients would see me as I could
21  provide the assistance and service of quality that the others
22  couldn't provide.
23      Q   Okay, you consider yourself to be a better technician
24  than you are a salesperson, don't you?
25      A   Nalco hired me for the technical side.

Page 80

1       Q   So, your testimony is Nalco did not hire you to perform
2  services relating to generating sales?
3       A   In the beginning, yes.
4       Q   Okay, later on then, Nalco expected you to start
5  generating sales, didn't they?
6       A   Yes.
7       Q   And, you had difficulty generating sales, didn't you?
8       A   No, and let me explain to you why. I was the resident
9  expert in a new technology called "3D Trasar".
10      I would be called from everywhere in Latin America,
11  Mexico, Central America, Dominican Republic, Columbia, Venezuela,
12  to ask me how to work the system.
13      Thanks to the support that I provided the other
14  representatives in the region, a lot of sales and other
15  accounts...
16      INTERPRETER: ... the Interpreter corrects himself...
17      A   ... we got a lot of sales and a lot of accounts that we
18  couldn't have gotten if I wasn't there.
19      And, I was also the expert in what was called the
20  "Treatment Plant", which also brought, in Serralles, Chevron
21  Phillips and PREPA, results for Nalco, and also in Cerveceria
22  India.
23      Many times I didn't generate sales for me, but I did
24  generate sales for the others. Many times I was told that I had
25  to reach some sales goals. But, if Jorge Ortiz called me and I

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Page 81

1  was on my way to see a client, and he would tell me "I need you
2  to go work on the problem in the Treatment Plant, in Pfizer, Vega
3  Baja, then I would have to stop what I was doing and go to
4  Pfizer.
5  BY ATTORNEY LIES:
6      Q   While you were providing these technical services and
7  not generating sales, you continued to get paid the salary of a
8  District Representative, didn't you?
9      A   Yes, and it was the same as Applications Engineer.
10     Q   I'm talking about 2007. You just told us that you were
11 not generating sales because you were performing technical
12 services for other people's clients within the company.
13         And, my question to you is, even though you weren't
14 generating sales during that period of time, you were still being
15 paid as a District Representative, were you not, sir?
16     A   Yes, and it was the same salary as the Applications
17 Engineer. The difference was the commissions.
18     Q   Okay, so were you receiving commissions in 2007?
19     A   Yes, from my accounts.
20     Q   Okay, turning your attention to Exhibit 005, Mr. Duggal
21 is telling you that, in 2007, the company did not receive the
22 January, February, March, and June Monthly District Reports. What
23 are the District Reports?
24     A   Well, these were reports that were generated that
25 included the Visit Reports, accounts that were at risk, the Sales

Page 82

1  Pyramid, and other reports that I don't remember right now.
2      Q   And, is it true that, as of August of 2007, you had not
3  sent in the January, February, March and June Monthly District
4  Reports?
5      A   They had been sent. Maybe there was one missing or some
6  missing or maybe they hadn't been sent the day that they were
7  requested.
8      Q   Okay, did you send an e-mail back to Mr. Duggal telling
9  him that the information on paragraph number seven was not
10 correct?
11     A   No.
12     Q   That you had, in fact, sent these reports in?
13     A   No.
14         ATTORNEY LIES: Okay, I think we said we're going to
15 break at twelve, thirty. We shot over the time a little bit.
16 I want to respect people's diets and things of that nature.
17 So, what time is it?
18         ATTORNEY CUADROS-PESQUERA: It's twelve, twenty-five.
19         ATTORNEY LIES: Oh, I thought it was twelve, thirty-
20 five. Well, let's break anyway. We can break right now.
21 We'll come back at one, fifteen. Does that work?
22         ATTORNEY CUADROS-PESQUERA: Good enough.
23         ATTORNEY LIES: Okay, thanks.
24 .       (Off the record.)
25         (Lunch recess.)

Page 83

1              A F T E R N O O N  S E S S I O N
2                       (1:20 P.M.)
3                  (Back on the record.)
4  BY ATTORNEY LIES:
5      Q   Before we took the break, we had talked about the day
6  you were terminated. Do you recall that, sir?
7      A   Yes.
8      Q   Okay, and, on the day that you were terminated, it was
9  your understanding that you were being terminated for performance
10 reasons. Is that right? Isn't that what you told us earlier?
11     A   Yes.
12     Q   During the course of the termination, Mr. Duggal said
13 nothing to you about your age, did he?
14     A   Correct.
15     Q   During the course of the termination, Mr. Duggal said
16 nothing to you about any health conditions that you had, did he?
17     A   No.
18     Q   Okay, during the course of your termination, Mr. Duggal
19 said nothing to you about your nationality or national origin,
20 did he?
21     A   No.
22     Q   And, during the course of your termination, he said
23 nothing to you about male stereotypes, did he?
24     A   No.
25     Q   I've handed you Exhibit 007, and I'd ask you to take a

Page 84

1  moment to look at it, sir.
2          (Whereupon, the above-referenced document was marked as
3  Exhibit 007 of the deposition.)
4                     PAUSE
5          (Revision of document by Deponent.)
6  BY ATTORNEY LIES:
7      Q   Have you ever seen it before?
8      A   Yes.
9          ATTORNEY LIES: Okay, and, for the record, Exhibit 007
10 is a one page document with a translation. It's dated
11 February 17th of 2007, and it's from Mr. Duggal to you.
12 BY ATTORNEY LIES:
13     Q   Is it not?
14     A   Yes.
15     Q   Okay, and, in the first paragraph, he's telling you
16 that he can't find the Monthly Reports for January. Isn't that
17 correct?
18     A   Yes.
19     Q   And, what reports were those?
20     A   Those were the reports that had to be submitted at the
21 going of the month.
22     Q   Okay, and, in the second sentence, he says "Nor FPC."
23 What is FPC?
24     A   Those are the Visit Reports.
25     Q   The Visit Reports to the clients?

