# Exhibit A

# Deposition Of Plaintiff Donato Aponte And Selected Exhibits

# Part 2

Donato Aponte-Navedo

Page 125

1    A   I continue saying that that's on paper.
2    Q   But, you don't know what would happen because you never
3    filed a Complaint. Isn't that true?
4    A   Would you have done it?
5    Q   I'm asking you the questions, sir.
6    A   Well, I had to work to support my family. I had to do
7    everything possible to keep my job and to continue on with things
8    like that.
9    Q   Okay, so you knew that there was a policy, but you
10   never made a verbal complaint, and you never submitted a written
11   complaint. Is that true?
12   A   That's correct, but it was discussed in the group, in
13   the meetings that were done, and the comments that Mr. Castillo
14   would make.
15   Q   Okay, are you talking us you made a complaint, under
16   this policy, to Mr. Castillo?
17   A   No.
18   Q   Did you make a complaint, under this policy, to Mr.
19   Duggal?
20   A   No.
21   Q   Did you make a complaint, under this policy, to Mr.
22   Ortíz?
23   A   No.
24   Q   Now, you also said that, during this time period, Mr.
25   Santiago was there. Is that right? From 2001, was he still there?

Page 126

1    A   He was fired in 2000.
2    Q   Did you ever make a complaint to Mr. Serrano?
3    A   No, I didn't have any access directly to Mr. Serrano.
4    Q   You could reach him by e-mail, couldn't you?
5    A   Yes, but, in Nalco, you follow the chain of command.
6    Q   This policy lets you complain to any Officer. He was
7    an Officer, wasn't he?
8    A   Yes.
9    Q   So, you never complained to Mr. Serrano and he was an
10   Officer, wasn't he?
11   A   No, but, once again, I tell you that, during the
12   meetings, the comments that Mr. Castillo would make were talked
13   about.
14   Q   We'll get into that. I'm asking you whether or not you
15   used this policy to submit something to Naperville...
16   A   No.
17   Q   ... or to any Officer for a period of seven years?
18   A   No.
19   Q   Okay, you're claiming, in this case, that you have some
20   type of a disability. Is that correct?
21   A   Yes.
22   Q   Okay, and what are claiming as your disability?
23   A   Diabetes Type II.
24   Q   Okay, when did you find out that you had diabetes?
25   A   Do want exactly the date, the time?

Page 127

1    Q   Did you receive a diagnosis from a physician that you
2    had diabetes?
3    A   I went into the Emergency Room with a six hundred and
4    fifty blood sugar.
5    Q   And, approximately, what day was that?
6    A   That was on August 26, 2005. I was working doing a
7    special study in Cervecería India. It was a Friday.
8        The Treatment Plant Operator noticed I was having some
9    weird symptoms. He forced me to go to the clinic and, in the
10   clinic, I had a two hundred and fifty blood sugar.
11   Q   Okay, which clinic was this? Was this the company
12   clinic?
13   A   The clinic at Cervecería India.
14   Q   Okay, and what did you notice about yourself?
15   A   Who, the Operator or me?
16   Q   What did you notice about yourself? Were you dizzy, did
17   you have headaches, did you have a loss of coordination?
18   A   I was urinating a lot, I was sweating a lot, blurry
19   vision. I was like shaking.
20   Q   Okay, anything else?
21   A   And, I didn't see very well, I didn't see very well.
22   Q   Okay, now you have a family history of diabetes, don't
23   you?
24   A   Yes, that's correct.
25   Q   Did anybody in your family die of diabetes?

Page 128

1    A   Yes, my grandfather.
2    Q   Okay, when you learned...
3    A   Directly, he died of gangrene.
4    Q   Okay, when you learned that you had disability, that
5    caused you to feel depressed, didn't it?
6    A   No.
7    Q   Did you think you might die?
8    A   If I didn't take care of it, yes.
9    Q   Okay, so you went then from the company clinic to a
10   hospital. Is that right?
11   A   Yes, what I wanted to do at that time was get in my
12   vehicle and go home. I was very far from my home. But, the
13   Manager, the Health and Safety Manager of the plant, did not
14   allow me to do so, and he called 911.
15   Q   He called 911, and they took him to the hospital.
16   A   After the call was made to 911, the paramedics then
17   came and took my vitals. And, at that time, the blood sugar was
18   already over range. The glucometer couldn't read it.
19       At that time, I called my Supervisor, Ashok Duggal, and
20   I told him what was happening to me, that I was going to be taken
21   to the hospital.
22       He told me that he was with Jorge Ortíz in a meeting,
23   in an after hours, after a PREPA seminar. And, what they were
24   going to do, in order to be able to take me home, was that they
25   were leaving. They were going to Mayaguez so that they could take

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 129

1   me home and take the vehicle also.
2     Q  And, isn't it a fact that, when you called Mr. Duggal,
3  you told him that your brother was going to pick you up?
4     A  No.
5     Q  Okay, what's the name of your brother?
6     A  Iván Aponte.
7     Q  And, how old is he?
8     A  Now, about forty.
9     Q  And, it's your testimony that you never spoke to your
10  brother, on the day that you were diagnosed, about taking you
11  home? Is that right?
12     A  No, I spoke to my brother, and he went by the hospital.
13  But, I told him that I was going to be picked up from Nalco.
14     Q  So, you don't recall telling Mr. Duggal that your
15  brother was going to pick you up at the hospital? Your brother
16  was there or coming to the hospital. He was going to pick you up
17  and take you home. You don't remember telling him that?
18     A  No, no, because I spoke to my brother after I had
19  spoken to the personnel from Nalco.
20     Q  And, you called Mr. Duggal between two and three
21  o'clock in the afternoon. Is that correct?
22     A  Yes, that's correct.
23     Q  Okay, and he told you that they were relating with
24  PREPA, P-R-E-P-A, the company we talked about earlier today.
25  That's what he told you, correct?

Page 130

1     A  That's correct, and they told me that, after that, they
2  were coming to pick me up, that I should call when I was about to
3  leave.
4     Q  And, the meeting with PREPA, the term "relating" means
5  that they were going to be working in a meeting with this
6  particular client as part of the sales promotion. Isn't that
7  true?
8     A  With PREPA, "relating" means, after the seminar, going
9  to a bar and drinking.
10     Q  Okay, and did the company have an expectation that you,
11  as a person responsible for sales, and other members of the team
12  would go out after hours and meet with clients and talk to them
13  and have drinks sometimes and have dinner with them to get to
14  know the client?
15     A  Yes, that's correct. I also did it.
16     Q  Okay.
17     A  I had dinner with clients.
18     Q  Okay, and, in fact, the competitors were doing the same
19  thing, like Chemtreat. They were out trying to entertain the same
20  people or your clients, weren't they?
21     A  Yes, that's correct.
22     Q  Okay, in fact, that's how you develop relationships,
23  personal relationships, with these clients? It's meeting them
24  after hours and getting to know about their families and their
25  children and their activities. Isn't that true?

Page 131

1     A  That's correct.
2     Q  And, in fact, you developed some strong personal
3  relationships with your clients by relating to them and going to
4  have dinner with them and having drinks with them, didn't you?
5     A  That's true, but I didn't drink.
6     Q  Okay, all right, and let's talk a little bit... let's
7  finish up on the hospital.
8     You called and spoke to Mr. Duggal about two or 3:00
9  P.M., and you'll get to ask Mr. Duggal his questions about what
10  he said. But, you deny that you told him your brother was going
11  to pick you up. Is that correct?
12     A  That's correct, because I remembered that my brother
13  was in the area much later after I called them.
14     Q  Okay, and you remember all these events very
15  specifically, even though you said a little... a few minutes ago
16  that you were dizzy, and your blood sugar was very, very high? Is
17  that right?
18     A  That's correct, and I remember specifically because, at
19  that time, I had a wife who wanted to pick me up, and I told her
20  not to do so because we had a two month old baby whom she was
21  breast-feeding, and that she couldn't come and pick me up.
22     Q  Okay, that's not in the papers that you filed with the
23  Court. There's no reference to your wife. Did you just remember
24  that right now?
25     A  Yeah.

Page 132

1     Q  Okay, so, when you signed these Answers and swore to
2  them, under oath, you didn't remember anything about your wife
3  breast-feeding? Is that right?
4     A  Correct, you've helped me to remember things.
5     Q  So, you deny that you told Mr. Duggal that you were
6  going to have your brother pick you up.
7     What time did the doctors tell you that you were going
8  to be discharged?
9     A  There was no discharge time. I was discharged at about
10  ten in the evening.
11     Q  Okay, now you say "When I was about to be discharged
12  from the hospital, I called Mr. Duggal.". So, I was asking you
13  when were you about to be discharged? Is that ten o'clock at
14  night?
15     A  When I was told that I was going to be discharged, at
16  ten in the evening, that I thought that they were already going
17  to be in the area.
18     Q  And, so it's your testimony that then you called Mr.
19  Duggal, and Mr. Duggal told you he was drunk? Is that your
20  testimony? Is that what he told you?
21     A  Well, when you've been working for people for so long
22  and you hear how they get, you know how they get, how they talk,
23  his tongue was already heavy. His speech was heavy.
24     And, he said "Look, we're going to go to Jorge's place.
25  And, from there, then we're going to pick you up.".

Electronically signed by Gregoria Echevarría (401-409-341-5259)         1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 133

1  Q   Okay, in your verified statement here, you said that
2  Mr. Duggal called you... you called Mr. Duggal, and he told you
3  he was drunk. He didn't tell you he was drunk, did he?
4  A   Yeah.
5  Q   You just told me that you made a self-diagnosis. He
6  didn't say "I'm drunk.", did he?
7  A   Can I clarify?
8  Q   I want an answer whether or not he said to you "I'm
9  drunk."?
10  A   Yes.
11  Q   Okay, what else did he say?
12  A   That they were going to go up to where Jorge was, they
13  were going to go to Ponce to drop off the car, and then they
14  would pick me up. At that time, I told them "Forget it. I'll deal
15  with it.".
16  Q   Okay, in fact, you told Mr. Duggal not to worry, didn't
17  you? That's what you said in your Sworn Statement?
18  A   Of course. I told him not to worry because what was I
19  going to do?
20  Q   Did you tell Mr. Duggal that you would take a cab,
21  asked him if you could take a cab, and the company would pay for
22  it?
23  A   No, no.
24  Q   Okay, did you ask Mr. Duggal to have him send somebody
25  else from the company to pick you up?

Page 134

1  A   No.
2  Q   Okay, did you then call your wife up and ask her to
3  come and pick you up?
4  A   No.
5  Q   Did you call your brother, at that point in time, and
6  ask him to come and pick you up?
7  A   My brother was already in Dorado.
8  Q   That's not my question. The question is did you call
9  your brother?
10  A   No.
11  Q   Okay, so you drove home, slowly to your home, with
12  blurred vision. Is that right?
13  A   Yes, that's correct.
14  Q   The doctor had released you from the hospital. Is that
15  correct?
16  A   Yes.
17  Q   The doctor didn't tell you that you couldn't drive, did
18  he?
19  A   No.
20  Q   How fast did you drive on the way home? You said "I
21  drove slowly.". How slow were you driving?
22  A   Like forty, forty-five miles.
23  Q   Forty-five miles per hour?
24  A   Uh huh.
25  Q   You have to answer out loud.

Page 135

1  A   Yes, yes.
2  ATTORNEY LIES: Let's take a break.
3  (Off the record.)
4  (Brief recess.)
5  (Back on the record.)
6  ATTORNEY LIES: Back on the record.
7  BY ATTORNEY LIES:
8  Q   Before the break, we were talking about the date that
9  you received the diagnosis of diabetes and what occurred on that
10  particular day. You recall that, do you not, sir?
11  A   Yes.
12  Q   And, you are claiming as your disability in this case
13  that you have Diabetes Type II. Is that correct?
14  A   Yes.
15  Q   Okay, all right, and are you taking any medication for
16  your diabetes right now?
17  A   Yes, that's correct.
18  Q   And, what medication?
19  A   Right now, I'm taking Metformin.
20  Q   How do you spell that?
21  A   M-E-T-F-O-R-M-I-N, if I'm not mistaken.
22  Q   Metformin, okay. And, how frequently do you take that?
23  A   Twice a day.
24  Q   Do you test your blood sugar?
25  A   Yes.

Page 136

1  Q   How frequently?
2  A   At least once a day.
3  Q   Since being diagnosed with diabetes, I just want to ask
4  you about your normal activities. Are you still able to get out
5  of bed in the morning?
6  A   Yes, that's correct.
7  Q   Are you able to brush your teeth?
8  A   Yes.
9  Q   Are you able to get yourself dressed?
10  A   That's right.
11  Q   Are you able to bathe yourself, shave, shower and groom
12  yourself?
13  A   Yes.
14  Q   Are you able to drive a car?
15  A   Yes.
16  Q   Are you able to perform work around your house, keeping
17  your house clean?
18  A   Yes, but sometimes I get tired a lot.
19  Q   Okay, are you able to buy groceries?
20  A   Yes.
21  Q   Are you able to cook or prepare meals?
22  A   Yes.
23  Q   I think you already answered this in your answers. But,
24  are you able to play with your kids?
25  A   Yes.

34 (Pages 133 to 136)

Electronically signed by Gregoria Echevarria (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 137

1    Q    What kind of games do you play with your kids? Do you
2  throw a baseball with them at all?
3    A    No, I don't play baseball with them.
4    Q    Okay, what type of games do you play with your kids?
5    A    We play in the house, sometimes I take him to ride his
6  bicycle.
7    Q    Do you ever take your kids swimming?
8    A    Yes, I take them to swim, yes.
9    Q    Okay, do you ever take them on walks?
10   A    It's not very common.
11   Q    Okay, are you able to fix things around the house?
12   A    Some, yes.
13   Q    Okay, can you operate a vacuum in your house?
14   A    Yes.
15   Q    Can you make your bed?
16   A    Yes, but I don't.
17   Q    Okay, can you wash dishes?
18   A    Yes.
19   Q    Okay, can you do laundry?
20   A    The machine does it, yes.
21   Q    Okay, and are you able to work on your computer?
22   A    Yes.
23   Q    And, you're currently able to work? Is that right?
24   A    Yes.
25   Q    Do you ever drive your children places?

Page 138

1    A    Yes.
2    Q    What kind of hobbies do you have?
3    A    Hobbies, bonsais.
4    Q    Is that working on trees?
5    A    Little ones.
6    Q    Okay, how long have you had that hobby?
7    A    I began in 1980. I stopped in 1982 to go to college.
8  And, then, as a method to lower stress, I began with it again in
9  2006.
10   Q    Do you and Belkis take your children out together to do
11  things together?
12   A    Sometimes.
13   Q    Okay, when you and Belkis take the children out, what
14  type of activities do you do with the children?
15   A    Almost always we go to El Moro to fly kites.
16   Q    To what?
17        ATTORNEY CUADROS-PESQUERA: El Moro, the fortress.
18  BY ATTORNEY LIES:
19   Q    Okay, to fly kites, okay. And, how often do you do
20  that?
21   A    Before, I tried to do it approximately twice a month.
22  Now, we practically don't do it.
23   Q    How frequently do you and Belkis see each other, on a
24  daily basis?
25   A    No.