Donato Aponte-Navedo

Page 85

```
1    A  No.
2    Q  What Visit Reports are you talking about?
3    A  Those are reports that were done in order to have a
4  metric.
5    Q  And, a metric for what, sir?
6    A  Time & Territory Management.
7    Q  And, what does Time & Territory Management mean?
8    A  That's how you would arrange time in order to provide
9  service for sales, traveling time, time at the office.
10   Q  Now, going to the next sentence, it says "Always send
11  me these before the 3rd of each month without failure. You are on
12  probation.". Do you see that?
13   A  Yes.
14   Q  So, you understood, as of February 17th of 2007, that
15  you were on probation, didn't you, sir?
16   A  That's what it says there.
17   Q  Okay, and you were on probation from February 17th of
18  2007, but were not terminated until July 23rd of 2008. Isn't that
19  correct?
20   A  No, for me, the probation began when the past document
21  was drafted.
22   Q  What past document are you talking about, sir?
23   A  Exhibit 005.
24   Q  Exhibit 005 was six months later.
25   A  Correct.
```

Page 86

```
1    Q  So, as of February 17th of 2007, you did or did not
2  considered yourself to be on probation?
3    A  No.
4    Q  So, when Mr. ... did you tell Mr. Duggal then, on
5  February 17th, after you got the e-mail, that you didn't believe
6  you were on probation?
7    A  No, I didn't tell him because there was no meeting to
8  discuss the situation. And, also, I wasn't the only one who
9  sometimes was late submitting the reports. There was an issue
10  with the whole group.
11   Q  Who else was on probation as of February of 2007? What
12  other employees were on probation, to your knowledge?
13   A  I can't answer that because those situations were not
14  discussed in the group.
15   Q  Okay.
16   A  But, in the e-mails that you have, there were other
17  people who were copied in those e-mails that had problems with
18  the reports.
19   Q  Okay, let me ask my question again. Do you know of any
20  other employees, in February of 2007, that were on probation,
21  besides you?
22   A  No, but I do have information of other employees that
23  arrangements were being made to get rid of them.
24   Q  Now, Mr. Duggal also says "The work does not end at the
25  plants or the meetings.". What did you understand that to mean?
```

Page 87

```
1    A  That, besides the...
2       INTERPRETER: The Interpreter just informed the Deponent
3  that, if he wants the question again...
4       ATTORNEY LIES: Sure.
5  BY ATTORNEY LIES:
6    Q  When you got this e-mail, when you received this e-
7  mail, which is Exhibit 007, from Mr. Duggal, that said "The work
8  does not end at the plants or the meetings.", what did you
9  understand that to mean?
10   A  Well, that meant that the work wasn't finished. That
11  Nalco demanded that the work...
12      INTERPRETER: The Interpreter corrects himself.
13   A  That meant that the work wasn't finished. That Nalco
14  would ask that people work, approximately, ten hours a day, and
15  that the work be... that they also work Saturdays and Sundays.
16      And, that was something that was discussed in the
17  meetings, in the Area meetings, and that many representatives
18  didn't believe that they would have to work Saturdays and
19  Sundays, and had to work more than eight hours a day.
20      Many of the representatives would turn off their cell
21  phones after 5:00 P.M., something which I never did. I would
22  practically visit my clients twenty-four hours a day, seven days
23  a week, including Saturdays and Sundays, during vacation time. I
24  mean I was always available to my clients whenever they needed.
25  BY ATTORNEY LIES:
```

Page 88

```
1    Q  Okay, you haven't seen any time sheets for the hours
2  that were worked for any of the other employees in the
3  organization, have you, sir?
4    A  No.
5    Q  So, you don't know how many hours the other employees
6  were working for the company and your organization because you
7  weren't with them all the time, were you, sir?
8    A  No, but they were topics that were discussed when we
9  had the meetings. And, they always had a day a week where they
10  could be at the office doing administrative work, something which
11  I didn't have on my schedule.
12   Q  Who were the other employees who had the same job as
13  you, in 2007?
14   A  As District Representative?
15   Q  Whatever his job description was, in 2007. Who were the
16  same employees that had the same job he did?
17   A  Jorge Ortíz, Edward Bray, Francisco Casanova, Pedro
18  Lara, Dennis López.
19   Q  And, when you were on probation, put on probation in
20  February of 2007, how many hours during that month did Mr. Ortíz
21  work? Can you tell me how many hours he worked that month?
22   A  No.
23   Q  Can you tell me how many hours that month Mr. Bray
24  worked?
25   A  No.
```

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

## Page 89

1    Q   Can you tell me how many hours that month Mr. Casanova
2    worked?
3    A   No.
4    Q   Can you tell me how many hours that month Mr. Lara
5    worked?
6    A   Yeah.
7    Q   Okay, can you tell me how many hours that month Mr.
8    López worked?
9    A   No.
10   Q   If I asked you the same question for March of 2007,
11   would your answer be the same?
12   A   Yeah.
13   Q   If I asked you for April of 2007, would your answer be
14   the same?
15   A   Yeah.
16   Q   Would your answer be the same all the way up until the
17   month that you were terminated, in 2008?
18   A   Yeah, but, when I was visiting their clients, they were
19   in the office giving support.
20   Q   When they were in the office, you don't know how many
21   hours they were working in the office, do you, sir, because you
22   weren't in the office with them, were you?
23   A   No, but they weren't with the clients, which is where
24   they were supposed to be.
25   Q   I'm going to show you Exhibit 008, and ask you whether

## Page 90

1    or not you've ever seen this document before.
2         ATTORNEY LIES: And, for the record, it's a one page
3    document dated March 24th of 2007, from Mr. Duggal to
4    yourself.
5         (Whereupon, the above-referenced document was marked as
6    Exhibit 008 of the deposition.)
7                        PAUSE
8         (Revision of document by Deponent.)
9    A   Uh huh.
10   BY ATTORNEY LIES:
11   Q   Have you ever seen this document before?
12   A   Yes.
13   Q   And, who is Paul Fonseca, F-O-N-S-E-C-A?
14   A   He was an Engineer from Chevron Phillips.
15   Q   Okay, and the document says that a survey was sent to
16   Mr. Fonseca. Is that correct?
17   A   Yes.
18   Q   And, the response from Mr. Fonseca said that Chevron
19   Phillips is at high risk, which is in English in the me, isn't
20   it?
21   A   Yes.
22   Q   And, what did you understand "high risk" meant?
23   A   That it was in high risk.
24   Q   What does "high risk" mean to you, high risk of losing
25   the client?