Page 139

1    Q    Do you see each other once a week?
2    A    Yes, when I go to see the kids.
3    Q    Okay, do you and Belkis ever go out together without
4  the kids?
5    A    No.
6    Q    What other activities do you and Belkis do with the
7  kids?
8    A    When I take them to the pool, when we go out for Daniel
9  to ride a little bit his bicycle, and sometimes, but rarely, to
10  the movies.
11   Q    And, do you also go to celebrate your children's
12  birthdays with Belkis?
13   A    Yes.
14   Q    And, do you and Belkis get together during the
15  holidays, say for Christmas, with the children?
16   A    Yes, I mean the families get together on Christmas.
17   Q    And, what other activities do you and Belkis do
18  together with the children?
19   A    Sometimes we go to the mall. Before, we used to go out
20  to dinner to someplace, but now it's been almost like six months,
21  about six months, that we don't do it anymore.
22   Q    And, what is the reason that you don't go out to dinner
23  with the children anymore with Belkis?
24   A    Financial.
25   Q    Any other activities that you and Belkis engage in

Page 140

1  together with your children?
2    A    The first day of school we took the kids together to
3  school.
4    Q    Okay, anything else?
5    A    No.
6    Q    Okay, you spoke before, when we were talking about
7  diabetes before, about drinking. Do you recall that, that you
8  don't drink?
9    A    Yes, normally, I don't drink.
10   Q    And, when was the last time you had a drink of alcohol?
11   A    Let me remember. It was July 15th of this year.
12   Q    And, what was the occasion?
13   A    An open-house at work.
14   Q    Okay, and what did you have to drink?
15   A    A glass of wine.
16   Q    Okay, before that, before July 15th of 2010, when was
17  the last time you had a drink of alcoholic liquids?
18   A    At Christmas.
19   Q    Okay, and what did you drink?
20   A    I was given a little bit of coquito.
21   Q    What is that?
22        ATTORNEY MC CARTNEY: It's like coconut eggnog.
23  BY ATTORNEY LIES:
24   Q    And, always what occasion? Where were you when you
25  drank it, the eggnog?

35 (Pages 137 to 140)

Electronically signed by Gregoria Echevarría (401-409-341-5259)          1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 141

1    A   At home, in a family gathering.
2    Q   Was Belkis there?
3    A   Yes, it was Belkis' family, the children, and we were
4  all at home, and my family also.
5    Q   Which home? Which home were the people at?
6    A   Of Toa Baja.
7    Q   At Belkis' house?
8    A   Yes.
9    Q   Okay, do you go over to Belkis' house for family
10  events?
11   A   Yes, my children are there.
12   Q   Okay, and would it be a fair statement you're at
13  Belkis' house at least once a week?
14   A   Yes, and that's how it's stated in the divorce
15  Complaint.
16   Q   Okay, now you said that... you were starting to tell us
17  a little bit about drinking at company events. Do you recall
18  that?
19   A   Yes.
20   Q   You attended company events that were for the sales
21  organization, didn't you?
22   A   Yes, that's correct.
23   Q   And, if you wanted to have an alcoholic drink, you
24  could? Is that right?
25   A   Yes.

Page 142

1    Q   And, if you wanted to drink a soft drink, you could
2  drink that too, couldn't you?
3    A   Yes.
4    Q   And, if you wanted to drink water, you could drink
5  water, couldn't you?
6    A   Yes, that's correct.
7    Q   And, at some of the occasions, you had a drink? Is that
8  right?
9    A   Yes, to be within the group.
10   Q   Okay, and no one told you that you had to have a drink?
11  No one walked up to you and handed you a drink and said "You have
12  to drink this drink.", did they?
13   A   No, but it was said that one of the requirements to be
14  of Nalco was that you had to drink.
15   Q   And, in some of the occasions, you didn't have any
16  alcohol to drink? Is that right?
17   A   Correct.
18   Q   Okay, and, for many years, you went to events and you
19  didn't have any alcohol to drink... is that right... sales
20  events... you didn't have any alcohol to drink? Is that right?
21   A   Correct.
22   Q   Okay, but you still kept your job even though you
23  weren't drinking, didn't you?
24   A   That's correct, but what I would do is I would get a
25  beer and I'd keep that beer all night. Or I would get a drink and

Page 143

1  I would keep that drink in my hands all night or some orange
2  juice, and just keep that orange juice in my hands all night.
3    Q   Did anyone go around, at any of the sales meetings, and
4  take a count about whether or not you were drinking alcoholic
5  beverages or not? Did somebody keep track of that?
6    A   No.
7    Q   Did anyone ever come up to you and say "Are you just
8  drinking orange juice or is that alcohol?"? Did anybody ever come
9  up and ask you that?
10   A   No.
11   Q   Did anybody ever come up and say to you "Gee, you've
12  been drinking the same ball all night."?
13   A   That did happen.
14   Q   Okay, and who came up to you?
15   A   Any one of the other salespersons that was there. And,
16  I was at a place in Columbia where somebody came up to me with a
17  cup, and they gave instructions to somebody else and told them
18  that that cup had to be empty, that that cup couldn't have
19  anything in it (sic).
20   Q   Okay, all right, and what was in the cup?
21   A   Ron Caldas, eight years.
22   Q   Okay, and when was that?
23   A   That was in Chinchiná, Columbia.
24   Q   Approximately, when?
25   A   I'm sorry, it was in Pereira... in Pereira.

Page 144

1    Q   When?
2    A   I am searching. I don't remember when that was. I went
3  to give a training to the Columbian sales force on 3D Trasar, and
4  that was in May, 2007, if I'm not mistaken.
5    Q   And, did you drink whatever was in that drink?
6    A   At that time, yes.
7    Q   Okay, and did the other sales people who were there
8  take the drink?
9    A   Yes.
10   Q   Okay, was this kind of a custom, they passed this drink
11  around to see if everybody wanted a drink? Was it some type of a
12  Columbian custom?
13   A   Up to a certain point, yes.
14   Q   Okay, so you drank one drink... is that right... this
15  drink in Columbia that had some rum in it?
16   A   No, it was like three.
17   Q   And, did other people there drink three drinks?
18   A   More.
19   Q   Okay, so you drank less than everybody else?
20   A   Yes, always.
21   Q   Now, we've already talked about complaints and the
22  company policy concerning discrimination.
23       You have to tell me did you ever call anyone in
24  Naperville or did you ever send an e-mail to Naperville telling
25  people that you were, in your view, having to drink when you

36 (Pages 141 to 144)

Electronically signed by Gregoria Echevarría (401-409-341-5259)        1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 145

1    didn't feel like drinking? Did you ever send a complaint about
2    that?
3        A   No.
4        Q   So, if I understand it, there were some occasions where
5    you went to the sales meeting and you drank nothing of alcohol.
6    Is that right?
7        A   Correct.
8        Q   And, there were some meetings where you went and you
9    had one beer. Is that right?
10       A   Yes.
11       Q   And, there were some meetings you went to and you had
12   orange juice?
13       A   Yes, correct.
14       Q   So, it would vary on the occasion whether or not you
15   would have something to drink or not. Is that right?
16       A   That's correct.
17       Q   And, you kept your job for many, many years even
18   though, on some occasions, you had nothing to drink, you had one
19   beer, you had orange juice or maybe you had more than that. You
20   kept your job that whole time, didn't you?
21       A   Correct.
22       Q   Did anyone ever say that you were gay because you
23   wouldn't drink?
24       A   No.
25       Q   Now, let me hand you what's been marked as Exhibit 019.

Page 146

1        ATTORNEY LIES: And, for the record, these are your
2    Answers that you filed to the first set of Interrogatories,
3    and I'd like you to turn to the last page.
4        (Whereupon, the above-referenced document was marked as
5    Exhibit 019 of the deposition.)
6    BY ATTORNEY LIES:
7        Q   And, where it says "Statement Under Penalty of
8    Perjury", it says... and apparently you signed these on November
9    3, 2009, in San Juan. Do you see your signature there?
10       A   Yes, that's correct.
11       Q   Okay, and did you read these Answers before you signed
12   them?
13       A   Yes, I wrote them.
14       Q   Okay, all right, let's talk about Mr. Castillo.
15       A   That's good.
16       Q   Now, when was the... the first time you met Mr.
17   Castillo you told me that... or you told us, I should say, that
18   it was at a... there was a general meeting, and then he met with
19   each person, including you, for about ten minutes. Is that
20   correct?
21       A   Yes.
22       Q   Okay, and where was this first meeting again?
23       A   That was in the office that was in Caparra, Chalets of
24   Caparra.
25       Q   Okay, now you also told us, I believe, that Mr.

Page 147

1    Castillo came into the area every two or three months. Is that
2    right? Is that correct?
3        A   Correct.
4        Q   Okay, so, if he came every two or three months, then
5    you would see him four times a year... if it was every two or
6    three months... or maybe five times a year?
7        A   Many times more.
8        Q   Okay, well, if he only came into town ever two to three
9    months, where else could you see him or you saw him more
10   frequently than that?
11       A   What happens is that Castillo would usually come for a
12   week. And, many times, on many occasions, I had to pick him up at
13   the hotel. So, I would see him about four times. I'd have to pick
14   him up four times and bring him to the office.
15       So, that's why I would see him more times than just
16   once during his visit. I would see him about four times during
17   his visit.
18       Q   Okay, so, when you picked him up at the hotel, which
19   hotel did he stay at?
20       A   Well, usually, he liked the hotel that's in Condado.
21   The Caribe Hilton is the one on the corner. Yes, the Caribe
22   Hilton.
23       Q   So, you would pick him up in the morning and take him
24   to the office? Where would you take him?
25       A   Usually, I would take him to the office or to see a

Page 148

1    client that another representative would pick him up at that
2    location.
3        Q   And, about how much time would you spend with him when
4    you would pick him up at the hotel and take him to the client?
5    Would you then leave him there?
6        A   Well, that would depend if it was my client, if was
7    somebody else's client or if it was the office. So, it would be
8    an hour, two hours, depending on the distance.
9        Q   Okay, and what time would you usually pick him up in
10   the morning?
11       A   Close to... between eight and eight, thirty in the
12   morning.
13       Q   Okay, and, on the way to either the office or visit a
14   client, would you talk about each other's families?
15       A   Yes.
16       Q   And, would you talk about other people who worked for
17   the company that you knew?
18       A   Well, yes, I would ask about the people who were
19   working in Columbia that I knew.
20       Q   Okay, so would these be what you would call social
21   communications that you had with him about people that you knew
22   and about work? Is that generally what it is?
23       A   Some, yes, and some were more regarding projects and
24   clients.
25       Q   Okay, were they... so they were also business-related.

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)        1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

## Page 149

1  Is that correct?
2      A   Yes.
3      Q   And, when you met with him, did he ever tell you that
4  he expected you to drink at work?
5      A   Yes, that I be more a part of the group.
6      Q   Okay, and did he tell you that he wanted you to be more
7  a part of the group so that you could network or make a network
8  with the other people at work?
9      A   No, rather after hours.
10     Q   So, he told you that he wanted you to meet and get
11 together with the other people in the group after hours to
12 network. Is that what he told you?
13     A   With the people at work, yes.
14     Q   Okay, and did you do that?
15     A   On occasions, I tried, but I couldn't get home too late
16 at night. At times, I thought that the other co-workers didn't
17 like being at their homes because they would get to their homes
18 so late.
19     Q   Okay, so you didn't like to stay around in the evenings
20 and network because you wanted to get home. Is that right?
21     A   That's correct, because I began work at five in the
22 morning, and my idea wasn't to stay until seven, eight or nine in
23 te evening at El Mariachi. That wasn't my idea of working.
24         If it was with a client, I would stay whatever time it
25 was working at a plant, but not drinking or spending time

## Page 150

1  socially.
2      Q   Okay, now we looked earlier today at the Performance
3  Improvement Plan that you got from the company concerning your
4  clients and the problems with your clients.
5         There was nothing in there criticizing you for going
6  home early, was there?
7      A   Can you give me that exhibit?
8      Q   Which exhibit? There's a lot of exhibits.
9      A   I think it's five.
10                    PAUSE
11        (Revision of documents by Deponent.)
12     A   It's not this exhibit. There's another one.
13                    PAUSE
14        (Continued revision of documents by Deponent.)
15     A   Okay, number ten, it says "You cannot seem to be
16 impatient or with little time.".
17 BY ATTORNEY LIES:
18     Q   Okay, and you understood that to mean what?
19     A   That I had to be working all the time, no matter what
20 time it was, with the client.
21     Q   It says "You cannot seem to be impatient.". And, that
22 didn't mean to you that he's telling you not to be in a hurry, to
23 slow down?
24     A   Well, yes, that's correct. But, when you have to visit
25 three clients in one day and you're driving four to six hours,

## Page 151

1  time is short. And, many times I was late visiting these clients.
2  I was until four to five in the afternoon.
3      Q   Okay, well, I asked you what information, on any
4  documents, talked about you going home early. And, this is the
5  only reference you have, in Exhibit 005, that says "You cannot
6  seem to be impatient or with little time."? That's your
7  reference?
8      A   There's another exhibit that states that you have to
9  work ten hours or more hours, whatever time is necessary. That's
10 what separates men from children.
11     Q   Okay, so let's go back to Mr. Castillo. You picked him
12 up in the morning. He would come into town every two to three
13 months. He'd be there for a week. You'd pick him up four or five
14 mornings in the morning.
15        You'd drive him into work, and you'd talk about your
16 families, and you'd talk about people at work and things of that
17 nature and business. Did you talk about anything else?
18     A   Well, he would make comments about what he had done the
19 night before.
20     Q   And, were you... had you been with him the night
21 before?
22     A   No.
23     Q   Okay, did you ever tell him that you didn't want to
24 hear what he did the night before?
25     A   No.

## Page 152

1      Q   Okay, did he tell you that he wanted to go out drinking
2  and with women?
3      A   Yes, that's the reason why he didn't like to stay at
4  the Four Points, in Caguas. Because, at the Four Points, he just
5  had the casino, and there were elderly people who would go there
6  and play.
7         And, at the other hotel, there wasn't an old people
8  environment. The disco was there... it was close... and that he
9  could go out dancing and drinking, whatever he wanted to do.
10     Q   So, he liked... when he was in town and by himself, he
11 liked to go out drinking and dancing? Is that what he told you?
12     A   Yes.
13     Q   And, do you know whether or not other people in the
14 group ever went out dancing?
15     A   Here, no.
16     Q   Okay, do you know whether...
17     A   But...
18     Q   Oh, go ahead, go ahead.
19     A   But, in the meetings outside of Puerto Rico,
20 practically the whole group would go out dancing to discotheques.
21     Q   Okay, do you like to dance?
22     A   Yes.
23     Q   Do you ever dance with Belkis?
24     A   Yes.
25     Q   Did you ever dance with your first wife?