## Page 91

1    A   Yes, because Mr. Fonseca said that he was available to
2    hear... I'm looking for the word... that he was willing to go
3    into the market to see what other options, like the good Engineer
4    that he is, to see what other technologies were available.
5         The thing is that, as soon as a client has the idea or
6    the thoughts of checking the market, then the account
7    automatically falls in as high risk.
8    Q   Now, in this e-mail, Mr. Duggal also says, in the
9    second paragraph, "I'm very worried about this.", doesn't he?
10   A   Yes, that's correct.
11   Q   He also says "Many of your clients are weak.", and he
12   talks about ALPLA, Baxter, CP, and then asks the question "Are
13   there any others?", doesn't he?
14   A   Yes.
15   Q   Okay, then he asks you "What is needed? What are you
16   doing?" and "What are your comments?", didn't he?
17   A   Yes.
18   Q   All right, and then he asked you to send a survey to
19   your clients, did he not?
20   A   Yes.
21   Q   Okay, and did you send a survey to your clients?
22   A   Yes, correct.
23   Q   Okay, I'm going to hand you what's been marked as
24   Exhibit 009.
25        ATTORNEY LIES: And, for the record, it purports to be a

## Page 92

1    three page document with an English translation. And, it's
2    an e-mail dated April 25th of 2008, from Mr. Duggal to you.
3         (Whereupon, the above-referenced document was marked as
4    Exhibit 009 of the deposition.)
5    BY ATTORNEY LIES:
6    Q   And, I'll ask you whether or not you've ever seen this
7    document before?
8                        PAUSE
9         (Revision of document by Deponent.)
10   A   Yes.
11   BY ATTORNEY LIES:
12   Q   Okay, and, on the third page... excuse me... page two
13   and three, Mr. Duggal has e-mailed what says "Game Rules for
14   Support". Do you see that? The subject is "Games Rules for
15   Support"?
16   A   Yes, that's correct.
17   Q   And, he was sending this e-mail out to everyone in the
18   group, wasn't he?
19   A   Yes, that's correct.
20   Q   And, that included people who were Puerto Rican and
21   people who were not Puerto Rican, correct?
22   A   No.
23   Q   You don't see individuals who are receiving this e-mail
24   from Mr. Duggal who are not Puerto Rican?
25   A   No.

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386
Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 93

1　Q　Okay, so the e-mail goes from Mr. Duggal to Dennis
2　López?
3　A　Yes.
4　Q　Is he Puerto Rican?
5　A　Yes.
6　Q　Okay, Edward Bray, is he Puerto Rican?
7　A　Yes.
8　Q　Okay, Francisco Casanova, is he Puerto Rican?
9　A　Yes.
10　Q　Jorge Ortíz, is he Puerto Rican?
11　A　Yes.
12　Q　Okay, Mr. Lara, is he Puerto Rican?
13　A　Yes.
14　Q　Okay, obviously, you've told us what you're national
15　origin is. How about Mr. Hernández, is he Puerto Rican?
16　A　Yes, that's correct.
17　Q　Okay, and Manuel Rivera-Ramos, is he Puerto Rican?
18　A　That's correct.
19　Q　Okay, so he's sending out the same Game Rules for
20　everyone. Is that correct? Everybody was expected to live up to
21　these Game Rules. Is that right?
22　A　That's correct.
23　Q　In fact, he says, on this third paragraph, "You have to
24　follow the Game Rules already agreed to by everyone, several
25　times already.". Do you see that?

Page 94

1　A　Where is that?
2　Q　The third sentence. It's not a paragraph, but the third
3　sentence.
4　A　Yes.
5　Q　Okay, and then, if you go to the next paragraph, he
6　says "There are no accounts here that belong just to one person.
7　We are all affected when something happens to any one of the
8　accounts.". Do you see that?
9　A　Yes.
10　Q　And, then he gives examples about "Serralles affects
11　Pedro, PREPA affects Donato.". Do you see that?
12　A　Yes, I see it.
13　Q　And, then he goes on to say "When an account is lost,
14　the group is weakened, the strength that we have.". Do you see
15　that?
16　A　Yes.
17　Q　Okay, and so what he was trying to tell you, as you
18　understood it, is that you had... you and others all had to work
19　together to try to service all these accounts, and that was part
20　of the job. Isn't that true?
21　A　Well, yes, that's true. But, the problem was that
22　when... well, the problem was that, when I was visiting those
23　clients, nobody was visiting my clients.
24　So, when I was providing support, that representative
25　wouldn't go to that account. That client would be without service

Page 95

1　if I was sick or traveling.
2　Q　Okay, did you ever send an e-mail to Mr. Duggal telling
3　him about the fact that you thought the other representatives
4　weren't going to your clients?
5　A　This one.
6　Q　That's what you say your response is?
7　A　Yes.
8　Q　Okay, let's go down to the paragraph that says
9　"Remember". In that same e-mail:
10　"Remember, we were hired to work Monday through Friday.
11　Normal workdays are from 7:00 A.M. until 5:00 P.M. If more
12　hours have to be put in, that's where you separate the men
13　from the children. Sometimes you even have to go on weekends
14　and holidays. If you do not like that, there are a lot of
15　other types of jobs in which this does not have to be
16　done.". Do you see that there?
17　A　I see it, and that's true. But, the problem is that,
18　when you have to separate the men from the children, it's
19　everyday, and it's for years.
20　And, when you say that you can't or you ask for help or
21　you say that one time you can't do it, then you're the bad guy.
22　You're the one who's not part of the team.
23　Q　Okay, and do you know whether or not other employees
24　who were working in the organization had to work on weekends?
25　A　Yes, practically all those who gave support.

Page 96

1　Q　Do you know whether other members or your organization
2　also had to work on the holidays?
3　A　Yes.
4　Q　Okay, do you know whether or not other members of your
5　organization had to work... start working before seven o'clock in
6　the morning and after 5:00 P.M. at night?
7　A　Usually, they wouldn't start at seven in the morning.
8　They would start later. Therefore, they would be up to later in
9　the evening working.
10　Q　Okay, so how late did some of the other representatives
11　in your organization work, seven, eight, nine o'clock at night?
12　A　Many times we would call the office at seven in the
13　evening, and Duggal, Jorge and Casanova would be at the office.
14　Q　I'm going to hand you what's been marked as Exhibit
15　010.
16　ATTORNEY LIES: For the record, it purports to be a one
17　page e-mail with an English translation, dated May 3rd of
18　2008, addressed to you from Mr. Duggal.
19　(Whereupon, the above-referenced document was marked as
20　Exhibit 010 of the deposition.)
21　BY ATTORNEY LIES:
22　Q　And, I'll ask you whether or not you've ever seen this
23　document before?
24　PAUSE
25　(Revision of document by Deponent.)