38  (Pages 149 to 152)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 153

1    A    No.
2    Q    You never danced with your first wife, okay, okay. And,
3  what type of dancing do you like?
4    A    Merengue.
5    Q    Okay, any other?
6    A    Bolero, slow dancing.
7    Q    Okay, do you consider yourself a good dancer?
8    A    No.
9    Q    Okay, do you step on your partner's feet?
10   A    Yes, and my own.
11   Q    Okay, so you have gone dancing at events, company
12  events. Is that right or not? You never danced?
13   A    The only place that I danced was in Pereira.
14   Q    Okay, now, at some of the company events, wives could
15  be brought along. Is that right?
16   A    For the Service Representatives, no. For the people who
17  are more at the top, in management, yes.
18   Q    Okay, so did you ever go to any events for the company
19  where Belkis was invited to come along?
20   A    There was a dinner, but there was no dancing.
21   Q    Okay, so, when you were at a company event... you said
22  you were at one company event and you danced. Is that right?
23   A    Yes.
24   Q    And, where was that company event again?
25   A    Well, that was when I went to give the 3D Trasar

Page 154

1  training for the Columbian sales force, in Chinchiná. It was
2  during... or the last night that all the group went to Pereira.
3  That was the last night, and there was sort of a get-together.
4         I was the only person from Puerto Rico, and they didn't
5  let me stay alone at the hotel. So, I went there, to Pereira, and
6  that's where I danced and that's where I also had the three
7  drinks. Can I make a correction?
8    Q    Sure.
9    A    On two occasions, I danced, on that one and in
10  Cartagena.
11   Q    So, on two occasions, you danced? At two company
12  events, you danced? Is that correct?
13   A    That's correct.
14   Q    Okay, and how many company events were there, ten,
15  twenty, thirty? How many events were there?
16   A    No, that time there were... I didn't go to ten. I went
17  to less.
18   Q    How many events did you go to?
19   A    Cancún, Merida, Cartagena, Pereira. There was two in
20  the Dominican Republic.
21   Q    So, six events you went to?
22   A    Approximately, yes.
23   Q    And, you danced at two of them?
24   A    Uh huh.
25   Q    And, how many dances did you dance, one dance each

Page 155

1  time, two dances?
2    A    Twice.
3    Q    Twice, once at each event you danced?
4    A    No, in each.
5    Q    Okay, who did you dance with, people from the company?
6    A    Yes.
7    Q    So, you danced with people that you knew?
8    A    Yes, that's correct.
9    Q    Okay, and these were not people that you had any sexual
10  interest in? They were just people you worked with, correct?
11   A    That's correct.
12   Q    And, the people you danced with didn't touch you
13  inappropriately sexually, did they?
14   A    No.
15   Q    Okay, they didn't touch any of your sexual organs, did
16  they?
17   A    Correct.
18   Q    And, you didn't touch any of their sexual organs, did
19  you?
20   A    No.
21   Q    Did you enjoy... did you have fun dancing with this
22  person or did you not like dancing with this person?
23   A    Yes, these were people I knew, that I had known for
24  some time, for quite an amount of time.
25   Q    And, what kind of dances were they?

Page 156

1    A    Merengue.
2    Q    And, while you were dancing, did you talk to them?
3    A    Yes, we would talk.
4    Q    Okay, did you smile at them?
5    A    Yes, when we were talking, yes.
6    Q    And, when you were done with the dance, did you thank
7  them for the dance?
8    A    Of course.
9    Q    Okay.
10   A    In fact, one of them had visited my home and had met
11  Belkis. When she was in Puerto Rico, we gave her a ride around
12  the island.
13   Q    What's her name?
14   A    I don't remember the last name, but her name is Sandra.
15   Q    Would you consider her to be a friend? You invited her
16  to your house.
17   A    We were with my family going around the island, yes.
18   Q    Okay, so you were dancing with a friend? Is that right?
19   A    Yes.
20   Q    Any other times that you danced at any of these events?
21   A    Not that I remember.
22   Q    Okay, you never... at any of these events, you never
23  had any type of intimate, sexual encounters with any third
24  persons, did you, sir?
25   A    No.

39 (Pages 153 to 156)

Donato Aponte-Navedo

Page 157

1    Q   I don't mean to embarrass. I'm asking you these
2   questions because of the answers that you gave. I don't... it's
3   not my intent to embarrass you.
4    A   No, no.
5
6    Q   Okay, so you were never asked to go... associate with a
7   prostitute, were you?
8    A   Not me. And, even if I was asked, I didn't look for
9   that sort of thing. I didn't do that sort of thing.
10   Q   Okay, and would it be fair to say that, when you were
11  at these events, you socialized with people for a little while,
12  maybe you had one dance, maybe you had a drink or not, and then
13  you went to your room? Is that right?
14   A   Yes.
15   Q   Okay, and Mr. Castillo never told you that you had to
16  associate with a prostitute, did he?
17   A   Well, he would put the situation to me. He would ask
18  me, and he asked me on several occasions. It wasn't in the
19  activities. It was when we were in the car.
20       And, he would ask me, if this hot girl would... and I
21  have to say it just as he would say it... if this hot girl would
22  just put it in my face, wouldn't I eat it up?, to which I
23  answered "No.".
24       And, he would ask this again on several situations. He
25  would ask me about a situation like that, and I would tell him

Page 158

1   no.
2    Q   So, he sometimes talked about sex, and you told him
3   that you weren't interested in what he was talking about? Is that
4   right?
5    A   I wouldn't tell him that I wasn't interested, but I
6   would change the topic.
7    Q   Okay, and then did the topic change to something else?
8   Did you talk about something else?
9    A   On some occasions, he would insist on the topic, and I
10  would again change the topic. And, on some occasions, the topic
11  would just change.
12   Q   And, you never called Naperville or you never sent a
13  written complaint to Naperville about any of these conversations,
14  if you didn't like these conversations? Is that correct?
15   A   That's correct, and it's the same answer that I've
16  given before.
17   Q   So, Mr. Castillo would come to Puerto Rico every two to
18  three months. So, if we figure, that means he's here four weeks
19  out of the year. And, you saw him in the mornings as you drove
20  him to work.
21       You saw him fifteen times, twenty times, during the
22  year. Would that be a fair statement?
23   A   Sometimes more.
24   Q   Sometimes more what? What does that mean?
25   A   Because I would take him to the office or I would take

Page 159

1   him to see a client. And, if he was at the office and I would go
2   by the office that day, I would see him at the office two or
3   three times during that day.
4    Q   Okay, now, when you had your meetings with Mr.
5   Castillo, he didn't talk about women on every occasion, did he?
6    A   No.
7    Q   In fact, many of the conversations were all about
8   families and business. Is that right?
9    A   Yes.
10   Q   And, when you went to meet with clients and you were
11  sitting in a meeting with him and clients, you weren't talking
12  about... or he wasn't talking about women, was he?
13   A   Correct.
14   Q   Now, you... in Exhibit... did... you referred to one
15  incident that took place on a bus called the "Duck", and you were
16  asked to dance. Is that right?
17   A   Yes.
18   Q   Okay, and, apparently, this was some type of a bus that
19  would go into the water for a trip around the bay, and that's why
20  they called it a Duck. Is that correct?
21   A   Yes, that's correct.
22   Q   Okay, and, according to your remembrance, everybody was
23  dancing. How many people were in this group?
24   A   The name... I mean the number I don't remember. But,
25  you had the people from Central America, from the Dominican

Page 160

1   Republic, the people from Florida, the Cubans, and the people
2   from Puerto Rico, but I don't remember the number.
3    Q   Okay, and you said everyone was dancing. So, did all
4   the other people dance?
5    A   Yes, it was the sort of dance that everybody is dancing
6   in a circle, and they get people in the middle of the circle to
7   just clown around.
8    Q   Okay, so everybody is in a circle, and they're kind of
9   laughing. Is that right? You're all standing in a circle, people
10  are dancing, and somebody gets in the middle. Is that right?
11   A   Correct.
12   Q   And, so you didn't want to get in the center of the
13  circle and dance. Is that right?
14   A   Correct.
15   Q   Okay, and did you get in the center of the circle?
16   A   No, in the beginning, I didn't. But, then, because of
17  the pressure, because colleagues would come up to me and say
18  "Hey, Castillo wants you to do it. If you don't do it, you can
19  get into problems, in trouble with him.", so I did it.
20   Q   Okay, were there women in the group?
21   A   Yes, and co-workers.
22   Q   So, some women got in the center and danced?
23   A   If they mentioned them, they would go in.
24   Q   Okay, and some men got in the dance, in the middle? Is
25  that right?

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarria (401-409-341-5259)                                1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 161

1    A   Yes.
2    Q   So, it was equal sex? Both sexes got in the middle and
3   danced? Is that right?
4    A   Yes.
5    Q   Okay, and did anyone tell you that, if you didn't get
6   in the center and dance, they would think that you weren't a man?
7    A   No, but that I could have problems with Castillo.
8    Q   Did you ever go up to Mr. Castillo that night and say
9   "I don't want to dance."?
10   A   I, on several occasions, said no, no, that I didn't
11  want to, but they continued insisting.
12   Q   Okay, and was everybody kind of clapping and saying
13  "Come on, Donato, get in the middle and dance."? All the people
14  were clapping, weren't they?
15   A   That's correct.
16   Q   Okay, so everybody was having a good time and wanted
17  you to get in the middle and dance along with them so you'd have
18  a good time too. Is that right?
19   A   That's correct, but I didn't want to, and I had to do
20  it just to take the group pressure off of me, and that Castillo
21  would be happy with me because I was part of the group.
22   Q   Okay, and Mr. Castillo wanted to build a very solid
23  sales organization where everybody felt that they were part of a
24  group. Isn't that right?
25   A   Yes, but that didn't mean that it had to be forcing

Page 162

1   people to do things that they didn't want to do.
2    Q   Okay, and one of the reasons everybody went out on this
3   little boat together is so you could all get to know each other
4   better. Isn't that right?
5    A   It was part of the District meeting that was occurring.
6    Q   Okay, and, during the course of this meeting, did you
7   have conversations with other employees in the group?
8    A   Yes.
9    Q   And, did you enjoy meeting the other people who were on
10  the boat and enjoy the conversations that you had with them?
11   A   We already knew each other.
12   Q   Okay, so you considered these people to be your
13  professional friends? Is that right?
14   A   Yes.
15   Q   Okay, and so you were enjoying the evening being with
16  our friends? Is that correct?
17   A   That's correct.
18   Q   And, how long were you dancing in the center of this
19  group, a minute, two minutes?
20   A   I jumped in the middle of the circle, I was there for
21  about ten seconds, and then I jumped out.
22   Q   And, while you were in the center for ten seconds, what
23  did you do? Did you wave your hands, did you shake your body?
24  What did you do?
25   A   Whatever they wanted you to do, which was to just clown

Page 163

1   around.
2    Q   Okay, what were other people doing to clown around?
3   Were they making faces, were they waving their hands? What were
4   the other people doing?
5    A   Each one did whatever they... I mean some of them
6   danced, some of them just clowned around.
7    Q   All right, did anything else happen on the Duck that
8   night, besides you getting in the center of this circle for ten
9   seconds and getting right back out again? Did you do any other
10  dancing, anything else?
11   A   Not in the boat.
12   Q   And, this occurred in 2005 or 2006. Is that right?
13   A   Yes.
14   Q   And, so you continued to work for the company for, at
15  least, two more years after that, if it was in 2006? Is that
16  right? You were still employed for two years after that?
17   A   Yes.
18   Q   Okay, now you also say that, when Mr. ... you and Mr.
19  Castillo were in the car, when you would pick him up, he would
20  ask you about your health. Is that right?
21   A   He would ask how did I feel.
22   Q   Okay, did you ever ask him how he felt?
23   A   Yes, I would ask just by courtesy.
24   Q   Okay, did you consider Mr. Castillo to be a
25  professional friend?

Page 164

1    A   Like my boss.
2    Q   Did... when he asked you about your health, did you
3   tell him about your health?
4    A   Yes, when he would ask me, yes.
5    Q   Okay, and, when you asked him about his health, did he
6   tell you about his health?
7    A   What he would say always was that he was all right.
8    Q   And, when he asked you about your health, did you...
9   what did you tell him about your health or did you tell him
10  anything?
11   A   The truth.
12   Q   Okay, what did you tell him about your health?
13   A   If I would feel bad, I would tell him. I would tell him
14  exactly how I felt at that time. And, he would always tell me
15  "Whenever I ask you, you say that you're in a bad state, and you
16  shouldn't say that. You should say that you're all right. You
17  should have a positive attitude and say that everything is fine,
18  that you're doing okay.".
19       He would tell me that I didn't have any energy, that I
20  didn't have any drive. He would always ask me about my weight and
21  how was it, if I had been losing weight. Whenever I would tell
22  him that, yes, I had been losing weight, that I had lost 'X'
23  amount of pounds, he would laugh and say "I don't believe you.".
24   Q   Okay, so did you lose any weight?
25   A   Yes.

Electronically signed by Gregoria Echevarría (401-409-341-5259)          1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

## Page 165

1    Q   Okay, and so, when he asked if you lost weight, he
2  didn't believe you? Is that right?
3    A   Correct.
4    Q   Okay, so it's nothing more than he didn't agree that
5  you lost weight. Is that what it is? You said "I lost weight.",
6  and he said "I don't think so.". Is that what he said?
7    A   He would do it mockingly.
8    Q   Oh, okay. So, did he have a... was he sarcastic
9  sometimes?
10   A   Very.
11   Q   Okay, did he tease you sometimes?
12   A   Yes.
13   Q   Okay, did you ever kid back with him?
14   A   Not usually.
15   Q   Not usually. But, sometimes you did kid back with him?
16   A   When we were all in a group, if a joke was going on,
17  then, yes, everybody would laugh, but it wasn't something that
18  was common.
19   Q   Now, when you talked to Mr. Castillo, was Mr. Castillo
20  one of these people that is always very positive? He never sees
21  anything negative? Is that how you viewed him?
22   A   You could say so.
23   Q   Okay, and you've seen salesmen in your life. And,
24  aren't salesmen... don't they try to be really positive, to be
25  enthusiastic, so they can get you to buy things?

## Page 166

1    A   Yes.
2    Q   Okay, so, Mr. Castillo, I think you told us, had a
3  background, an educational background, in Economics. Is that
4  right?
5    A   No.
6    Q   Okay, what do you understand his background is?
7    A   Engineering.
8    Q   Okay, had Mr. Castillo been in sales for many years?
9    A   Yes, that's correct.
10   Q   And, in fact, you understood that his job was to be
11  head of the sales organization, wasn't it?
12   A   Yes.
13   Q   And, one of the things that he tried to tell the whole
14  group was to be very positive, when you went out to talk to a
15  client, so that you could try to get the client to buy products
16  or services from Nalco. Is that right?
17   A   That's correct. Yes, that's correct. He expected
18  everything to be positive, no matter what was happening.
19   Q   Okay, do you not like people who are always positive
20  all the time?
21   A   Yes.
22   Q   You don't like people who are positive all the time?
23   A   No, I like them. But, when Mr. Castillo arrived, he
24  would state that Puerto Rico didn't have any sales culture. And,
25  what was tried to explain to him was that, in Columbia, in Latin

## Page 167

1  America, well, you live to work. But, that here, in Puerto Rico,
2  in the U.S., you work to live.
3    Q   And, who said this, Mr. Castillo or...
4    A   That was tried to be explained to Mr. Castillo on many
5  occasions.
6    Q   So, Mr. Castillo had a different type of view of the
7  importance of work. He viewed that you should be basically
8  working all the time. Is that what he thought?
9    A   That's correct.
10   Q   Okay, and you didn't agree with that. Is that correct?
11   A   That's correct.
12   Q   Okay.
13   A   I saw how he treated people in Columbia, and, in
14  Columbia, he was a tyrant. Here, he couldn't do it because he
15  would always ask about the laws to see what he could or couldn't
16  do.
17   Q   Okay, so, when you saw him in Columbia and you said he
18  was a tyrant, he was a tyrant towards everybody. Is that right?
19   A   Well, not with everybody, but with a certain type of
20  people, with women who worked with him, that he would grab them,
21  he would squeeze them, he would touch them, and they couldn't say
22  anything because, in Columbia, there's no type of laws against
23  that. If they talk, they're fired.
24   Q   Okay, so these were events that you're talking about
25  where he... you say he acted like a tyrant. That was to people in

## Page 168

1  Columbia. Is that correct?
2    A   Correct.
3    Q   Okay, so you never saw him grab a woman in Puerto Rico,
4  did you?
5    A   When he came to Puerto Rico, he asked "Well, can you
6  say this to the secretary?", and we'd tell him that, no, that you
7  can't say that type of thing. He would ask "Can I say that she
8  looks beautiful today, that she looks good?", and we'd say "No,
9  you can't say that type of thing because you're going to get into
10  trouble.".
11       So, in the beginning, he would ask. But, if you're
12  asking me did he squeeze, did he grab any secretary, well, he
13  would take advantage of when he was saying "Hi.", and, yes, he
14  would grab her.
15   Q   So, he would hug people when he would say "Hi." to
16  them?
17   A   Yes.
18   Q   Okay, did you ever hug anybody at work on a birthday or
19  a holiday... anybody at work?
20   A   Not usually.
21   Q   But, you have done it, have you not?
22   A   Yes.
23   Q   Okay, and, if someone hugs you, does that bother you?
24  If somebody hugs you at work as a friend, does that bother you?
25   A   No.