24　(Pages 93 to 96)

Electronically signed by Gregoria Echevarría (401-409-341-5259)　　　　　　　　1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Page 97

1    A  Yes.
2    BY ATTORNEY LIES:
3    Q  Okay, and, in this e-mail, Mr. Duggal is talking about
4    a meeting that he had at Amgen. Is that correct?
5    A  Yes, correct.
6    Q  Was Amgen one of your clients?
7    A  Yes.
8    Q  Okay, Mr. Duggal is telling us about a meeting that he
9    had on May 2nd, at Amgen, where he was told that the service was
10   going down. Do you see that?
11   A  Yes.
12   Q  And, then Mr. Duggal proceeds to set out a certain
13   number of items for immediate action that needs to be taken. Is
14   that right?
15   A  Yes, I see it.
16   Q  And, then he says, at the end, "Let's talk. It is
17   critical for you to improve for the sake of being a 'Rep'. If
18   not, it will be easy for the customer to change.". Do you see
19   that?
20   A  Yes, I saw it.
21   Q  And, were you eventually removed from the Amgen
22   account?
23   A  Yes, that's correct.
24   Q  And, when did that happen?
25   A  No, I don't remember well, during those days I was

Page 98

1    sick.
2    Q  I've handed you what's marked as Exhibit 011, and ask
3    you to look at this document.
4         ATTORNEY LIES: For the record, it's a three page
5         document. And, the cover page is an e-mail from Jorge Ortíz,
6         dated June 23rd of 2008, to Mr. Duggal. And, then attached
7         to that is a June 23rd, two page memorandum from Mr.
8         Duggal... excuse me... to Mr. Duggal from Jorge Ortíz.
9         (Whereupon, the above-referenced document was marked as
10        Exhibit 011 of the deposition.)
11   BY ATTORNEY LIES:
12   Q  Do you see that?
13                    PAUSE
14        (Revision of document by Deponent.)
15   A  Yes, I see it.
16   BY ATTORNEY LIES:
17   Q  All right, now who is Kenneth Colón, C-O-L-Ó-N.
18   A  Utilities Manager.
19   Q  Okay, if you look at the two page, June 23, 2008 memo,
20   Mr. Ortíz says he called on Kenneth Colón, from Amgen
21   Pharmaceutical, "in order to attend his complaint of the lack of
22   service received from Donato Aponte at this site". Do you see
23   that?
24   A  Yes, I see it.
25   Q  And, apparently, a meeting was called or occurred on

Page 99

1    June 19th of 2008, at 2:00 P.M., and Jorge Castillo, the Regional
2    Manager, Kenneth Colón. Roberto Picou, from Amgen Utilities, was
3    there, and Mr. Ortíz. Do you see that?
4    A  Yes.
5    Q  Do you know Mr. Roberto Picou?
6    A  Yes.
7    Q  And, then Mr. Ortíz is summarizing what is going to be
8    happening here relating to Amgen. And, the first comment is:
9         "They do not perceive from Donato a professional level
10   of service at the high standard that Nalco is supposed to
11   deliver.". Do you see that?
12   A  Yes, I see it.
13   Q  All right, and, prior to the time this meeting, had you
14   received any complaints from Amgen about your performance out
15   there?
16   A  No. What I did talk about on several occasions, with
17   Roberto Picou, was that he would tell me that I was always alone
18   there at the pharmaceutical company.
19        It was something that was too large for me to do alone,
20   that I looked tired, and that I should come around so that he
21   could see that this was too large an account for me to do by
22   myself, to do alone.
23   Q  If you look at paragraph number six, it says:
24        "They have requested a report from Donato several times
25   of the recommendations for the chemical treatment changes

Page 100

1    needed for the boiler system where they will be using a new
2    type of make up water (RO reused water from WWTP), and
3    nothing has been received yet.". Do you see that?
4    A  Yes.
5    Q  And, what report did Amgen request regarding
6    recommendations for that treatment change?
7    A  They were trying to use the water from the Treatment
8    Plant and then reuse it. They were already using it for the
9    cooling power, so they wanted to use it for the boilers.
10        That was being worked out with the people that Kenneth
11   Colón delegated to do that. So, that was being done. And,
12   simulations had been done and were given to them with the
13   calculations.
14   Q  Paragraph number seven talks about...
15        ATTORNEY LIES: Is he done with his answer?
16        INTERPRETER: Yes.
17        ATTORNEY LIES: Okay.
18   BY ATTORNEY LIES:
19   Q  Paragraph number seven talks also about Edward Bray not
20   making any service calls "at any of the other buildings where
21   closed loops were supposed to be serviced by Nalco". Do you see
22   that?
23   A  Yes.
24   Q  Did Mr. Bray also have responsibility for this account?
25   A  Just in that part.

25 (Pages 97 to 100)

Donato Aponte-Navedo

Page 101

1    Q   Okay, if you go to the second page, it says:
2        "As an immediate action plan, we notified Kenneth and
3    Roberto that, beginning immediately, Crispin Hernández, you
4    (Ashok Duggal) and myself (Jorge Ortíz) would take the total
5    responsibility of servicing this account.". Do you see that?
6    A   Yes.
7    Q   So, you became aware then that this account, as of June
8    of 2008, was being taken away from you as far as responsibility.
9    Isn't that correct?
10   A   No, because I hadn't seen this e-mail. I read it
11   together with the evidence that Nalco had sent in. And, the only
12   thing that I was told was that Jorge Ortíz called me and told me
13   that I shouldn't go to Amgen because they were going to be fixing
14   some things.
15       And, during that time, I was sick. I could barely lie
16   down for an MRI to be performed on me. I had some injured discs.
17   And, during the moment that I was having my MRI done, Jorge kept
18   calling me, asking me questions, during the time that I was
19   practically under sedation.
20       So, after that, I took a week off. And, when I came
21   back, I was told that I no longer had to go to Amgen, that they
22   were doing some investigation.
23   Q   Do you have any e-mails that you sent to Mr. Ortíz
24   about your back pain?
25   A   No, that was done on the phone. If I had to go to the

Page 102

1    Chiropractor, I would usually just call Duggal and let him know
2    that I was going to the Chiropractor. And, that, when I came out
3    of the Chiropractor, I was going to visit my clients.
4        That's how it was always done. It was quicker because,
5    at that time, we didn't have the portable Internet. So, if I had
6    a bad back and I had to go to the Chiropractor, I would just call
7    in and state it.
8    Q   Okay, so you called in to Mr. Ortíz, and you said "I'm
9    going to the Chiropractor.", and he said "Okay.". Is that right?
10   A   No, I never called Mr. Ortíz.
11   Q   Okay, you called Mr. Duggal?
12   A   That's correct.
13   Q   Did Mr. Duggal ever tell you you couldn't go to the
14   Chiropractor?
15   A   No.
16   Q   Did he ever tell you you couldn't go to any doctor that
17   you wanted to?
18   A   No.
19   Q   And, you just told us that you took a week off because
20   your back hurt, and the company let you take a week off. Mr.
21   Duggal let you take a week off, didn't he?
22   A   It was two weeks, and I came back a week earlier so
23   that the work wouldn't accrue.
24   Q   Okay, so you asked for two weeks off, he said "Okay.",
25   and you came back after a week. Is that right?