42 (Pages 165 to 168)

Electronically signed by Gregoria Echevarría (401-409-341-5259)        1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

## Page 169

1    Q   Okay, do you remember any other conversations that you
2  had with Mr. Castillo? We've now talked about Mr. Castillo and
3  whether he wanted you to dance or not dance, have we not? We've
4  covered that whole subject. Is that correct?
5    A   Well, about the dancing, about the topics. On several
6  occasions... I don't know if it's here... but he would always
7  make comments about people's weight, that we didn't seem like
8  Nalco representatives, that we had to be like him, in his
9  physical shape.
10   Q   So, he talked about men and women about their weight.
11 Is that right?
12   A   No, because none of the women were overweight.
13   Q   Okay, so he only talked about... he talked about men
14 and their weight. Is that correct?
15   A   Yes.
16   Q   What other men did he talk about their weight?
17   A   Well, about all of them because we're all overweight,
18 except two.
19   Q   So, he, if you will, teased or was sarcastic to all the
20 men, except for two, about their weight. Is that right?
21   A   That's correct.
22   Q   And, you said that all the men are overweight, except
23 for two, if I understood what you said?
24   A   That's correct.
25   Q   So, he didn't limit his comments about weight to you.

## Page 170

1  He was talking to other men about their weight also. Is that
2  correct?
3    A   Correct, but I was the only one he would ask if I had
4  lost weight. Also, he once brought somebody in. He brought Sandra
5  to give training on cholesterol. They were linking cholesterol to
6  being overweight.
7        I got upset, and I asked if there was anybody in the
8  room who knew what their cholesterol and their triglycerides
9  were.
10   Q   Okay, who's Sandra?
11   A   She was a person from Columbia who, on many occasions,
12 he would bring in to give trainings.
13   Q   Okay, and...
14   A   And, on that occasion, I asked... and this person was
15 practically thin... I asked this person if he knew what his
16 cholesterol and his triglyceride levels were, and this person
17 said that his levels were five hundred and three hundred and
18 something for his cholesterol. And, compared to me who is
19 overweight, I was very under the limits.
20   Q   So, Mr. Castillo brought Sandra in to talk to all the
21 employees about cholesterol. Is that right?
22   A   Yes.
23   Q   And, you knew that cholesterol can causes changes in
24 our cardiovascular system and can kill you, if it's the wrong
25 type of cholesterol, before Sandra came in, didn't you?

## Page 171

1    A   Of course.
2    Q   And, so Mr. Castillo was bringing someone in to talk to
3  all the employees about cholesterol because cholesterol could be
4  a serious health hazard for all the employees. Is that correct?
5    A   That's correct.
6    Q   And, you thought there was something wrong with having
7  an employee come in and talk about a health hazard to all the
8  employees, if I understand what you're saying. Is that correct?
9    A   No, that isn't a bad thing. But, there was a secondary
10 reason for which he would bring Sandra.
11   Q   What was the secondary reason?
12   A   She was one of the ones he would grab.
13   Q   Did you actually see him... you saw him hug her? Is
14 that correct?
15   A   Yes.
16   Q   Okay, how many times did you see Castillo, Mr.
17 Castillo, hug Sandra?
18   A   Many times.
19   Q   Okay, and did he touch her in any genital areas?
20   A   Well, that, I didn't see.
21   Q   What did he give her, a hug?
22   A   Yes, and in Cartagena, he got upset with me because I
23 danced with her.
24   Q   He got upset with you because you danced with Sandra?
25   A   Yes.

## Page 172

1    Q   Okay, did you want to dance with Sandra?
2    A   Well, we had talked, and I asked her, the next time
3  that a Merengue would be playing, if we could dance.
4    Q   Okay, so you weren't forced to dance with Sandra, were
5  you?
6    A   No.
7    Q   Okay, so you voluntarily danced with Sandra one dance.
8  Is that right?
9    A   Correct.
10   Q   And, what did Mr. Castillo... and this was... where was
11 this? This was in Columbia?
12   A   Yes, in Cartagena de Indias.
13   Q   And, what did Mr. Castillo say to you after you danced
14 one dance with Sandra?
15   A   He didn't have to say anything. Just with the look that
16 he gave me and the attitude that he had it was enough.
17   Q   Did he say anything to you?
18   A   No.
19   Q   Okay, and what was the look? He stared at you?
20   A   Yeah.
21   Q   So, if I understand it, your testimony, he forced you
22 to dance with people. But, when you danced with people, he stared
23 at you and frowned. Which is it?
24   A   No, that wasn't my testimony. My testimony was that,
25 when I was on the Duck, he forced me to dance something that I

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                           1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 173

1  didn't want to do.
2      Q   Okay.
3      A   And, on the other occasion that I went to dance, I
4  chose the wrong person, and then that's when he gave me the
5  intimidating stare.
6      Q   Okay, when he gave you this stare... you claim he gave
7  you this stare... did you go up to say to him "Why are you
8  staring at me?"? Did you ask him?
9      A   No, because I didn't want to have any type of
10 argumentation.
11     Q   Did Mr. Castillo ever tell you "I don't want you ever
12 dancing with Sandra again?"? Did he ever tell you that?
13     A   No, but the two disappeared.
14     Q   Okay, what happened the rest of the evening after you
15 danced with Sandra? Did you go back to the rest of the evening?
16     A   I was with the rest of my colleagues, and I was taking
17 pictures of the activity, and then I went to sleep.
18     Q   Okay, and, just so you're clear, the only time that you
19 were forced to dance was you danced alone... is that right... for
20 ten seconds?
21     A   Yes, because I usually didn't dance.
22     Q   Okay, now you were... Mr. Castillo told you a couple of
23 times that you don't have energy. Is that right?
24     A   Yes.
25     Q   And, what did you say to him when he told you

Page 174

1  didn't have energy, if anything?
2      A   That that wasn't so.
3      Q   Okay, so you told him you did have energy?
4      A   Sure.
5      Q   How old was Mr. Castillo?
6      A   He must have been close to fifty.
7      Q   Okay, and, at that time that Mr. Castillo and you were
8  working together, how old were you?
9      A   Forties.
10     Q   Okay, did he ever ask you your age?
11     A   Yes, to tell me "Look, you're younger than me, and I
12 have more energy than you.".
13     Q   So, he was being sarcastic about your age?
14     A   Yes.
15     Q   He asked you about your age once. Did he ever ask you
16 about your age again?
17     A   He knew all of our ages. Therefore, he didn't have to
18 ask anything.
19     Q   Okay, my question is he asked you once about your age.
20 He never asked you about your age again. Is that right?
21     A   He didn't have to do it because he knew my age.
22     Q   Did he ever ask you again about your age?
23     A   I don't remember.
24     ATTORNEY LIES: Okay, let's... what time is it anyway? I
25 don't want to kill the Court Reporter.

Page 175

1      ATTORNEY CUADROS-PESQUERA: Around five.
2      ATTORNEY LIES: What time do you normally go for
3  depositions around here, how late? What's the custom and
4  practice?
5      ATTORNEY CUADROS-PESQUERA: The rules say seven hours.
6      ATTORNEY MC CARTNEY: Yeah, but that's...
7      ATTORNEY RIESCO: Excluding breaks and...
8      ATTORNEY MC CARTNEY: And, also not necessarily where
9  there's a Translator involved.
10     ATTORNEY RIESCO: Right.
11     ATTORNEY LIES: Yeah, I mean this cuts down the time.
12     ATTORNEY CUADROS-PESQUERA: Well, it lasts as long as it
13 lasts. I mean, as a point of personal privilege, after seven
14 hours, I'm pretty much beat up.
15     ATTORNEY LIES: And, that's not what I'm suggesting. I'm
16 suggesting that maybe we finish tomorrow morning with Mr.
17 Aponte, and then take Belkis right after that. Does that
18 work?
19     We're going to have to... do you want to... she asked
20 for an Interpreter too.
21     INTERPRETER: I'm scheduled for tomorrow also.
22     ATTORNEY LIES: Okay, then you're going to be here
23 anyway. And, you're going to be here tomorrow or not?
24     COURT REPORTER: Yes.
25     ATTORNEY CUADROS-PESQUERA: We'll all be here.

Page 176

1      ATTORNEY RIESCO: Do you want to stay on the record?
2      ATTORNEY LIES: We don't have to stay on the record.
3  Well, this is scheduling. Are we going to agree that we're
4  going to recess then until nine o'clock tomorrow morning,
5  and resume with finishing Mr. Aponte and go right into Ms.
6  Belkis? Does that work?
7      ATTORNEY CUADROS-PESQUERA: It works for me.
8      ATTORNEY LIES: All right, okay.
9      ATTORNEY CUADROS-PESQUERA: Thank you very much.
10     ATTORNEY LIES: Thank you.
11 DEPOSITION RECESSED OCTOBER 12, 2010, AT 5:00 P.M.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)          1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

Donato Aponte-Navedo

Page 177

```
 1              CERTIFICATE OF REPORTER
 2      I, GREGORIA ECHEVARRÍA, Court Reporter and a member of Vega
 3  Reportage;
 4      DO HEREBY CERTIFY:  That the foregoing transcript is a full,
 5  true and correct record of the testimony given which was taken
 6  down by me and thereafter reduced to the typewritten form under
 7  my direction and supervision.
 8      I FURTHER CERTIFY:  That I am not in any way involved or
 9  interested in the outcome of said action.
10      WITNESS my hand this 18th day of October, 2010, in San Juan,
11  Puerto Rico.
12
13
14
15
16      _____
17      GREGORIA ECHEVARRÍA
18      Court Reporter
19
20
21
22
23
24
25
```

Page 178

```
 1            CERTIFICATE OF NOTARY PUBLIC
 2      I, LUIS NOLLA, ESQ., Attorney at Law and Notary Public, duly
 3  commissioned and qualified in and for the Commonwealth of Puerto
 4  Rico;
 5      DO HEREBY CERTIFY:  That by stipulation of the parties I
 6  acted as Notary Public. That the foregoing deposition was taken
 7  on the date and time heretofore mentioned; and
 8      That the Court Reporter, the Interpreter, and the Deponent
 9  were sworn by me before the commencement of the taking of the
10  Deponent's testimony. Afterwards, my presence was excused by
11  stipulation of the parties.
12      IN WITNESS WHEREOF, I sign this document and affix my
13  notarial seal in San Juan, Puerto Rico, on the___day of_____,
14  2010.
15
16
17
18      _____
19      LUIS NOLLA, ESQ.
20      Notary Public
21
22
23
24
25
```

Page 179

```
 1            CERTIFICATE OF DEPONENT
 2      I, DONATO APONTE-NAVEDO, of legal age, certify that:
 3      I have read the transcript of my deposition, taken on
 4  October 12, 2010, in the case before The United States District
 5  Court for the District of Puerto Rico, Donato Aponte-Navedo, et
 6  al, Plaintiffs versus Nalco Chemical Company, et al, Defendants,
 7  Case Number 09-CV-01232(GAG), from page one (1) through one
 8  hundred and seventy-nine (179) inclusive, together with the
 9  corresponding exhibits that were attached, if any.
10      If there are corrections or amendments to the aforementioned
11  transcript, the same are included as an addendum to the
12  transcript. The pages are initialed and numbered by me,
13  commencing with page number one hundred and eighty (180).
14      IN WITNESS WHEREOF, I sign this document in San Juan, Puerto
15  Rico, on the___day of_____, 2010.
16
17
18
19      _____
20      DONATO APONTE-NAVEDO
21
22
23
24
25
```

45  (Pages 177 to 179)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    1f32acc1-b3c9-49b7-b9e7-cd723ed3c0cb

# Transcript of the Testimony of **Donato Aponte-Navedo**

**Date:** October 13, 2010
**Volume:** 2

**Case:** Donato Aponte-Navedo, et als. v. Nalco Chemical Company, et als.

Printed On: June 20, 2011

Vega Reportage, Inc.
Phone:(787) 764-6386
Fax:
Email:vegareportage@onelinkpr.net
Internet:

Page 180

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DONATO APONTE-NAVEDO, et al,  :  CIVIL NO.: 09-CV-01232(GAG)
   Plaintiff(s)   :
  vs   :  RE: TITLE VII VIOLATION, AGE,
NALCO CHEMICAL COMPANY,  :  GENDER AND NATIONAL ORIGIN
JOSÉ SERRANO, JANE DOE  :  DISCRIMINATION, AMERICANS WITH
and the CONJUGAL PARTNERSHIP  :  DISABILITIES ACT, AND TORTS
SERRANO-DOE, JORGE CASTILLO,  :  PLAINTIFFS DEMAND TRIAL
JANE DOE and the CONJUGAL  :  BY JURY
PARTNERSHIP CASTILLO-DOE,  :
ASHOK PAUL DUGGAL,  :
JANE DOE and the CONJUGAL  :
PARTNERSHIP DUGGAL-DOE, and  :
ABC INSURANCE,  :
   Defendant(s)   :
------------------------------

CONTINUATION OF THE TAKING OF THE DEPOSITION OF:
MR. DONATO APONTE-NAVEDO

DATE  :  October 13, 2010
TIME  :  9:00 A.M.
PLACE  :  Cancio, Nadal, Rivera & Díaz
      403 Muñoz Rivera Avenue
      San Juan, Puerto Rico 00918

---

Page 181

1        A P P E A R A N C E S
2
3  FOR DEFENDANTS:  MARK A. LIES, ESQ.
4       Seyfarth Shaw, LLP
5       131 South Dearborn Street
6       Suite #2400
7       Chicago, Illinois 60603
8       NATASCHA B. RIESCO, ESQ.
9       JAMES MC CARTNEY, ESQ.
10      Cancio, Nadal, Rivera & Díaz
11      403 Muñoz Rivera Avenue
12      San Juan, Puerto Rico 00918
13  FOR PLAINTIFFS:  MIGUEL A. CUADROS-PESQUERA, ESQ.
14      701 Ponce De León Avenue
15      Suite #215
16      San Juan, Puerto Rico 00907
17  OTHERS PRESENT:  MR. ASHOK PABLO DUGGAL
18      Nalco Representative
19      MS. BELKIS ISABEL SANTIAGO-MARTÍNEZ
20  DEPONENT:   MR. DONATO APONTE-NAVEDO
21  INTERPRETER:  MR. CARLOS LAO-DÁVILA
22  COURT REPORTER:  MS. GREGORIA ECHEVARRÍA
23      Vega Reportage
24
25