Page 103

1    A   I didn't ask for two weeks. The doctor gave me two
2    weeks.
3    Q   Okay, but you only... the doctor gave you two weeks,
4    but you decided to come back to work after one week. Is that what
5    happened?
6    A   Yes, in order to provide service to my clients because
7    I knew that my clients were not going to be provided the service
8    that they should be provided, and also in order to comply with
9    what Nalco required of the service it provided.
10   Q   Okay, and, when you were off for that week, you got
11   paid, didn't you?
12   A   Of course. I had Sick Leave.
13   Q   And, the name of the doctor that you went to see? The
14   Chiropractor, what's his name?
15   A   Elvin Siverio.
16   Q   And, he is a Chiropractor?
17   A   Yes.
18   Q   And, how long have you been seeing him or how long had
19   you been seeing him before the time you were off, in 2008?
20   A   That I was off or that I was fired?
21   Q   No, let's try it again. You said that Dr. Siverio told
22   you to take two weeks off around June of 2008, and you only took
23   one week off. Is that right?
24   A   I took one.
25   Q   Okay, did the doctor tell you to take two weeks off or

Page 104

1    not?
2    A   Yes, I had a certificate for two weeks.
3    Q   Okay, and you took one week off?
4    A   Yes, correct.
5    Q   Okay, when did you start seeing or going to Dr. Siverio
6    to get treatment for your back?
7    A   That was the beginning of the year.
8    Q   Of 2008?
9    A   Yes, yes, that's correct.
10   Q   Are you still treating with that doctor?
11   A   No, because he's in San Juan and I'm in Mayaguez.
12   Q   When was the last time you saw Dr. Siverio?
13   A   That was approximately August, September, 2008. Well,
14   the back pain and the problems with my back began long ago. But,
15   I used to manage it with Celebrex and with other medication. But,
16   it just got so bad that I had to start going to a Chiropractor.
17   Q   And, the last time you went to a Chiropractor was in
18   August of 2008?
19   A   No, I visited a Chiropractor in the Mayaguez area, due
20   to back pain, but I stopped going to the Chiropractor because I
21   didn't have any money to pay him.
22   Q   What was the name of the other Chiropractor?
23   A   I don't remember.
24   Q   When did you stop going to the other Chiropractor?
25   A   That was between December, 2008 and February, 2009.

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 105

1     Q   Okay, and are you taking any prescription medication
2  for your back at this time?
3     A   Not today.
4     Q   When was the last time you took any prescription
5  medication for your back?
6     A   Last week.
7     Q   What prescription? What is the doctor who prescribed
8  the medication for you?
9     A   Carlos Gil.
10    Q   And, where is this... Carlos Gil, where is Dr. Carlos
11  Gil located?
12    A   In Barceloneta.
13    Q   When did you start going to see Dr. Gil?
14    A   Like in 2007.
15    Q   And, the last time you saw Dr. Gil was when?
16    A   Last week.
17        ATTORNEY LIES: Okay, we'll ask... Counsel, we'll ask to
18  supplement the medical. I'm unaware of this Dr. Gil in terms
19  of any of that. Supplement our Discovery request. We're
20  unaware of this particular doctor.
21        ATTORNEY CUADROS-PESQUERA: Very good. Can you send me
22  an e-mail with those dates?
23        ATTORNEY LIES: No problem. Those are not the names that
24  are in the Discovery.
25                         PAUSE

Page 106

1        ATTORNEY LIES: We may be aware of the doctor.
2        ATTORNEY CUADROS-PESQUERA: Yes.
3        ATTORNEY LIES: I want to be totally up front with you.
4        ATTORNEY CUADROS-PESQUERA: Absolutely.
5        ATTORNEY LIES: Okay, and we may be aware of the doctor,
6  and maybe we have an outstanding Subpoena that hasn't been
7  responded to.
8        ATTORNEY CUADROS-PESQUERA: Yes, that's what I'm being
9  informed about right now. But, whatever needs to be done...
10       ATTORNEY LIES: I don't know.
11       ATTORNEY CUADROS-PESQUERA: ... go ahead and do it.
12       ATTORNEY LIES: Okay.
13  BY ATTORNEY LIES:
14    Q   In looking at Exhibit 011 again, at the very end, it
15  says:
16       "I already communicated to Donato and Edward our
17       decision in removing them from the responsibility of
18       servicing this account, and all of the customer complaints.
19       Neither Donato nor Edward rejected the decision.".
20       So, were you informed by Jorge Ortiz that you were
21  being removed from responsibility for servicing that account and
22  all customer complaints?
23    A   Jorge told me that I no longer had to go. He didn't
24  tell me that it was due to complaints.
25    Q   And, I'm going to hand you what's been marked as

Page 107

1  Exhibit 012. It's a two page document, one of which is the
2  original e-mail, and the second of which is a translation.
3        It's dated May 23, 2008, and ask you whether or not you
4  ever saw it before?
5        (Whereupon, the above-referenced document was marked as
6  Exhibit 012 of the deposition.)
7                         PAUSE
8        (Revision of document by Deponent.)
9     A   Yes.
10  BY ATTORNEY LIES:
11    Q   Okay, and, in this e-mail, you're being asked, by
12  Ashok, what's going on with reports relating to ALPLA Barbados,
13  are you not, and various other companies, are you not?
14    A   Yes, that's correct.
15    Q   And, what type of reports are those that Mr. Duggal was
16  asking about?
17    A   Those are the personal Service Reports.
18    Q   Okay, and what does a "personal Service Report" mean?
19    A   The Service Report of the account.
20    Q   Okay, and what does he report in there? What type of
21  information is communicating in that report?
22    A   Analyses, recommendations, situations found,
23  adjustments made.
24    Q   So, in this e-mail, Mr. Duggal is asking you where
25  these reports are because at least some of them appear to be