---

Page 182

1        I N D E X
2
3  MR. DONATO APONTE-NAVEDO
4    DIRECT EXAMINATION (Cont.):
5      By Attorney Lies:      184
6
7  EXHIBIT      DESCRIPTION      PAGE NO.
8  Exhibit 020
9    Copy of multi-page document,
10   Civil Case # 09-CV-01232(GAG),
11   RE: Complaint,
12   03/06/2009.      232
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 183

1        P R O C E E D I N G S
2        (9:20 A.M.)
3    ATTORNEY LIES: This is the resumption of the deposition
4  of Mr. Donato Aponte. It's taken pursuant to Notice. It
5  commenced yesterday, and it's taken pursuant to the Federal
6  Rules of Procedure, the Federal Rules of Evidence and
7  applicable orders from the United States District Court, in
8  this particular district. Mr. Aponte, you understand you're
9  still under oath, do you not?
10    DEPONENT: Yes.
11    ATTORNEY LIES: Jim, I don't have to bring the Notary
12  back today, do I?
13    ATTORNEY MC CARTNEY: No, everybody continues under the
14  same oath as yesterday.
15    ATTORNEY LIES: Okay, all right, I just want to make
16  sure that I'm following the custom.
17  (Whereupon,
18      MS. GREGORIA ECHEVARRÍA
19  having been previously duly sworn, acted as the official Court
20  Reporter of the proceedings held during the act of taking of
21  deposition.)
22  (Whereupon,
23      MR. CARLOS LAO-DÁVILA
24  having been previously duly sworn, acted as the official
25  Interpreter of the proceedings held during the act of taking of

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)    fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

## Page 184

1 deposition.)
2    (Whereupon,
3        MR. DONATO APONTE-NAVEDO
4 having been previously duly sworn, was examined and, through the
5 Interpreter, testified upon his oath as follows:)
6        DIRECT EXAMINATION (Cont.)
7 BY ATTORNEY LIES:
8    Q   Between the time that we finished yesterday, Mr.
9 Aponte, and today, did you review any documents relating to this
10 matter?
11    A   No.
12    Q   And, between the time that we finished last night and
13 today, have you talked to anyone about this case, other than your
14 Attorney?
15    A   With anybody who wasn't in this room, no.
16    Q   Okay, did you talk to Belkis about the case?
17    A   Yes.
18    Q   And, what did you and Belkis talk about? I don't want
19 any conversations if Counsel was there. But, if the two of you
20 had conversations when he was not there, then I'd like to know
21 what those conversations were about in this case.
22    A   You want to know what we talked about?
23    Q   About the case, not anything else, just about the case.
24    A   Nothing. We talked about the style of asking questions,
25 and we spoke a little bit about you, that sometimes you were a

## Page 185

1 little bit aggressive, but manageable.
2    Q   Manageable?
3        ATTORNEY CUADROS-PESQUERA: He's leading, right!
4        ATTORNEY LIES: Nobody's ever said that to me. You
5 haven't seen anything yet! No, that's not a question.
6        (General laughter.)
7 BY ATTORNEY LIES:
8    Q   Okay, Mr. Aponte, I just want to clear up a few things.
9 Yesterday we talked about the jobs that you held before you went
10 to work for Nalco.
11        Do you recall those discussions that we had yesterday
12 about those other jobs?
13    A   Yes.
14    Q   None of the jobs that you held, before you went to
15 Nalco, involved you receiving a commission for sales, did they?
16    A   No.
17    Q   And, since your employment with Nalco and you're now
18 employed by Cervecería India...
19    A   Cervecería de Puerto Rico.
20    Q   Oh, okay. The current job that you're in right now with
21 that company does not involve payment of commissions, does it?
22    A   No.
23    Q   Okay, so the only job that you've ever had, that you
24 testified about here with is, is the job that you had with Nalco
25 where you had an opportunity to receive sales commissions for

## Page 186

1 sales of products and services. Is that correct?
2    A   Yes, that's correct.
3    Q   Do you consider yourself to be as competent a
4 salesperson as you are a Technical Engineer?
5    A   I was always considered the most technical of the
6 group.
7    Q   Do you consider yourself to be a better technical
8 person than a salesperson?
9    A   Yes.
10    Q   Okay, now, in your current job, you told us that you
11 started your job Cervecería de Puerto Rico when, sir?
12    A   October 31, 2008.
13    Q   Okay, do you know whether or not Mr. Ashok Duggal and
14 Mr. Jorge Ortíz recommended to the people at your current
15 employer that they consider employing you because of your
16 technical skills?
17    A   Yes, that's correct.
18    Q   Okay, how did you learn that they had recommended you
19 to work at your current employer because of your technical
20 skills? How did you come to that knowledge?
21    A   Jorge Ortíz called me and told me.
22    Q   Did you ask Mr. Ortíz to help you try to find another
23 job after you left Nalco?
24    A   No, he offered that, if I needed any help, I could
25 count on him.

## Page 187

1    Q   Did Mr. Duggal also make that same offer to you, that,
2 if you needed any help, he could help you or would help you?
3    A   Yes, we had communication through e-mail, and he also
4 stated that.
5    Q   Do you still consider Mr. Duggal to be a professional
6 friend?
7    A   Yes.
8    Q   Do you still consider Mr. Jorge Ortíz to be a
9 professional friend?
10    A   Yes, right now, he's my supplier.
11    Q   Okay, how often do you see Mr. Ortíz?
12    A   In the beginning, it was more. I was seeing him once a
13 month. Now, it's like once every two months.
14    Q   And, is Nalco providing services and products to your
15 satisfaction with your company?
16    A   Yes. I mean there have been some deviations, but we've
17 talked about it, and they've been tried to be corrected.
18    Q   Have other chemical companies approached you to try to
19 sell their services and products to you, the same type of
20 services and products that Nalco sells?
21    A   Yes.
22    Q   Okay, and have those other companies invited you out to
23 be entertained so that they could get to know you and possibly
24 develop a relationship where you would buy products and services
25 from them for your company?

2 (Pages 184 to 187)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

Page 188

1    A   Yes.
2    Q   And, have some of those competitors who are reaching
3  out to you asked you to go out to dinner with them?
4    A   Yes.
5    Q   All right, and, yesterday, we talked about the fact
6  that...
7    A   But, I haven't gone.
8    Q   Okay, I'll start over. Yesterday, I believe you
9  testified that Mr. Suárez was the individual you believed
10  replaced you at Nalco. Is that what you told us yesterday?
11    A   That wasn't discussed yesterday.
12    Q   All right, who do you claim was the person that
13  replaced you at Nalco after you left, what individual?
14    A   When I was terminated, they had hired Mr. Jaime Suárez
15  practically a month before.
16    Q   Are you claiming that Mr. Suárez was the individual who
17  replaced you, in your job, when you were terminated by Nalco?
18    A   Yes.
19    Q   Okay, at the time of your termination, what was your
20  job title? Were you a District Representative III?
21    A   Yes, that's correct.
22    Q   Okay, and, when Mr. Suárez was hired, as you told us, a
23  month before you were terminated, he was hired as an Applications
24  Engineer, wasn't he?
25    A   That, I don't know how he was hired. The name of the

Page 189

1  position I don't know.
2    Q   And, the reason you don't know the name of the position
3  is you've never seen Mr. Suárez' personnel folder, have you?
4    A   No.
5        ATTORNEY LIES: Okay, just so I understand, when he says
6  "no", he means he did not see the personnel folder.
7  BY ATTORNEY LIES:
8    Q   When you say "no", sir, do you mean that you have not
9  seen the personnel folder? I want to make sure I understand what
10  you mean by "no".
11    A   No, no, I mean none of the people have access to that.
12    Q   So, as you sit here today, you don't know what position
13  Mr. Suárez was hired into when he was hired by Nalco a month
14  before you were terminated? You don't know what that job
15  description is, do you?
16    A   No, but that day I was terminated I saw him at the
17  office and I talked to him, and he told me that he had been in
18  the United States for two weeks receiving training for the new
19  representatives.
20    Q   At that time that you talked to Mr. Suárez in the
21  office when you were terminated, you did not know what his job
22  classification or title was, did you?
23    A   No, but he had gone to receive the training for the
24  people who are going to have a position in sales.
25    Q   Do you know...

Page 190

1    A   What usually happened in Nalco is you would receive...
2  in my time, you would receive the training through some modules,
3  and you would take the training system on-line.
4        And, after you would have that on-line regarding the
5  techniques, the packs (phonetic), the chemical treatments, then
6  you would go to the United States to get trained.
7    Q   Okay, at that time that you were terminated, as you sit
8  here today, you can't tell me what Mr. Suárez' job title was, can
9  you?
10    A   No.
11    Q   Okay, and, because you did not review his personnel
12  folder, you don't know what his educational background is, do
13  you?
14    A   No, I hadn't seen his personnel file, but I had seen
15  his résumé.
16    Q   And, what did his résumé say about his educational
17  background?
18    A   Mechanical Engineering, and he studied in the
19  University of Atlantica, in Barranquilla, Columbia, and then he
20  did a Master's in Mechanical Engineering in the University of
21  Puerto Rico, Mayaguez Campus.
22    Q   Do you have a Master's Degree in Chemical Engineering?
23    A   No.
24    Q   Okay, I believe yesterday you told us that you don't
25  have any degrees beyond your degree... your undergraduate degree.

Page 191

1  Is that correct?
2    A   That's correct.
3    Q   And, at that time of the termination, you don't know
4  what Mr. Suárez was being paid, do you?
5    A   No.
6    Q   Okay, do you know whether or not Mr. Suárez, at that
7  time that you were terminated, was being paid less than you were?
8    A   No, but the SOP in Nalco is that they have a table when
9  people come in, and that people have to be paid much less than
10  somebody who has been in the company almost thirteen years.
11    Q   So, do you believe, at that time that you were
12  terminated, that Mr. Suárez was earning less than you were
13  earning?
14    A   Yes, that's correct. And, also he didn't have a pension
15  plan. The pension plan had been ended from some time back, and
16  what he had was a 401-K and I had a pension.
17    Q   So, Mr. ... you received a pension from the company,
18  and Mr. Suárez had to contribute money to a 401-K. Is that your
19  understanding?
20    A   Correct.
21    Q   And, at that time that you were terminated, you don't
22  know whether or not Mr. Suárez was being paid any type of a
23  commission or just a straight salary, do you?
24    A   Correct.
25    Q   Okay, now you said you looked at Mr. Suárez' résumé.

3  (Pages 188 to 191)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

## Page 192

1  What other experiences did he have on his résumé before he came
2  to Nalco? Do you remember?
3      A   If I'm not mistaken, he had been working with a company
4  providing service and performing audits for a pharmaceutical
5  company.
6      Q   Do you remember the name of the pharmaceutical company?
7      A   No, he didn't work at the pharmaceutical company. He
8  worked for a company that provided services to a pharmaceutical
9  company.
10     Q   What was the name of that company that provided the
11 services, if you remember?
12     A   I don't remember the name of the company, but it was
13 with Engineer Jorge Hernández.
14     Q   Have you ever spoken to Mr. Suárez since the time you
15 were terminated?
16     A   Yes.
17     Q   When was the last time you spoke to Mr. Suárez?
18     A   Last Saturday.
19     Q   Okay, and what was the occasion that you spoke to Mr.
20 Suárez last Saturday?
21     A   He was giving a training at the brewery.
22     Q   So, Mr. Suárez is providing services to the brewery. Is
23 that correct?
24     A   Yes, he's right now my supplier.
25     Q   And, is he providing professional services and products

## Page 193

1  of Nalco that meet the needs of your company?
2      A   Yes, that's correct. Like I said before, there have
3  been some deviations, but we've talked about it and we've tried
4  to correct them.
5      Q   Okay, so you and Mr. Suárez have worked together, and
6  he has tried to meet whatever concerns you have about the
7  products and services?
8      A   Yes.
9      Q   Now, yesterday you told us that you were claiming a
10 disability because of your diabetes. Do you recall that?
11     A   Yes.
12     Q   And, do you recall we went into when you first had your
13 diabetes diagnosed, how you test your blood sugar, and the
14 doctors that you went to see? You recall we went through all that
15 yesterday, correct?
16     A   Yes.
17     Q   Is there any other information that you wish to tell us
18 about... concerning your diabetes and why you claim it's a
19 disability, besides what you told us yesterday?
20     A   Well, I try to control my diabetes as best as possible.
21 I have to follow a diet, eat at certain times, eat my snacks, and
22 try to have sufficient rest to keep it under control.
23         Stress and maybe other medications that you have to
24 take, if you have some other condition, can also affect diabetes.
25 What else?

## Page 194

1          Many times when there were meetings, I had to go and
2  eat. I had to go out and eat something. Many times when they
3  would say "We're not going to go out to lunch." and food would be
4  brought in, they would bring the things that precisely I couldn't
5  eat, and I had to eat them because it was going to be worse if I
6  didn't eat anything.
7          And, that, many times, would affect, would cause
8  effect.
9      Q   Okay, anything else?
10     A   No...
11     Q   Are you claiming any other...
12     A   ... not right now.
13     Q   I don't want to repeat myself, but are you claiming any
14 other disability besides diabetes?
15     A   No.
16     Q   Okay, now, in your Answers to Interrogatories, you
17 reference pictures which your Counsel is going to make a good
18 faith effort to find if they, in fact, exist.
19         What type of pictures were you referring to? Did you
20 take pictures, did you get pictures from company events? What
21 pictures are we talking about here?
22     A   I like to take pictures. And, when we would go to
23 activities, I would usually have my camera with me.
24         Usually, at the moment of the official activity, I
25 would be taking photos. I'd be taking pictures. And, at the end

## Page 195

1  of the activity when the get-together would begin, well, then I
2  wouldn't take pictures because that would probably cause problems
3  with any family or any person.
4          But, in Cartagena, I continued taking photos all the
5  time when I was in the activities.
6      Q   I realize your Attorney may object because the pictures
7  speak for themselves.
8          But, tell us what is on these pictures, if you recall
9  what's on these pictures?
10     A   There were people drinking, and also Mr. Jorge Castillo
11 filling the glasses and cups of people.
12     Q   And, these people were drinking at some of the
13 company's social events? Is that why the pictures were taken?
14     A   Yes.
15     Q   So, there's pictures of people drinking and pictures of
16 Mr. Castillo pouring drinks. Is that correct?
17     A   That's my best recollection because I handed in those
18 pictures about a year ago, and I haven't seen them anymore.
19     Q   About how many pictures did you hand to your attorneys?
20     A   Five, six. I don't remember very well.
21     Q   And, these pictures were all taken in what country?
22     A   Columbia.
23     Q   And, approximately, what time frame, 2005, 2006, 2007?
24 Do you remember?
25     A   2008.