Page 108

1  overdue. Is that correct?
2     A   That's correct.
3     Q   By the way, Marriott, St. Kitts, ALPLA, A-L-P-L-A
4  Barbados, Sandals Regency and Sandals Grand, were those your
5  clients?
6     A   They were provided support.
7     Q   Okay, so that... you were going to go and provide
8  technical support for them and issue reports. Is that correct?
9     A   That's correct.
10    Q   Okay, I'm handing you what's been marked as Exhibit
11  013.
12        ATTORNEY LIES: For the record, it's a one page document
13        dated May 30th of 2008. The original is an e-mail from Mr.
14        Duggal to you, with a translation.
15        (Whereupon, the above-referenced document was marked as
16  Exhibit 013 of the deposition.)
17  BY ATTORNEY LIES:
18    Q   And, I'll ask you whether or not you've ever seen the
19  original before?
20                         PAUSE
21        (Revision of document by Deponent.)
22    A   Yes.
23  BY ATTORNEY LIES:
24    Q   And, in the e-mail, Mr. Duggal is telling you that
25  Manuel's presentation, Manuel Rivera-Ramos' presentation, was

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

## Page 109

1  very good. Is that right?
2  A  No.
3  Q  All right, so he wasn't saying something about the
4  presentation in his e-mail response to you, in the response at
5  the top?
6  A  Yes, he's saying something.
7  Q  Okay, he said the presentation was very good. Is that
8  right?
9  A  Yes.
10  Q  And, then he's asking you to provide him information
11  about Wyeth, W-Y-E-T-H. Do you see that?
12  A  Yes.
13  Q  And, who is Wyeth?
14  A  Wyeth was a client of Casanova, Wyeth, Guayama.
15  Q  And, were you providing service to Wyeth?
16  A  No, support.
17  Q  Support, okay. What type of support were you providing
18  to Wyeth?
19  A  In the Treatment Plant and in the study that was being
20  done with the towers. In fact, Manuel's presentation was
21  regarding the results of the tests that were done with the
22  towers.
23  Q  Okay, so Mr. Duggal was asking you to provide him
24  certain information, "a final table summarizing" certain
25  information. Is that right?

## Page 110

1  A  Yes, that's correct.
2  Q  I'm going to hand you what's been marked as Exhibit
3  014, and it's a one page document with a translation in English.
4  The original is dated June 8th of 2008, and it's from Mr. Duggal
5  to you, and ask you whether or not you've ever seen that before?
6  (Whereupon, the above-referenced document was marked as
7  Exhibit 014 of the deposition.)
8  PAUSE
9  (Revision of document by Deponent.)
10  A  Yes.
11  BY ATTORNEY LIES:
12  Q  And, what is CP Alarm?
13  A  Well, let me explain. The 3D Trasar was the equipment
14  that was installed in one of the cooling towers of Chevron
15  Phillips.
16  And, that instrument, one of the characteristics that
17  it has is that it can send an alarm through the Internet to cell
18  phones or to the e-mails of people. And, this equipment would
19  send out many alarms, and Chevron Phillips was a company that was
20  known throughout the district, but it was a company that was in
21  the process of shutdown and they were trying to sell.
22  So, the equipment couldn't reach a steady state, and it
23  kept going up and down the parameters, and the tower wasn't in
24  service.
25  Also, the Utilities Engineer, who was in charge had the

## Page 111

1  custom to try and save money, lowered the pumps and, therefore,
2  the chemicals wouldn't reach the parameters that they were
3  supposed to, and, therefore, the alarm would ensue.
4  And, this alarm that you see here said that the levels
5  were lower than the system that sent the alarm, although the
6  chemical treatment had reached its normal level.
7  Q  Thank you. I'm going to hand you what's been marked as
8  Exhibit 015.
9  ATTORNEY LIES: For the record, it's a one page e-mail.
10  There's actually two messages on there. The first message is
11  from a Dennis López to Ashok and others. And, then there's
12  an e-mail at the top from Ashok Duggal to you dated June 21,
13  2008.
14  (Whereupon, the above-referenced document was marked as
15  Exhibit 015 of the deposition.)
16  BY ATTORNEY LIES:
17  Q  And, I'll ask you whether or not you've seen these e-
18  mails before?
19  PAUSE
20  (Revision of document by Deponent.)
21  A  Yes, I've seen them.
22  BY ATTORNEY LIES:
23  Q  And, Mr. Duggal is saying:
24  "I'm very displeased with your performance lately. This
25  is not the level of work of a Nalco Sales 'Rep' with your

## Page 112

1  experience. I have sent several e-mails during the past few
2  weeks asking for your action plan on how to improve your
3  quality of service: timely report submitting, visit
4  frequency, and general Nalco Representative attitude
5  improvement.
6  And, after some weeks, I have still not received
7  anything.". Do you see that?
8  A  Yes, I see it.
9  Q  And, I believe there's a 'typo' here. It says "Please
10  be prepared to discuss this Wednesday, May 25th...". I'm assuming
11  he means June 25th because May 25th had already passed. So, do you
12  recall receiving this e-mail?
13  A  Yes.
14  Q  Do you recall having a meeting...
15  A  And, I was available for that meeting, and it never
16  occurred.
17  Q  Okay, what were the reports that Mr. Duggal was asking
18  you about. "Timely reports submitting", what were the reports?
19  A  The reports from the beginning of the month.
20  Q  And, what was he referring to when he talked about
21  visit frequency? Was he asking you to make more frequent visits?
22  A  No.
23  Q  Okay, what did you understand he meant by "visit
24  frequency"?
25  A  Comply with the schedule that there was. Many times,

28  (Pages 109 to 112)

Electronically signed by Gregoria Echevarría (401-409-341-5259)

1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 113

1    upon requests of other representatives, the schedule was changed.
2        Q    Okay, and then he talks about the "general Nalco
3    Representative attitude improvement". What did you understand he
4    was talking about there?
5        A    Well, to be with the client. Well, that has sort of two
6    faces. I mean it may mean that, if you felt sick, tired or you
7    had been working ten to twelve hours, with the client, you had to
8    be as if nothing had happened.
9        But, the problem was that, if I'm tired... well, you
10   see, many of my clients became my friends. So, they learned to
11   read you. So, if a client tells you that you're tired and you
12   tell them "no", I mean the client's going to tell you "Well, you
13   know, you can't be here. You're tired.".
14       So, the same thing would happen with phone calls. You
15   know, if you get a phone call that you have to help a colleague,
16   a co-worker, you can't say no.
17       And, the same thing would happen with meetings. There
18   were long meetings. For example, a meeting that they scheduled
19   for 4:00 P.M. wouldn't begin on time. It would begin up to eight
20   or nine in the evening. And... you know... I would just give my
21   report and leave.
22       I mean I couldn't be there anymore. I had to eat. I had
23   to take my medication, and I didn't have those things there.
24       Q    Now, you just told you what you understood the "general
25   Nalco Representative attitude" should be. Do you recall that?