4  (Pages 192 to 195)

Electronically signed by Gregoria Echevarria (401-409-341-5259)     fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

Page 196

1    Q   Did you ever show these pictures to any of the people
2  from the company just to tell them that you were taking pictures
3  when you went to the event, in Columbia?
4    A   Yes, because I would even be told "Take pictures.", and
5  I would get all the pictures and I would put them in a disc, in a
6  DVD, and I would take them to the office.
7    And, they would use those pictures for the newsletter,
8  the small newspaper that they have, so they could show what the
9  activities that they had were.
10   ATTORNEY LIES: Okay, before we go any further, I think
11  that Belkis is freezing. Should we turn the air conditioning
12  off? She's wrapped up in a sweater.
13   Maybe we should... we can turn it down. You don't have
14  to sit there all wrapped up.
15   MS. SANTIAGO: That's fine. If you can turn this one off
16  and that one on, that's fine. Thank you.
17  BY ATTORNEY LIES:
18   Q   So, the pictures we're talking about, some of the
19  pictures may have even been in the company newsletter... they may
20  be. Is that right?
21   A   Yes.
22   Q   Okay, now yesterday you told us that you had seen a
23  psychologist sometime in 2010, at least that's what my notes
24  show.
25   What is the name of that psychologist? Because we'd

Page 197

1  like to try and get the records from that psychologist.
2    A   I saw that psychologist as part of the Employee
3  Assistance Program from the brewery. I went to that psychologist
4  a few times. I don't remember the name, but I can get the
5  information, and I can provide it to my Attorney so that he can
6  send it.
7    Q   And, you're not under any type of continuing treatment
8  with this psychologist? You just went to see him several times?
9    A   Well, I saw her... because it's a female
10  psychologist... and I saw her the number of times I was allowed
11  to do so for free under the Employee Assistance Program.
12   Q   And, do you remember the name of the medical group or
13  where she may be?
14   A   Right now, I don't remember. But, tomorrow I can call
15  the office and go to that location and get the information.
16   Q   Okay, do you have anymore appointments currently
17  scheduled with this female psychologist through the EAP Program?
18   A   No.
19   Q   And, I believe I asked you this yesterday, but I want
20  to make sure. You're not taking any medication now for any mental
21  or emotional condition, are you, sir?
22   A   No, I couldn't do it because I couldn't work.
23   Q   Okay, now you testified yesterday about a number of
24  different employees. I'd like to make sure we have clear record
25  here.

Page 198

1    Which employees... which employee do you claim may have
2  received more favorable treatment from you... strike that.
3    Which employee do you claim received more favorable
4  treatment from the company than you did?
5    A   Can you repeat the question?
6    Q   Are you claiming that any employee at the company
7  received more favorable treatment from the company than you did
8  and, if so, what's the name of that employee?
9    A   Yes.
10   Q   Okay, what's the name of the employee?
11   A   Edward Bray.
12   Q   And, who's Edward Bray?
13   A   He's a representative... was.
14   ATTORNEY LIES: I'm sorry, he's a what?
15   INTERPRETER: Representative.
16  BY ATTORNEY LIES:
17   Q   A District Representative, is that what you mean?
18   A   Yes, that's correct.
19   Q   And, when was Mr. Bray... and that's spelled B-R-A-Y...
20  when was he hired?
21   A   I don't know.
22   Q   Was he hired before you?
23   A   No.
24   Q   And, you have not seen his personnel file, so you don't
25  know his educational background, do you?

Page 199

1    A   No, but everybody knew he was a Mechanical Engineer.
2    Q   And, he had a degree? Was he a degreed (sic) Mechanical
3  Engineer, if you know?
4    A   What do you mean a "degree"?
5    Q   Did he have a college degree as a Mechanical Engineer,
6  if you know?
7    A   Yes.
8    Q   Okay, and do you know whether or not he had any post-
9  graduate degrees?
10   A   No.
11   Q   You don't know?
12   A   No, he didn't have.
13   Q   What type of work experience did Mr. Bray have before
14  he started working for Nalco?
15   A   Well, that, I don't know.
16   Q   Okay, how old... what was Mr. Bray's age?
17   A   He was in his thirties.
18   Q   And, in what way do you claim Mr. Bray received more
19  favorable treatment from the company than you did? What's the
20  basis for that?
21   A   Well, Edward had problems with clients. He lost
22  accounts, several accounts. And, on several occasions, it was
23  mentioned in the group that he was hanging by a thread to be
24  taken out of the company.
25   And, even with all of that, he was still given the

5  (Pages 196 to 199)

Electronically signed by Gregoria Echevarria (401-409-341-5259)                                fc15cb15-d81b-4985-80b9-2d5dd04a760a

Page 200

1  opportunity to resign, to make his own company, and Nalco hired
2  that company to provide services.
3      Q   So, if I understand what you're telling me, Mr. Bray
4  had problems with clients. Did he serve the same clients that you
5  did?
6      A   Just in Amgen.
7      Q   So, you don't know what his problems were with clients,
8  other than what you may know about Amgen, is that correct,
9  because you didn't serve those other clients?
10     A   Well, no, but Pablo Duggal (sic) and Jorge would
11  discuss it with me that he was having problems with clients. He
12  would argue with clients, that he had problems with his character
13  in terms of arguing with clients. He had a strong character, and
14  that he lost accounts.
15     Q   All right, do you know whether or not Mr. Bray was put
16  on a Performance Improvement Plan, just like you were?
17     A   No, because those things were done behind closed doors.
18     Q   Okay, do you know whether or not Mr. Bray was put on
19  probation, like you were?
20     A   No.
21     Q   Okay, and you were not present when Mr. Bray was talked
22  to about being terminated and offered the opportunity to resign.
23  Is that correct?
24     A   No, but he discussed it with me during the time that he
25  was in negotiations and I was still working in Nalco. He

Page 201

1  discussed it with me on several occasions that they still hadn't
2  reached an agreement with the percentages, with the financial
3  side.
4      Q   And, when did Mr. Bray leave Nalco?
5      A   After I did.
6      Q   What year?
7      A   I'm not sure. It could be the end of 2008.
8      Q   So, you're claiming that one employee, Mr. Bray, was
9  treated more favorably than you by the company because, when he
10  was being told he was going to be terminated, he was given an
11  opportunity to resign, and the company looked at some opportunity
12  for him to continue performing some type of services as a
13  consultant. Is that right?
14     A   Not as a consultant, but rather to perform
15  installations and to take clients that are very small.
16     Q   And, do you... does Mr. ... excuse me... do you know
17  how much Mr. Bray may be earning in that job?
18     A   No.
19     Q   Do you know whether or not Mr. Bray was earning less
20  money than you're earning working for the company that you work
21  for now?
22     A   No, because I haven't talked to him.
23     Q   When was the last time you spoke to Mr. Bray?
24     A   Maybe at the end of 2008.
25     Q   Have you now told us everything about the only employee

Page 202

1  that you claim received more favorable treatment from the company
2  than you did, sir?
3      A   Of Edward, yes.
4      Q   And, that is the employee that you claimed received
5  more favorable treatment from the company than you did, correct?
6  I just want to close this subject out.
7      A   No, there's another one.
8      Q   Okay, what other employee do you claim received more
9  favorable treatment from the company than you did?
10     A   Francisco Casanova.
11     Q   When was Francisco Casanova hired?
12     A   He was hired at the end of 2000 or 2001... the
13  beginning of 2001.
14     Q   And, what is Mr. Casanova's educational background?
15     A   If I'm not mistaken, he's a Chemist, and I think he
16  also has studies in Biology.
17     Q   Have you ever seen his résumé?
18     A   No.
19     Q   What type of college degree does he have?
20     A   If I'm not mistaken, it's a Bachelor's Degree in
21  Chemistry and Biology.
22     Q   And, does he have any educational degrees past
23  undergraduate?
24     A   No, I don't know.
25     Q   Okay, Mr. Casanova is Puerto Rican, is he not?

Page 203

1      A   Yes.
2      Q   Okay, all right, so are you claiming that he was
3  treated more favorably than you were because he was Puerto Rican?
4      A   No.
5      Q   What position was Mr. Casanova initially hired into?
6      A   Like everyone, as an Applications Engineer.
7      Q   Applications Engineer I, II or III?
8      A   I don't know. It should be III, which is the starting
9  one.
10     Q   And, is Mr. Casanova still working for the company?
11     A   Yes, that's correct.
12     Q   And, what is his current position?
13     A   If I'm not mistaken, it's District Representative.
14     Q   District Representative I, II or III?
15     A   It should already be I.
16     Q   And, do you know anything about Mr. Casanova's medical
17  history? Do you know whether he has a disability or not?
18     A   He has high blood pressure.
19     Q   How do you know that?
20     A   Because he takes medication. And, many times he would
21  take it at the office, and he would tell me it was because he had
22  high blood pressure. His face would many times get red.
23     Q   Do you know anything else about Mr. Casanova's medical
24  history or any medical conditions?
25     A   No.

6 (Pages 200 to 203)

Donato Aponte-Navedo

## Page 204

1    Q    And, how old is Mr. ... how old was Mr. Casanova in
2    2008?
3    A    Thirty... in his thirties.
4    Q    You have not seen Mr. Casanova's people folder, have
5    you?
6    A    As I said before, that's not accessible to any
7    employee.
8    Q    So, you have not seen any of Mr. Casanova's Performance
9    Reviews during the time he's worked for Nalco, have you?
10   A    No.
11   Q    Did you and Mr. Casanova service the same clients?
12   A    Some, yes. I was the one who would cover his back.
13   Q    When you say "cover his back", did you provide
14   technical services to some of his clients?
15   A    Yes.
16   Q    Did he provide any technical services to any of your
17   clients?
18   A    No.
19   Q    When did you provide technical services to his clients?
20   A    In the beginning of the 2000's, and, if I'm not
21   mistaken, in 2006, 2007, 2008 also.
22   Q    Mr. Casanova is still employed by the company. Is that
23   correct?
24   A    That's correct.
25   Q    And, how old is he now?

## Page 205

1    A    He should be forty.
2    Q    And, you're claiming that he was treated more favorably
3    than you were because he was in his thirties?
4    A    No.
5    Q    In what way are you claiming he was treated more
6    favorably by the company than you were?
7    A    Because he lost accounts, large accounts, and he's
8    continued to lose accounts, and they've just taken him out of
9    those accounts.
10        I asked Jorge Ortíz "How is Casanova?" because I
11   know... we all know that, technically, he's not good. And, his
12   answer is "You know.".
13   Q    Why... in what way is Mr. Casanova, in your view, no
14   good technically?
15   A    Well, when the installations were being made... well,
16   he could sell a 3D Trasar. In fact, he was the first one who sold
17   one in Latin America.
18        But, he couldn't put that equipment to work as it was
19   supposed to be put to work, and he had it working just as an
20   expensive tracer.
21   Q    And, when did this happen?
22   A    He had about seventeen 3D Trasars on the island, and
23   none of them was working as 3D. I had three, and two of them were
24   working as 3D. And, other representatives had those equipments
25   working well.

## Page 206

1    Q    So, it's your opinion, sir, that you were more
2    technically qualified than Mr. Casanova. Is that correct?
3    A    That's correct.
4    Q    Okay, and that's your opinion?
5    A    That's a... well, that's a fact.
6    Q    And, you have never seen any of his Performance Reviews
7    or any communications that he had with any of his clients, have
8    you, sir?
9    A    No.
10   Q    Mr. Casanova, however, was skilled at being able to
11   sell services and products, wasn't he, sir?
12   A    Yes, he would sell, but he didn't know what he was
13   selling. I would then have to go to his clients to solve the
14   problems and solve whatever mess he had made with the client. I
15   would solve those problems for him so that he would then be in
16   the client's good graces.
17   Q    So, Mr. Casanova was very good at selling services and
18   products for Nalco. And, you believe that you're very good at
19   going in and providing the technical services for those products
20   and services. Isn't that correct?
21   A    Well, Mr. Casanova would sell products and services
22   because, before selling, he would ask me, on occasion, to go and
23   do the studies and the calculations so that then he was really
24   selling the technical side, and he didn't know what he was
25   selling.

## Page 207

1    Q    So, if I understand what you've just told me, Mr.
2    Casanova was very good at selling services and products, but you
3    were very good at the technical services of going to make sure
4    that those products and services worked after they were sold to
5    the client. Is that right?
6    A    Yes, because how Nalco works is that it's based on a
7    strong, technical side. And, it's that strong, technical side
8    which makes the sale.
9    Q    So, now you've told us that you claim that Mr. Bray
10   received more favorable treatment from the company than you did,
11   and you've explained that to us.
12        And, now you've told us why you believe that Mr.
13   Casanova received more favorable treatment from the company than
14   you did.
15        Have you now told us about the employees that you claim
16   received more favorable treatment from the company than you did?
17   A    Yes.
18   Q    Okay, now yesterday we looked at your Answers to the
19   Interrogatories, which is Exhibit 019, I believe. Well, I'll give
20   you the original, and your Attorney can look at his copy.
21        And, on page nine... if you'll turn to that... you say,
22   at the bottom of the page, that Mr. Castillo would stroke your
23   stomach. Do you recall that?
24   A    Yes.
25   Q    Okay, I want to know how many times Mr. Castillo rubbed

7 (Pages 204 to 207)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

Page 208

1   or stroked your tummy or your belly?
2       A   Every time he would ask me about my weight. Every time
3   he would come to Puerto Rico.
4       Q   So, it's your testimony that, every time he came to
5   Puerto Rico, he would stroke your belly? Is that correct?
6       A   Yes, every time he would ask me about my weight.
7       Q   Okay, now you told us yesterday that he talked to all
8   the employees about their weight.
9           And, in fact, you told us yesterday that everyone was
10  overweight, didn't you?
11      A   Not everybody. There were two persons who were not
12  overweight, Dennis López and Edward Bray.
13      Q   Were not overweight?
14      A   Who were not overweight.
15      Q   Okay, what does overweight mean to you? Did you ever
16  put them on a scale to figure out what their weight was?
17          I'm trying to figure out how you, sir, believe they're
18  overweight, overweight or underweight.
19      A   Look at Pablo. Look at me. Jorge was the same. Casanova
20  was the same. Pedro Lara was the same.
21      Q   What does "the same" mean?
22      A   The same shape of the body, with a full belly.
23      Q   So, that means that many of the people that were
24  working there had full, round bellies like yours. Is that right?
25      A   Yes, but Castillo, well, the one that he would always

Page 209

1   ask and whose belly he would always rub was me.
2       Q   Okay, now you said he came to Puerto Rico four times a
3   year. You said it was two to three months. So, he came four
4   times a year, and he was usually here for a week. Is that right?
5   Is that what you told us yesterday, sir?
6       A   Yes, but there were times that the visits were closer
7   together. There were times that the visits were every three
8   months or every four months.
9       Q   So, if Mr. Castillo came to the country, to Puerto
10  Rico, four times or five times a year, is it your testimony that
11  one time, on each trip... so that would be four times or five
12  times a year... he touched your belly and talked about your
13  weight? Is that right?
14      A   Approximately.
15      Q   So, he touched your tummy or belly four to five times a
16  year. Is that right?
17      A   Correct.
18      Q   And, how many seconds did he touch your belly? Did he
19  touch your belly and hold his hand on there or did he brush your
20  belly? Was it a second, was it two seconds? How long did he touch
21  your belly?
22          And, let me demonstrate here. Did he put his hand on
23  your belly and hold it like this for one or two seconds? Did he
24  brush it across your belly? What did he do when he touched your
25  belly?