Page 114

1        A    Repeat.
2        Q    You just told us what you understood the "general Nalco
3    Representative attitude" should be with a client.
4        Was every member of your organization expected to have
5    the same attitude, if they were tired, not to act tired, if they
6    were sick, not to act sick? Was everyone expected to act the same
7    way?
8        A    According to Jorge Castillo, yes.
9        Q    And, Mr. Castillo, what was his title?
10       A    Sales Manager.
11       Q    And, did he tell all the employees that this was the
12   attitude that employees should have when you met him at that
13   first meeting that you told us about this morning?
14       A    Not in that meeting, but, in other meetings, yes.
15       Q    So, Mr. Castillo was telling everyone that he wanted
16   all the members of the organization to have a positive attitude
17   when they went out to visit a client at all times. Is that right?
18       A    Yes, and it was so.
19       Q    You have in front of you what's been marked as Exhibit
20   016.
21       ATTORNEY LIES: And, for the record, it is six pages.
22   It's a series of e-mails.
23       (Whereupon, the above-referenced document was marked as
24   Exhibit 016 of the deposition.)
25   BY ATTORNEY LIES:

Page 115

1        Q    And, I'll ask you whether or not you've ever seen these
2    documents before? The cover page is a memo or an e-mail dated
3    June 21st of 2008.
4            PAUSE
5        (Revision of document by Deponent.)
6        A    Yes.
7    BY ATTORNEY LIES:
8        Q    Okay, and there is an e-mail from a Tim Bender, at
9    Chevron Phillips. Who's he?
10       A    He was the Operations Manager, if I'm not mistaken.
11       Q    And, was he asking for certain information from Nalco?
12       A    Yes.
13       Q    Okay, and what was the information that was being
14   requested?
15       A    Well, according to what it says here, what was being
16   requested was treatment for the Superfund Tower.
17       Q    And, when was the initial request made for the
18   information? Was it made on May 6th of 2008?
19       A    Yes.
20       Q    And, on June 18th, Paul Fonseca, from Chevron Phillips,
21   is sending an e-mail to Ashok basically saying he didn't receive
22   the actual cost of the chemicals that are mentioned below. Do you
23   see that?
24       A    On June 8th?
25       Q    June 18th.

Page 116

1        A    Yes, I see it.
2        Q    So, more than a month later, they're still asking the
3    people at... Chevron Phillips is still asking for this
4    information on these chemicals. Is that right?
5        A    That's correct. And, that was due to... well, in that
6    situation, I did the jar test to see if this chemical would work
7    in the system.
8        And, the report was prepared and it was sent to Paul
9    Fonseca. And, the information was entered into the SIP of Nalco.
10   And, I started to look for the prices of these products because
11   these are products that were sold in Puerto Rico.
12       That type of work was usually done by... that type of
13   administrative work was usually done by Glenda Liz García, who
14   was the person in charge of looking up the prices for those
15   products.
16       She was the person at the training and the contact to
17   look for the price of those products since here, in Puerto Rico,
18   the SIP had been place for a short while. And, administratively,
19   Puerto Rico was sort of in a black hole regarding product prices.
20       Q    At the very top of Exhibit 016, Mr. Duggal is asking
21   you, in his e-mail, "I sent you an e-mail on May 30th requesting
22   that you complete this. Did you ever send them the requested
23   information? Please respond ASAP.".
24       Did you ever send the information back to Chevron
25   Phillips?

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarria (401-409-341-5259)            1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 117

1    A   Really, I don't remember.
2    Q   Did you ever respond back to Mr. Duggal?
3    A   Yes.
4    Q   Okay, and did you tell him that you had sent it or not?
5    A   I spoke to him on the phone and I explained to him the
6    problem.
7    Q   So, as of June 21st, the information had still not been
8    sent to Chevron Phillips. Is that right?
9    A   I can't say that it had been sent because I didn't have
10   it.
11   Q   Okay, I'm going to hand you what's been marked as
12   Exhibit 017.
13       ATTORNEY LIES: And, for the record, it's a one page
14       document from Ashok Duggal to Stephanie Glashagel, G-L-A-S-
15       H-A-G-E-L.
16       (Whereupon, the above-referenced document was marked as
17   Exhibit 017 of the deposition.)
18   BY ATTORNEY LIES:
19   Q   And, I'll ask you whether or not you've ever seen this
20   document before, and you may have seen it during Discovery?
21       PAUSE
22       (Revision of document by Deponent.)
23   A   Yes, when they sent it.
24   BY ATTORNEY LIES:
25   Q   Okay, so you saw it on or about July 1st of 2008. Is

Page 118

1    that correct?
2    A   No.
3    Q   Well, let me understand your answer. You said you saw
4    it. I'm trying to figure out when you saw it.
5    A   In the Discovery.
6    Q   Okay, all right, let's go to paragraph one. It talks
7    about Warner Chilcott, does it not?
8    A   Yes.
9    Q   Okay, and the Warner Chilcott contract was canceled and
10   went to a competitor. Is that right?
11   A   Yes.
12   Q   Who was the competitor?
13   A   Chemtreat.
14   Q   And, then paragraph two talks about the perform
15   improvement letter, which we discussed this morning, telling you
16   that you were on notice, that you had to improve certain
17   performance or you would be subject to termination. Do you
18   remember that? Is that the performance improvement letter? Do you
19   recall that?
20   A   Yes.
21   Q   Okay, and then we've already talked about the meeting
22   with Amgen. That's paragraph number five. And, do you recall what
23   we talked about that a few moments again with Amgen?
24   A   Correct.
25   Q   And, you were removed from that account. Is that

Page 119

1    correct?
2    A   Yes.
3    Q   Okay, paragraph number seven talks about the special
4    test for a client, Wyeth, had asked for?
5    A   Yes.
6    Q   And, what was the special test for Wyeth?
7    A   A cooling performance test which required information
8    from the Cooling Performance Institute, information which I
9    didn't have...
10       INTERPRETER: ... Interpreter corrects himself...
11   A   ... a program from the Cooling Performance Institute,
12   which I didn't have, and I was doing all the calculations
13   manually. And, besides, at that time, my back was giving me a lot
14   of problems.
15       Usually, that job was done a Columbian Engineer by the
16   name of Luis Fernando Gabiria, and he had the program from the
17   Cooling Performance Institute, and it would take him two to three
18   days.
19   BY ATTORNEY LIES:
20   Q   Okay, when you couldn't do the special test
21   calculations for Wyeth because of your back, did you tell Mr.
22   Duggal that you couldn't do it because of your back, and ask
23   somebody else to do it for you?
24   A   Well, I did all the study. What I couldn't finish were
25   the calculations, which the information of the study was given to