Page 210

1       A   It was like rubbing a Buddha.
2       Q   So, how many seconds was that, one to two seconds?
3       A   Four or five.
4       Q   Four or five seconds, okay.
5           ATTORNEY CUADROS-PESQUERA: Maybe you want to go and rub
6   Mr. Duggal's belly.
7           ATTORNEY LIES: Okay, let me... just so the record will
8   show, I did, in fact, put my left hand on Mr. Duggal's
9   stomach.
10          One time I held it there for one or two seconds.
11  Another time I brushed it lightly across his stomach for one
12  to two seconds, as demonstrative as part of the question to
13  the Witness so that the record is clear.
14  BY ATTORNEY LIES:
15      Q   Now, when Mr. Castillo would talk to employees
16  generally about their weight, you told us yesterday that he
17  considered himself to be very physically fit. Is that right?
18      A   Correct.
19      Q   Did Mr. Castillo run or exercise or lift weights? What
20  did he do?
21      A   On several occasions when I would go pick him up at the
22  hotel, he had just finished running.
23      Q   So, Mr. Castillo... did you consider Mr. Castillo to be
24  overweight?
25      A   No.

Page 211

1       Q   And, it's your understanding, sir, that he talked to
2   all the employees that he considered to be overweight about their
3   weight. Is that correct?
4       A   Well, he said, on several occasions and in several
5   meetings, that we didn't have the standard for a District
6   Representative. That it should be somebody who had a good
7   demeanor, a good body.
8       Q   What kind of body did he say people should have?
9       A   Like his.
10      Q   Okay, so he was not overweight. That's the kind of body
11  that he thought people should have. Is that right, to your
12  understanding?
13      A   Yes, that's correct.
14      Q   And, he was concerned about employees being overweight,
15  wasn't he, sir? And, that's one of the reasons that he brought
16  Sandra in to talk to everybody about high levels of cholesterol
17  that you told us about yesterday. Isn't that true.
18      A   Yes.
19      Q   And, did you try to lose weight while you were working
20  for Nalco?
21      A   Yes.
22      Q   When Mr. Castillo touched your stomach, as you talked
23  about, did you ever report that to Naperville or to anyone else
24  that you considered that to be anything that was improper?
25      A   No, I didn't report it to Naperville. But, whenever he

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                                   fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

Page 212

1  left, it was talked about in the group that those types of
2  comments were wrong.
3      Q   Oh, okay. So, all the people in the group did not like
4  the comments about weigh?
5      A   Well, I don't know if everybody in the group didn't
6  like the comments about weight. But, at least it was talked
7  about, and I know that two or three of the people in the group
8  didn't like those comments.
9          And, on several occasions, it was mentioned in the
10 group that, if that was Nalco's idea of a Service
11 Representative... of a District Representative, then Nalco,
12 Puerto Rico was not going to have an office because none of us
13 would fit that idea.
14     Q   So, did you consider Mr. Castillo's comment about your
15 weight to be something that you thought was rude?
16     A   Yes, he didn't care.
17     Q   Did you ever tell Mr. Castillo not to rub your tummy
18 when he came to visit?
19     A   No, but I would avoid it.
20     Q   So, you don't know, if you had told Mr. Castillo to
21 stop rubbing your belly, whether he would have stopped because
22 you never told him. Isn't that correct?
23     A   No, I didn't tell him, and I don't know if he would
24 have stopped doing it. But, most likely, he would have done it
25 more.

Page 213

1      Q   Well, you don't know whether he would have stopped or
2  not because you never asked him. Isn't that true?
3      A   Correct, but you have to know and get to know
4  Columbians and get to know Columbia men. They like to mock
5  people, and they are... what's... I'm trying to look for the
6  word... well, they like to mock people, and they enjoy making
7  people feel less.
8      Q   So, you don't like Columbia men. Is that correct?
9      A   Not all of them.
10     Q   All right, and Mr. Castillo wanted his District
11 Representatives to have a certain image concerning when they
12 would go out to visit clients, and that's the reason you think he
13 was talking about everyone's weight. Is that correct?
14     A   Yes.
15     Q   Okay, turning to page eleven in your Answers to
16 Interrogatories, you say that, on certain instances when you
17 didn't please Mr. Castillo, he would say "No seas hueva." or
18 "Eres una hueva.". That's the best I can do. And, you claim he
19 said that. Is that right?
20     A   Yes, that's correct.
21     Q   Okay, now how many times did... well, first of all,
22 isn't it true that the phrase... these phrases that we just read
23 into the record here translate to something like "Don't be
24 silly." or "Don't be stupid."?
25     A   It could be.

Page 214

1          ATTORNEY CUADROS-PESQUERA: Counsel, why don't we just
2  translate it literally?
3          ATTORNEY LIES: I'll ask the Court Reporter to translate
4  it literally, if he can.
5          COURT REPORTER:      The Interpreter.
6          ATTORNEY LIES: I'm sorry, the Interpreter, the
7  Translator, literally, if he can.
8          INTERPRETER: But, the...
9          ATTORNEY LIES: I don't speak the language, and I'm told
10 that's what it means. If it means something else, then
11 somebody else can interpret it for me.
12         INTERPRETER: The Interpreter, at this moment, can't do
13 it because the Interpreter believes that that is a cultural
14 phrase. It's something cultural, and the Interpreter would
15 have to look at it and take time and research it.
16         So, if there is a translation that's been provided...
17         ATTORNEY CUADROS-PESQUERA: There is a literal
18 translation, and the literal translation is "Don't be a
19 female egg.".
20         INTERPRETER: If Counsels like that, the Interpreter
21 wouldn't stand by that translation. But, if Counsels believe
22 that's what it should be, then that's up to Counsels.
23         ATTORNEY LIES: Okay, I'd like the record to show where
24 the word female is in that phrase. I don't speak Spanish,
25 but I don't see the word "female".

Page 215

1          ATTORNEY CUADROS-PESQUERA: In Spanish, the final 'A' or
2  'O' of both words, in this case, is the gender. Huevo is a
3  male egg and hueva is a female egg.
4          ATTORNEY LIES: Okay.
5          ATTORNEY CUADROS-PESQUERA: I think anybody who speaks
6  Spanish will verify that.
7          ATTORNEY LIES: Okay.
8          ATTORNEY RIESCO: I've personally never heard of the
9  word hueva to refer to an egg.
10         ATTORNEY CUADROS-PESQUERA: Do you know the rules of
11 grammar?
12         ATTORNEY RIESCO: Yes, but I've never heard the word
13 used to mean egg.
14         ATTORNEY MC CARTNEY: I think the whole point is sort of
15 moot because it's very clear that this term is not being
16 used in its literal sense.
17         So... you know... whatever the literal interpretation
18 of hueva is it's moot because it's clearly not being
19 used in its literal sense in the context of this Answers to
20 Interrogatories.
21         ATTORNEY CUADROS-PESQUERA: We don't know in what sense
22 that it's meant because we don't have any testimony to that
23 effect.
24         ATTORNEY MC CARTNEY: Well, we have the answer. I mean
25 maybe Mark...

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386
Electronically signed by Gregoria Echevarria (401-409-341-5259)                    fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

Page 216

1       ATTORNEY CUADROS-PESQUERA: Well, go ahead, proceed.
2       ATTORNEY LIES: No, I want to get this solved because...
3       ATTORNEY MC CARTNEY: Maybe...
4  BY ATTORNEY LIES:
5       Q   Okay, Mr. Aponte, we'll try it a different way. The
6  three quotations or phrases that I posed to you a few minutes ago
7  that you claim Mr. Castillo may have said from time to time, what
8  was your interpretation of what those words meant or those
9  phrases meant?
10      A   Okay, well, he would use those phrases whenever
11 somebody wouldn't do exactly what he wanted them to do. Whenever
12 somebody wouldn't do specifically what he wanted, he would use
13 those phrases.
14      And, I know a lot of Columbians, and he's the only one
15 that I know of who uses those phrases.
16      Q   Okay, I'd like to find out what your understanding of
17 what the phrase meant, if it means something other than what I
18 asked you earlier, "Don't be silly." or "Don't be stupid.".
19      If it means something else besides that, tell me what
20 you understand it means?
21      A   Okay, it's something like telling somebody "Don't be an
22 asshole.".
23      Q   So, it's a form of a curse word?
24      A   To not say a curse word, he would say that.
25      Q   Okay, now you just said a minute ago whenever

Page 217

1  someone... whenever anyone would not do something that he wanted,
2  he would use that phrase or those phrases. Do you recall telling
3  us that a couple minutes ago?
4       A   Yes, that's correct.
5       Q   Okay, so tell me who else he used that phrase with when
6  they didn't do what he wanted them to do? And, I want your best
7  recollection of everyone that you heard him make that comment to
8  when they didn't do what Mr. Castillo wanted them to do.
9       A   Well, the times that I remember that he used it and he
10 wasn't using it with me was on the phone, when he was talking to
11 some of the representatives who I didn't know who it was, when we
12 were in the car and he would tell them.
13      Q   You told us yesterday that, from time to time, you
14 would pick him up at the Caribe Hotel, I believe, and drive him
15 to work, to the offices. Is that right?
16      A   Yes, that's correct.
17      Q   And, while you were driving him, was he on his cell
18 phone sometimes?
19      A   That's correct.
20      Q   So, when he was on his cell phone, it was your
21 understanding that he was talking to someone, but you were only
22 hearing one side of the conversation. Is that correct?
23      A   Yes, that's correct.
24      Q   And, you heard him talking to other Nalco employees
25 using all three of these phrases or one of these phrases? Tell me

Page 218

1  which ones you heard him use towards other Nalco employees?
2       A   The one he would use the most is "No seas hueva.".
3       Q   And, how many times did you hear him using that phrase
4  over the cell phone when he was talking to other employees of
5  Nalco?
6       A   I really don't remember how many times, but it was
7  several times.
8       Q   And, how many times did he use that phrase, which you
9  say means "asshole", how many times did he use that phrase when
10 he was talking with you?
11      A   A few times, five, six times.
12      Q   And, that was five or six times... strike that. Mr.
13 Castillo and you worked together for how many years?
14      A   Four or five years.
15      Q   So, over a period of four or five years, he called you
16 an asshole five or six times. Is that correct?
17      A   Or more.
18      Q   Okay, ten times?
19      A   Probably, but I don't remember how many because there
20 were a lot of incidents then.
21      Q   Okay, I want to know was it five or six times or was it
22 six or seven times? How many times was it?
23      A   Let's say seven times.
24      Q   Seven times. And, did you ever call Naperville, under
25 the company's Anti-Harassment Policy, and make a complaint

Page 219

1  because you did not like Mr. Castillo using the term "asshole"?
2       A   No, and I already explained that yesterday.
3       Q   Okay, now, in addition to what you claim he may have
4  said this to you seven times over a period of four or five years,
5  and what you heard on the cell phone, did you hear him use that
6  term when he was... when you were in the presence of another
7  employee, and he used that term towards them?
8       A   Yes, he used it.
9       Q   Okay, and which other employees did he call an asshole
10 during the time that Mr. Castillo was present with you and
11 another employee?
12      A   I can't say to which employee, but it was towards the
13 group.
14      Q   Okay, so he talked towards the entire group and used
15 the term "asshole". Is that correct?
16      A   On occasions, yes.
17      Q   Okay, and who was in the group? Were there Puerto
18 Ricans and non-Puerto Ricans in the group?
19      A   Well, there were two who weren't Puerto Rican in that
20 group, and one was Pablo Duggal and the other one was him.
21      Q   So, when Mr. Castillo used the term "asshole", which
22 you thought was rude, in front of a group, the group included
23 individuals who were of Puerto Rican descent, as well as people
24 who were not of Puerto Rican descent. Is that correct? Do I
25 understand what you're telling me?

10 (Pages 216 to 219)

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

Page 220

1   A   Yes.
2   Q   Okay, and, when I used the term "asshole", that was
3   your interpretation of what these three phrases mean. Is that
4   correct? He didn't use the term "asshole". I was using that as a
5   reference to using these three phrases. Do you understand that?
6   A   That's correct.
7       ATTORNEY LIES: Okay, let's take a break. This is
8   getting me all screwed up.
9       (Off the record.)
10      (Brief recess.)
11      (Back on the record.)
12      ATTORNEY LIES: Okay, let's go back on the record.
13  BY ATTORNEY LIES:
14  Q   Mr. Aponte, I asked you some questions regarding these
15  phrases that are contained in your Answers to Interrogatories.
16  And, you gave us your interpretation of these phrases that are
17  contained here and that are in the record as meaning something to
18  the effect of "asshole". Is that correct?
19  A   That's correct.
20  Q   And, that is your interpretation. Is that correct?
21  A   Yes, given the tone and the situations that these were
22  mentioned, yes.
23  Q   Okay, and Mr. Castillo never used the actual "asshole",
24  which is "pendejo", did he?
25  A   That's correct.

Page 221

1       ATTORNEY CUADROS-PESQUERA: Counsel, at this point, I
2   would like to clarify that the word "pendejo", in Spanish,
3   is translated as "pubic hair" into English. It is not
4   "asshole".
5       INTERPRETER: The Interpreter is going to stand by his
6   translation acknowledging that Counsel's translation, in a
7   strict, literal, dictionary sense, is correct, and that is a
8   correct translation.
9       But, the Interpreter believes that, given the context
10  and given the situation, the Interpreter's translation is
11  accurate in this instance.
12      ATTORNEY CUADROS-PESQUERA: I take issue with that
13  translation.
14      ATTORNEY LIES: Okay, let's get straight to the heart of
15  this then.
16  BY ATTORNEY LIES:
17  Q   Mr. Aponte, do you have any objection to the way in
18  which this Interpreter has been interpreting my questions to you
19  and your answers back to me after you have answered the question?
20      Do you have any objection to anything he has said, in
21  the last two days, about the way he has interpreted the questions
22  that have been put to you and his response back to me?
23  A   Just one.
24  Q   And, what is the one you're talking about, what
25  objection?

Page 222

1   A   When the word "manada" was stated, to me, it wasn't
2   "crowd". It was "pack".
3   Q   When was this? This was yesterday? I don't remember
4   that word.
5   A   Yes, that's correct.
6   Q   Okay, so, other than that word or whatever that phrase
7   means, you have no objection to the accuracy with which this
8   Interpreter has taken the question, given it to you in Spanish,
9   you've responded back, and he's given it back to me, do you, sir?
10      ATTORNEY CUADROS-PESQUERA: Counsel, the only person who
11  makes any objections here is the attorney representing the
12  client, the Deponent.
13      And, I stand by my objection that the word "pendejo"
14  means "pubic hair". It does not mean "asshole".
15      ATTORNEY MC CARTNEY: Your objection is noted.
16      ATTORNEY CUADROS-PESQUERA: That's fine.
17      ATTORNEY LIES: And, I respect your objection. My point
18  is, if there is something that the Witness believes that
19  this Interpreter has not accurately interpreted, then I'm
20  going to go back to that, and we're going to straighten that
21  out right now.
22      Because, if this case goes to trial and the Witness
23  says "That's not a correct interpretation.", I don't want to
24  face that at trial.
25      You certainly can make whatever objections you believe

Page 223

1   concerning that, and I understand that. Fine. I want to get
2   this straightened out if there's any issues, and we only
3   have it on one word apparently.
4   BY ATTORNEY LIES:
5   Q   Is that correct? There's only one objection as to one
6   word, the word "manada"?
7   A   To my best understanding, yes.
8       ATTORNEY LIES: And, what does "manada", just so I know
9   what that means?
10      INTERPRETER: Well, the Interpreter may make a
11  clarification. The Interpreter used the word "crowd" in a
12  specific answer, and then the Interpreter used the word
13  "pack" in the next sentence, in the next answer, that the
14  Witness provided.
15      And, the Interpreter believes that the word "pack" was
16  a more accurate answer, but the word "crowd" was also an
17  accurate answer. "Pack" was more accurate.
18  BY ATTORNEY LIES:
19  Q   Mr. Aponte, are these phrases that we talked about
20  earlier, that are in your Answers to Interrogatories, are those
21  phrases that you have used from time to time?
22  A   No.
23  Q   You've never used those phrases at all in your entire,
24  adult life?
25  A   No.

11 (Pages 220 to 223)

Donato Aponte-Navedo

Page 224

1    Q   Okay, now you say, further in the answers to the same
2    question:
3        "After some time of hearing these phrases from Mr.
4    Castillo, the Puerto Rican sales force began to use those
5    phrases between them like a joke.". Do you see that?
6    A   Yes, I see it.
7    Q   So, how many of the employees in the Puerto Rican sales
8    force started using those terms like a joke?
9    A   Three or four.
10   Q   And, who were the three or four employees who used the
11   term... these terms like a joke, as you have said your Answers to
12   Interrogatories here?
13   A   Jorge Ortíz, Francisco Casanova, Ashok Duggal, and also
14   Pedro Lara.
15   Q   And, anyone else?
16   A   Of the Puerto Rican sales force, no.
17   Q   Okay.
18   A   That's my best recollection.
19   Q   Okay, and how many times did you hear these employees
20   from the Puerto Rican sales force using those phrases like a
21   joke?
22   A   Practically every time there was a meeting.
23   Q   And, how frequently were there meetings?
24   A   There was supposed to be a monthly meeting and every
25   time that they would see each other in the office.

Page 225

1    Q   Okay, so at every one of these monthly meetings people
2    were using these phrases like they were a joke. Is that correct?
3    A   At some moment, yes.
4    Q   Okay, and for how many years were employees using these
5    phrases at the sales meetings like a joke?
6    A   Well, I really can't say in terms of a specific
7    moment in time, but it was about two or three years.
8    Q   So, you heard these phrases being used as a joke by
9    employees in the Puerto Rican sales force on a monthly basis for
10   two or three years. Is that right?
11   A   Correct.
12   Q   Okay, when you... I believe you told us yesterday the
13   day that you were terminated you started taking action to seek a
14   pension reduction, did you not?
15   A   I don't remember having said that yesterday, but that
16   is here in the answers.
17   Q   Now, on the day that you were terminated, you've told
18   us what took place at that time, and nothing else. Did you have some type of legal
19   obligation to pay a pension to your former wife for your son from
20   your previous marriage?
21   A   Yes, that's correct.
22   Q   And, when you started to take action to have that
23   pension reduced on the day that you were terminated, what did you
24   do? Did you talk to Belkis?
25   A   Of course I spoke to her. And, also we spoke to an

Page 226

1    attorney. I spoke to an attorney to ask her what course of action
2    I had to take in order to work with the pension, so it wouldn't
3    accrue, so that I wouldn't end up in jail.
4    Q   So, what was the name of the attorney that you spoke
5    to?
6    A   I don't remember.
7    Q   Did you call that attorney for the first time on the
8    day that you were terminated?
9    A   It was a neighbor.
10   Q   So, the first time that you talked to the attorney
11   about having a pension reduction was the same day that you were
12   terminated?
13   A   Yes, about legal matters, yes.
14   Q   Okay, did you speak to Belkis before you were
15   terminated about getting your pension reduced for the child of
16   your first marriage?
17   A   No.
18   Q   And, did you get the pension reduced?
19   A   Yes.
20   Q   And, when did that happen? There's no answer in your
21   Interrogatory.
22   A   When was it that the pension was reduced? It was like
23   in September of last year. I don't remember very well.
24   Q   September of 2009?
25   A   Correct.

Page 227

1    Q   And, was there a hearing for the determination about
2    whether the pension should be reduced?
3    A   Yes, there was a hearing, and it was with... this
4    person was a judge, but it's like a pension analyst.
5    Q   Okay, did you testify?
6    A   No.
7    Q   Did Belkis testify?
8    A   No, the only thing that was taken was the evidence of
9    the income there was at that time, and nothing else.
10   Q   And, by the time the pension was reduced, you were
11   already working for your new employer. Is that right?
12   A   Correct.
13   Q   Now, when did you and Belkis get married?
14   A   June, 2003.
15   Q   And, what was the date of the divorce?
16   A   April or March... I don't remember very well... of
17   2009. That's a date that I don't remember.
18   Q   And, before getting divorced, did you and Belkis go to
19   any marriage counselors?
20   A   No.
21   Q   When did you and Belkis first discuss getting divorced?
22   A   It was in the beginning of 2009.
23   Q   So, what happened to the marriage that caused... if you
24   went to no marriage counselors and you hadn't discussed
25   divorce... what caused this marriage to... you to discuss the

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

## Page 228

1   possibility of a divorce in early 2009?
2     A   That was through mutual consent that we didn't tell the
3   judge.
4     Q   Was the divorce for economic reasons?
5     A   Again, we didn't tell the judge.
6     Q   I'm asking you was the divorce for economic reasons?
7   What was the reason why you and Belkis decided to get divorced by
8   consent?
9     A   Part of it was for financial reasons, but the other
10   part was the separation that we had.
11     Q   Okay, when did the two... when did you and Belkis
12   separate?
13     A   In October.
14     Q   Of what year?
15     A   2008.
16     Q   And, what was the reason for the separation?
17     A   Working in Mayaguez.
18     Q   So, it wasn't because you two did not love each other
19   anymore. It's because you were working in Mayaguez. Is that what
20   the answer is?
21     A   Let me see how I can say this that it doesn't sound
22   bad. There was also problems in the emotional side of the
23   relationship due to the separation.
24       There's a phrase here that I don't want to say it
25   because it sounds bad, but it explains it well.

## Page 229

1     Q   And, what is the phrase?
2     A   "Amor de lejos, amor de pendejo."
3       INTERPRETER: Just a second.
4             PAUSE
5       INTERPRETER: The Interpreter is going to state, for the
6   record, that the Deponent has stated a very cultural, Puerto
7   Rican phrase for which the Interpreter, right now, doesn't
8   remember the appropriate English translation.
9       The Interpreter is going to suggest that Counsels can
10   do whatever they deem appropriate to state the phrase for
11   the record in Spanish, and take it from there, whatever
12   Counsels believe should be asked to the Witness.
13   BY ATTORNEY LIES:
14     Q   Mr. Aponte, would you state whatever this phrase is
15   that you're relying upon, in Spanish, for the record, so that we
16   can have that on the record?
17     A   Yes. "Amor de lejos, amor de pendejo."
18     Q   So, this phrase "Amor de lejos, amor de pendejo.", does
19   that mean something to the effect that "Love from afar means love
20   that is stupid."?
21     A   It's a little bit stronger than that.
22     Q   So, tell us what the phrase means to you, sir?
23     A   It's that the last word that you used in the phrase is
24   a word that's much stronger than "stupid".
25     Q   What does that word mean in the phrase that he used?

## Page 230

1     A   Well, that word in Puerto Rican and Latin America is
2   much stronger. It goes beyond being "stupid".
3     Q   So, you and Belkis divorced each other, at least
4   according to you, to be in a long-distance relationship like this
5   was stupid?
6     A   Well, it's not stupid. It's just that the distance
7   damages the relationship.
8     Q   I don't mean to be insensitive, Mr. Aponte, but was
9   there any infidelity involved in the decision to divorce, for you
10   and Belkis to get divorced?
11     A   Neither of the two of us are people that, before
12   finishing a relationship, would go into another one.
13     Q   I didn't ask you whether or not you were in another
14   relationship. Were there any acts of infidelity that caused you
15   and Belkis to get divorced?
16     A   That's why I answered what I answered. The answer is
17   no.
18     Q   At this point in time, you told us about your
19   relationship with Belkis. Do you consider yourself to still be in
20   emotional love with her?
21     A   I have feelings, yes.
22     Q   Do you consider those to be feelings of love for
23   Belkis?
24     A   Love to the mother of my children.
25     Q   Do you believe that Belkis has feelings of love for

## Page 231

1   you?
2     A   Well, she feels love to me as the father of her
3   children.
4     Q   Now, you told us yesterday that the two children are
5   with her, and that you go over to the house for holidays and
6   birthdays and spending time with the children. Do you recall when
7   we talked about that yesterday?
8     A   Yes, that's correct.
9     Q   Okay, do you ever stay overnight at Belkis' house?
10     A   Yes.
11     Q   How frequently do you stay overnight at Belkis' house?
12     A   When I go to see the children.
13     Q   And, how frequently is that?
14     A   Once a week.
15     Q   Okay, and, since the time that you and Belkis have been
16   divorced, have you ever had intimate relations with each other?
17     A   No.
18       ATTORNEY LIES: Let me just take five minutes to see if
19   I have anything else.
20         (Off the record.)
21         (Brief recess.)
22       (Back on the record.)
23       ATTORNEY LIES: Okay, back on the record.
24   BY ATTORNEY LIES:
25     Q   I'm going to hand you what's been marked as Exhibit

13 (Pages 228 to 231)

Donato Aponte-Navedo

Page 232

1    020.
2         ATTORNEY LIES: And, for the record, it purports to be a
3    copy of the Complaint that was filed on your behalf and
4    Belkis' behalf in Federal Court.
5         (Whereupon, the above-referenced document was marked as
6    Exhibit 020 of the deposition.)
7    BY ATTORNEY LIES:
8    Q   And, I'm going to ask you to take a moment, and tell me
9    whether or not you've ever seen this document before?
10        PAUSE
11        (Revision of document by Deponent.)
12   A   Yes, I've seen it.
13   BY ATTORNEY LIES:
14   Q   Okay, if you turn to page sixteen, there is what
15   purports to be your signature under a Statement Under Penalty of
16   Perjury.
17        And, I'm going to ask you whether or not that, in fact,
18   is your signature?
19   A   Yes, that's correct.
20   Q   And, did you sign the Statement Under Penalty of
21   Perjury on or about March 6th of 2009?
22   A   Yes, that's correct.
23   Q   And, on that date, did you sign that Complaint, this
24   document, Exhibit 020, in your lawyer's offices?
25   A   Yes, that's correct.

Page 233

1    Q   And, was Belkis also in the office with you?
2    A   No.
3    Q   She wasn't there at the same time that you signed the
4    Complaint?
5    A   No.
6    Q   And, did anyone explain to you, before you signed this
7    document... strike that. What is your understanding of what
8    perjury is?
9    A   To lie under oath.
10   Q   Okay, now you have not filed an Amended Complaint. This
11   is the only Complaint you've filed, correct, sir, as far as you
12   know?
13   A   As far as I know, yes.
14   Q   So, all the complaints that you have against Nalco are
15   set out in this Complaint, which is Exhibit 020. Is that correct?
16   A   Correct.
17   Q   Okay, over the last day and a half, I've asked you a
18   number of questions about matters in your Complaint and matters
19   that are in your Answers to Interrogatories.
20        Is there anything you would like to add, any additional
21   facts that you would like to add, to any of the answers that you
22   gave me to any of the questions I asked about your Complaint or
23   your Answers to Interrogatories?
24   A   About the questions you've asked me and the answers
25   I've given, no.

Page 234

1    Q   And, is there any other facts that you have that
2    support your Complaint that you haven't told us about in your
3    testimony yesterday and today, sir?
4    A   That I remember right now, at this moment, no. But, it
5    could happen, just like yesterday, through the questions and the
6    Examination, that something comes to mind.
7    Q   So, as you sit here today, based upon what you remember
8    as of today's date, the current state of your memory, you have
9    told us every fact that you are aware of that supports your
10   Complaint or your Answers to Interrogatories. Is that correct?
11   A   That's correct.
12        ATTORNEY LIES: Okay, at this time, I have no further
13   questions, and I pass the Witness to Counsel, if he has any
14   questions.
15        ATTORNEY CUADROS-PESQUERA: We have no questions. Thank
16   you very much.
17        ATTORNEY LIES: Okay, Counsel, do you wish to then
18   advise your client about his right to read the deposition,
19   reserve his signature or to waive that right? I assume that
20   exists down here. The Witness has a right to...
21        ATTORNEY CUADROS-PESQUERA: Yes, usually, you will
22   notify us with a copy, and we will give... you'll give us a
23   number of days in which to review and subscribe or whatever.
24        ATTORNEY LIES: I understand that. I just typically
25   would want something on the record that says the Witness

Page 235

1    either through Counsel or alone, says "I reserve my right to
2    read the deposition when presented to me, and make any
3    corrections.", just so that's on the record.
4         I don't know if that's local practice here or not.
5    That's the practice...
6         ATTORNEY CUADROS-PESQUERA: We've done it, and we've now
7    done it. So, for the purposes...
8         ATTORNEY LIES: Reserve the signature?
9         ATTORNEY CUADROS-PESQUERA: ... let's reserve the
10   signature.
11        ATTORNEY LIES: All right, very well. Thank you very
12   much, sir. We're done.
13   DEPOSITION CONCLUDED OCTOBER 13, 2010, AT 11:40 A.M.

Electronically signed by Gregoria Echevarria (401-409-341-5259)                fc15cb15-d81b-4985-80b9-2d5dd04a760a

Donato Aponte-Navedo

Page 236

1    CERTIFICATE OF REPORTER
2        I, GREGORIA ECHEVARRÍA, Court Reporter and a member of Vega
3    Reportage;
4        DO HEREBY CERTIFY:  That the foregoing transcript is a full,
5    true and correct record of the testimony given which was taken
6    down by me and thereafter reduced to the typewritten form under
7    my direction and supervision.
8        I FURTHER CERTIFY:  That I am not in any way involved or
9    interested in the outcome of said action.
10       WITNESS my hand this 20th day of October, 2010, in San Juan,
11   Puerto Rico.
12
13
14       _____
15       GREGORIA ECHEVARRÍA
16       Court Reporter
17
18
19
20
21
22
23
24
25

Page 237

1    CERTIFICATE OF DEPONENT
2        I, DONATO APONTE-NAVEDO, of legal age, certify that:
3        I have read the transcript of my deposition, taken on
4    October 12, 2010, in the case before The United States District
5    Court for the District of Puerto Rico, Donato Aponte-Navedo, et
6    al, Plaintiffs versus Nalco Chemical Company, et al, Defendants,
7    Case Number 09-CV-01232(GAG), from page one eighty (180) through
8    two hundred and thirty-seven (237) inclusive, together with the
9    corresponding exhibits that were attached, if any.
10       If there are corrections or amendments to the aforementioned
11   transcript, the same are included as an addendum to the
12   transcript. The pages are initialed and numbered by me,
13   commencing with page number two hundred and thirty-eight (238).
14       IN WITNESS WHEREOF, I sign this document in San Juan, Puerto
15   Rico, on the___ day of _____, 2010.
16
17
18
19
20
21       _____
22       DONATO APONTE-NAVEDO
23       Deponent
24
25

15 (Pages 236 to 237)

Vega Reportage, Inc.vegareportage@onelinkpr.net(787) 764-6386

Electronically signed by Gregoria Echevarría (401-409-341-5259)                    fc15cb15-d81b-4985-80b9-2d5dd04a760a