Page 120

1    Manuel so that he would give his presentation, in Guatemala.
2        And, really, everybody in the district knew that I had
3    problems with my back, and that my health wasn't very good.
4    Q   Did you tell Mr. Duggal that you couldn't do that
5    special Test Report because of your back, and ask him to have
6    someone else do the report? That's the question.
7    A   No.
8    Q   Paragraph number twelve talks about Smurfit and why you
9    hadn't serviced Smurfit. Was that one of your accounts?
10   A   Yes, and service was provided to them, and that e-mail
11   was sent to Ortega. What happened was that the other person
12   didn't see the e-mail in their in box.
13       So, what I did was I sent a copy, a forward of that e-
14   mail that I had sent before, to that person.
15   Q   All right, I'm going to hand you what's been marked as
16   Exhibit 018, which purports to be a document entitled
17   "Communicating Our Commitment to Equal Employment Opportunity"
18   and ask you whether or not you've ever seen this document before?
19       (Whereupon, the above-referenced document was marked as
20   Exhibit 018 of the deposition.)
21       PAUSE
22       (Revision of document by Deponent.)
23   A   Yes.
24   BY ATTORNEY LIES:
25   Q   And, in fact, you saw this document at the time that

30 (Pages 117 to 120)

Electronically signed by Gregoria Echevarria (401-409-341-5259)                                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 121

1   you started working for Nalco, didn't you?
2       A   Yes, that's correct.
3       Q   And, it was available to you online, was it not?
4       A   Yes.
5       Q   And, there are many, many policies at Nalco that are
6   available to you online and were during the time you were working
7   for the company, were there not?
8       A   Yes, that's correct.
9       Q   And, this policy is the Equal Employment and Harassment
10  Policy.
11      A   Uh huh.
12      Q   Do you see that?
13      A   NO AUDIBLE RESPONSE FROM DEPONENT.
14      Q   Do you see that?
15      A   Yes.
16      Q   Okay, and it says, in paragraph three:
17          "Any employee or applicant who feels that he or she has
18  been the subject of discrimination or harassment should
19  report the incident promptly as described below in the
20  'Reporting Procedure' section of this policy.". Do you see
21  that?
22      A   Yes, I see it.
23      Q   And, it says that there's a reporting procedure for you
24  to use that is contained further in the document, Reporting
25  Procedure to Report Discrimination, Including Harassment. Do you

Page 122

1   see that?
2       A   Yes.
3       Q   And, during the time that you were employed by Nalco up
4   to the time of the termination, you never made a report of
5   discrimination or harassment to your Supervisor, to the EEO, the
6   Human Resources contact, the Nalco Officer for your location or
7   anyone else as provided in this procedure, did you?
8       A   That's correct. First, Nalco doesn't have a Human
9   Resources Office in Puerto Rico. And, whenever you had to call
10  Naperville to explain any type of situation like this, it was
11  difficult. It was very hard to be understood because, with the
12  Puerto Rican accent, it was very hard to be understood.
13          And, Nalco has a service for different languages. But,
14  when you would ask for somebody who spoke Spanish, it would take
15  an hour to get them on the phone.
16      Q   Okay, did you ever call Naperville and make a report to
17  anyone in Naperville of any discrimination or harassment?
18      A   No, because, when...
19      Q   Okay.
20      A   ... when I found out how things were done, I was
21  already out.
22      Q   Now, it says that you can make a report orally, and you
23  said you never called up there, or in writing. Did you ever file
24  a written Complaint, while you were working for Nalco, where you
25  claim that there was discrimination or harassment?

Page 123

1       A   No...
2       Q   Okay.
3       A   ... because, as I explained before, when you notice
4   that things are happening, you're already feeling discriminated
5   against.
6           And, the part of the harassment, well, it was being
7   part of the crowd. And, if you weren't part of the crowd, you
8   were doing things wrong.
9       Q   Okay, Mr. Aponte, your Complaint says that you started
10  being discriminated against in 2001.
11          The Complaint you filed says you started being
12  discriminated against in 2001, does it not, sir?
13      A   When Jorge Castillo arrived.
14      Q   Okay, and it says it continued until July 23rd of 2008.
15  Is that correct?
16      A   Yes.
17      Q   So, for a period of seven years, you never called
18  Naperville and made an oral report. Is that correct?
19      A   That's correct.
20      Q   And, for a period of seven years, you never sent a
21  written report in of any complaints of discrimination or
22  harassment. Isn't that also true?
23      A   That's correct because, as I said before, being part of
24  the crowd, and also because I was afraid of Jorge Castillo. Mr.
25  Duggal had told me, on several occasions, that Mr. Castillo

Page 124

1   wanted my head because, as an Applications Engineer, I earned
2   much more money than an Applications Engineer earned in Columbia.
3   So, I was afraid to do anything.
4       Q   The policy also prohibits retaliation. It says:
5           "Nalco strictly prohibits any retaliation against an
6   employee who, in good faith, reports conduct the individual
7   believes to be discriminatory or harassing.
8           Any Supervisor, agent or other employee of Nalco who
9   retaliates against any employee for making a good faith
10  report of discrimination or harassment will be subject to
11  appropriate discipline up to and including termination.". Do
12  you see that?
13      A   Yes, but that's on the paper. I mean how does that
14  guarantee that nothing else is going to be done to me or that any
15  other situation is going to go up to the point that it makes me
16  resign.
17      Q   So, you don't know whether or not, if you had made a
18  complaint, it would have been corrected because you never made a
19  complaint, did you?
20      A   No, and it's due to the same reason. I was afraid of
21  being fired and not in any other way.
22      Q   But, you saw the policy, and the policy says that, if
23  you had reported it and Mr. Castillo or Mr. Duggal or Mr. Ortiz
24  had done anything to you to retaliate, they could be subject to
25  termination. You knew that was in the policy, didn't you?

31 (Pages 121 to 124)

Electronically signed by Gregoria Echevarria (401-409-341-5259)                                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb