IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| DONATO APONTE NAVEDO et al,<br>    Plaintiffs,<br><br>    v.<br><br>NALCO CHEMICAL, INC., et al,<br>    Defendants | 09-01232-MEL<br><br>TITLE VII AGE & GENDER<br>DISCRIMINATION, ADA,<br>NATIONAL ORIGIN, TORTS<br><br>TRIAL BY JURY |

## PLAINTIFFS' MOTION IN LIMINE

### I. INTRODUCTION

Nalco's discovery abuses throughout the current litigation were egregious. Federal Rules of Civil Procedure rule were exploited for loopholes, bent, and broken by Nalco. Court orders were disobeyed, documents were intentionally and irretrievably destroyed, and all efforts were expended by Nalco to perpetrate discovery abuses and stonewalling to conceal the crucial information in their in possession, towards obtaining a distinct and game-winning advantage, effectively turning this instant litigation into a crime against due process.

In the following sections Plaintiffs will document Nalco's tactics of attrition, designed to fend off their claims by making them too costly to pursue, or prolonging the procedural defense long past the point of utility. Nalco sought at all

1

times to primarily hide all the relevant and most important documents –notably, even the evidence they proffered to support their defenses- by sequestering them pursuant to baseless claims of privilege, and even destroying them altogether.

This Court should not ignore such behavior, as it impinges on its ability to administer orderly justice. Lesser sanctions than those here sought by Plaintiffs would fail to have a deterrent effect, given the egregiousness of Nalco's actions: a litigant who clearly anticipating that compliance with discovery rules would result in the production of damning evidence, which in turn would lead to an adverse judgment against them, chose to destroy that decisive evidence. Willful spoliation of evidence deserves the harshest sanctions because it is antithetical to our system of justice. The evidence is sufficient to show such willfulness here. *Philips Electronics N. Am. Corp. v. BC Technical*, 773 F. Supp. 2d 1149, 1158 (D. Utah 2011).

Plaintiffs challenge the admissibility of the documentary evidence Nalco intends to present at trial. As a corollary to the suppression of the documentary evidence, Plaintiffs also seek relief in the form of preclusion at trial of the related and corresponding pleadings and defenses said documentary evidence is purported to be offered in support of.

## II. PROCEDURAL HISTORY

1. Discovery expectations where set at the outset of this case on
September 18th, 2009, as noted in the parties': *Initial
Scheduling Conference Memorandum*, **ECF No. 32**, at pp. 34-35,
where it states:

"*. . . V. ELECTRONIC DISCOVERY ISSUES*
*The parties have addressed electronic discovery issues pursuant*
*to the provisions of Fed.R.Civ.P. 26 (f) (3), and are in the*
*process of compiling and exchanging ESI composition to*
*adequately direct discovery in the present case. The parties do*
*not foresee at this time any electronic discovery issues.*

*VI. JOINT PROPOSED DISCOVERY TIMETABLE*
*1. The parties already notified each other by e-mail*
*Interrogatories and Requests for Production of Documents on*
*September 9, 2009.*
*2. The parties will respond to notified Interrogatories and*
*Requests for Production on or before October 27, 2009. . .*"

"*. . . VII. OTHER MATTERS*
*b. The parties have requested each other to preserve and prevent*
*any and all spoliation of electronic data, files, documents*
*and/or e-mails. . .*"

2. On November 18th, 2009, the Court issued its first scheduling
order setting the Pretrial conference for July 9th, 2010, and
Jury Trial for August 9th, 2010 (**ECF No. 37**).

3. On January 11th, 2010, due to Nalco's unresponsiveness to
discovery requests served upon them, Plaintiffs filed their
first motion to compel (**ECF No. 41**); on January 26th, 2010, a
second motion to compel (**ECF No. 44**); and on February 24th,
2010, a third motion to compel (**ECF No. 47**).

4. On May 20th, 2010, the Court issued a discovery order, which
for the most part granted Plaintiffs the relief they sought,

compelling Nalco to produce certain pieces of evidence, in the specified format as requested by Plaintiffs (**ECF No. 57**).

5. On July 9<u>th</u>, 2010, Nalco failed to be represented at and failed to be excused from the Pretrial conference. Counsel was fined $250 for failure to appear, and the Court noted that "**. . . Outstanding discovery requests should have been complied with. . .**" The Court further scheduled the proposed pretrial order for July 30th, 2010, and proposed voir dire, jury instructions and verdict forms for August 2nd, 2010. Trial date remained set for August 9th, 2010 (**ECF No. 58**).

6. On July 21<u>st</u>, 2010, solely at the behest of Nalco, the Court reset Jury Trial for November 15th, 2010 (**ECF No. 64**).

7. On October 15<u>th</u>, 2010, again solely at the behest of Nalco, the Court left without effect the date for Jury Trial of November 15th, 2010 (**ECF No. 75**).

8. On October 25<u>th</u>, 2010, due to Nalco's continued unresponsiveness to discovery requests served upon them, in brazen defiance to the Courts order pursuant to **ECF No. 57**, Plaintiffs were forced to file their fourth motion to compel (**ECF No. 77**), together with a proposed discovery protocol (**ECF No. 77-2**).

9. On November 12<u>th</u>, 2010, Nalco admitted to the Court that they would not be complying with discovery requests served on September 9th, 2009, due to their e-mail retention policy,

4

where all messages are deleted from their servers after 90 days (**ECF No. 78**, at 9-10). The issue of Nalco's spoliation will be further discussed in section **III**, *infra*, ***Nalco's Spoliation***.

10. On <u>January 28th, 2011</u>, the Court issued yet another discovery order, which again for the most part granted Plaintiffs the relief they sought, compelling Nalco to produce certain pieces of evidence, in the specified format as requested by Plaintiffs. Within that same order compelling discovery from Nalco, the Court set a discovery cutoff date of April 30th, 2011 (**ECF No. 93**).

11. On <u>February 28th, 2011</u>, 31 days after they had been compelled by the Court to produce the discovery requests issued by Plaintiffs as set forth in **ECF No. 93**, Nalco took it upon itself to unilaterally and self-servingly extend the due date for compliance to March 15th, 2011. <u>See</u>: **Exhibit 1**.

12. On <u>March 7th, 2011</u>, in the spirit of full cooperation with the discovery process, Plaintiffs redrafted the discovery requests Nalco was once again overdue on. <u>See</u>: **Exhibit 2**. Needless to say, Plaintiffs did not have to redraft or reissue the discovery requests, as Nalco had twice been ordered to produce by the Court as set forth in **ECF No. 57** and **ECF No. 93**.

13. On <u>March 15th, 2011</u>, 46 days after they had been compelled by the Court to produce the discovery requests for the second

time, and on the date Nalco's self-granted-unilateral extension of time expired, Nalco failed to issue any production as ordered by the Court in **ECF No. 57**. Plaintiffs immediately reminded Nalco of their failure to comply. <u>See</u>: **Exhibit 3**. On the same date, Nalco produced bates labeled 332-372 -<u>See</u>: **Exhibit 4**-, and a so-called Supplemental Response to Interrogatory No. 14 -<u>See</u>: **Exhibit 5**.

14. Nalco's production of <u>March 15th, 2011</u> was also in default with the Courts order in **ECF No. 93**, regardless of the self-serving characterization proffered by Nalco in that regard. The issue of the <u>March 15th, 2011</u> production will be further discussed in paragraph **31**, of section **IV**, *infra*, ***Nalco's Cavalier Attitude Towards Discovery Orders***.

15. On <u>April 6th, 2011</u>, Nalco presented yet another untimely and baseless objection to the discovery the Court compelled them to produce as set forth to the order pursuant to **ECF No. 93**. <u>See</u>: **Exhibit 7**. Said objection was in default with such order. The issue of the <u>April 6th, 2011</u> objection will be further discussed in paragraph **37**, of section **IV**, *infra*, ***Nalco's Cavalier Attitude Towards Discovery Orders***.

16. On <u>April 15th, 2011</u>, a little short from a full year later, Nalco purportedly produced the discovery requests as ordered by the Court on <u>May 20th, 2010</u> -**ECF No. 57**-<u>See</u>: **Exhibit 11**. Once again, Nalco's production was in default with said order.

The issue of the April 15th, 2011 production will be further discussed in paragraph **49**, of section **IV**, *infra*, **Nalco's Cavalier Attitude Towards Discovery Orders**.

17. On April 27th, 2011, Plaintiffs took exception to the above production (See: **Exhibit 12**), and three days later, on April 30th, 2011, discovery closed for the instant case.

### III. NALCOS SPOLIATION

#### A. NALCO'S DUTY TO PRESERVE

18. "*The duty to preserve relevant evidence is fundamental to federal litigation.*" *Innis Arden v. Pitney Bowes, Inc., 257 F.R.D. 334, 339 (2009)*. Parties are always under a duty to preserve evidence. *Leon v. IDX Sys. Corp., 464 F.3d 951, 959 (9th Cir. 2006)*. Duty to preserve evidence typically attaches at the time of inception of a case, *Zubulake v. UBS Warburg, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)*, *Silvestri v. General Motors Corp., 271 F.3d 583, 590 (2001)*; *Velez v. Marriott PR Management, Inc., 590 F.Supp.2d 235, 258 (D.P.R. 2008)*, but could be at an earlier time, if the party has reason to anticipate that there is potential for litigation. *Pension Committee of University of Montreal Pension Plan v. Banc of America, 685 F.Supp.2d 456, 466 (S.D.N.Y. 2010)*.

19. What type of evidence needs to be preserved, will depend largely on the context of the underlying cause of action. In an employment discrimination case, such as the instant case, communications and

calendar appointments between Aponte's supervisor and others at Nalco, concerning Aponte' work assignments are undoubtedly covered within the scope of this obligation. *Zubulake v. UBS Warburg, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)*. Nalco's ensuing failure to meet its discovery obligations because the evidence that it ostensibly would produce is being destroyed, cannot be reasonably considered not harmless and inconsequential. Contrarily, courts have found it to constitute sufficient prejudice. *In re Seroquel Products Liability Litig., 244 F.R.D. 650, 665 (2007)*; *Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 112 (2005)*. Furthermore, as large, technologically sophisticated institutions, such as Nalco, increasingly move from paper based communications and archiving of documents, to entirely computerbased, electronic messaging and transactional environments, an unchecked practice of destroying and failing to preserve evidence, would have the effect of crippling discovery in discrimination cases, such as the present one. This undermines the strong public policy in resolving disputes on their merits. *Zubulake v. UBS Warburg, 217 F.R.D. 309, 317 (S.D.N.Y., 2003)*.

20. Nalco's duty to preserve in the instant case commenced, at the latest, when it first anticipated that there was potential for litigation against Aponte, or at the moment of his termination on July, 2008. However, Nalco first started to assemble a negative file on Aponte as early as January, 2007,

based on the earliest date of the relevant disclosures tendered by Nalco, which then tends to suggest that at that earlier date Nalco reasonably believed it was headed to litigation against Aponte.

21. Nalco's duty to preserve evidence relevant to this case started, therefore, no later than as <u>January, 2007</u>.

22. Aponte made his first inquiry into Nalco's discoverable evidence and underlying systems as early as <u>August 25th, 2009</u>, and served discovery request as early as <u>August 27th, 2009</u>. After numerous procedural incidents, Nalco remained unresponsive to the discovery request served upon them by Aponte, and in default of the discovery orders as set forth by the Court. Finally, on <u>November 12th, 2010</u>, or three (3) years and eleven (11) months after the latest probable date on which Nalco's duty to preserve arose, and almost one (1) full year and three (3) months after Aponte's first discovery inquiry, Nalco alleged that they were not in possession or control of any responsive documents, on account of Nalco's retention policy of ninety (90) days, after which all electronic messages are deleted.

23. Even if it were true that Nalco has a retention policy of just ninety (90) days for all of its electronic communications, and that the loss of the documents had been routine or accidental, Nalco –on account of its duty to

preserve at the outset of litigation- must be charged with an adverse inference that they acted with gross negligence or in bad faith, which is ordinarily sufficient to support a finding that the missing or destroyed evidence would have been harmful to Nalco, and therefore necessary relevant to the underlying cause of action. *Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99, 110 (2nd Cir., 2002). The fact that the destruction may have been effected pursuant to a document retention policy -provided this were true- is no defense. Nalco's own document retention policies cannot trump their discovery obligations. *Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.,* 412 F.3d 745, 750-751 (7th Cir. 2005).

24. Harsher remedies, other than just an adverse inference, are imposable upon Nalco, however, due to the egregiousness of their spoliation, and the degree of their culpability.

25. Firstly, the ninety (90) day retention period is a falsehood aimed solely at misleading the Court, and denying Aponte the discovery that is rightfully his. Nalco is a publicly traded corporation subject to the Sarbanes-Oxley Act, which imposes an obligatory retention period of electronic records of no less than five (5) years. **18 U.S.C. § 1520 (a)(1)-(2).**

26. Secondly, even if Nalco had had such a foolishly and unbelievable retention period, their duty of preservation

included halting the automatic deletion of records at the outset of this litigation, and implementing a litigation hold.

27. "*Today, the implementation of a 'litigation' or 'legal' hold after litigation is 'reasonably anticipated' is one of the most important, if not the most important, part of your litigation. **The failure to preserve 'evidence' can be the most egregious mistake in a case**.*" [emphasis added] <u>Arkfeld's Best Pract. G. for Lit. Readiness and Hold § 4.1</u>. " . . . **no act serves to threaten the integrity of the judicial process more than the spoliation of evidence** . . . *when critical documents go missing, judges and litigants alike descend into a world of ad hocery and half measures -- and our civil justice system suffers*." [emphasis added] <u>United Medical Supply Co., Inc. v. U.S.</u>, 77 Fed.Cl. 257, at 1 (2007).

28. Nalco has not had the audacity of claiming that they instituted such a litigation hold program, which leads only to the conclusion that Nalco also failed in their duty as a producing party, as did counsel in regards to their duty of competence, on account of such a failure. Nalco cannot rely on its unlawful, seemingly innocuous, and unwise alleged routine document retention policy as a shield, to dismiss the unavailability of relevant documents, no more than Nalco can blindly destroy relevant documents. "***Imposing an adverse inference instruction*** *is supported by either the court's*

**11**

*inherent power or Rule 37 of the Federal Rules of Civil Procedure.*" [emphasis added] *Stevenson v. Union Pacific R. Co.,* 354 F.3d 739, 750 (8th Cir. 2004).

29. Applying the above legal principles to the present case, and according to the evidence given here, are sufficient for a finding that Nalco intentionally allowed the destruction of documents, and that Nalco did so out of a desire to suppress the truth. For that, the Court has available the imposition of spoliation sanctions. *Morris v. Union Pacific R.R.,* 373 F.3d 896, 901 (8th Cir. 2004).

30. <u>Thirdly</u>, Nalco's selective deletion of records is highly suspect, as it was able on <u>September 18th, 2009</u>, to tender disclosures of electronic communications it intends to present in evidence in support of its defenses that occurred as early as <u>January, 2007</u>, or two (2) years and seven (7) months later, well past the ninety (90) day retention period. Courts have found that where a producing party has failed to retain the responsive documents sought by the requesting party, but retained files that are favorable to producing party, indicates selective destruction, evidencing intentional behavior and bad faith. *Doe v. Norwalk Community College,* 248 F.R.D. 372, 380 (D.Conn. 2007).

### IV. NALCO'S CAVALIER ATTITUDE TOWARDS DISCOVERY ORDERS

A. <u>NALCO'S PRODUCTION OF MARCH 15TH, 2011</u>

12

31. As to Nalco's production of <u>March 15th, 2011</u> being in in default with the Courts order in **ECF No. 93**, as first made reference to at paragraph **14**, *supra*, Plaintiffs submit to the Court the following:

32. <u>Firstly</u>, bates labeled 332-372 were issued in collection of static images -**stripped of all metadata** and lumped together- without any means of permitting Plaintiffs the use of electronic search tools in their analysis and preparation for trial. <u>See</u>: **Exhibit 4**. Such production is blatantly in default with the Courts order in **ECF No. 57**: "***for each document produced, the defendants must provide a <u>soft-copy in its native format in order and original metadata</u>.***"

33. <u>Secondly</u>, the Court ordered in **ECF No. 93** that: "***Interrogatory No. 14 is to be answered.***", while Nalco limited itself to issue what they unwittingly label: "*Defendant's Supplemental Response to Interrogatory No. 14.*" <u>See</u>: **Exhibit 5**. Nalcos's so-called *Supplemental Response to Interrogatory No. 14* is troubling in many respects.

34. At the outset, it states untruthfully: "***Pursuant to the Court's order at the discovery hearing on January 14, 2011, this request was narrowed in time frame from 2007 to the present and solely as to employees in Puerto Rico.***" Nowhere in the record of this case is there such a limitation in the scope of discovery. The Court did limit the scope of discovery

**13**

in **ECF No. 57**, at page 15, where it referred to: "***The
information requested by plaintiffs in interrogatories 12
through 18 is based on the narrowly defined group laid out in
interrogatory No. 5 . . . Accordingly, <u>plaintiffs' discovery
request will be limited to Nalco's Puerto Rico databases
located in Naperville, Illinois</u>.***"

35. Moreover, Nalco is also untruthful where it asserts:
"***Further, and based on the discussion at the discovery
hearing, our understanding is that Plaintiff is interested in
identifying individuals who may input or change personnel or
employee information for employee in Puerto Rico in the SAP
database.***" Nothing could have given Nalco a reasonable belief
that Plaintiffs were merely requesting information on the end-
users who access a SAP database, where, the language of the
interrogatory requests information on those who are:
"***responsible for maintaining electronic processing systems,
networks, servers, and data security measures.***" That Nalco
understood the request in such a way is evidently
disingenuous, considering the context of Interrogatory No. 14,
which was issued in a string of Information Technology related
interrogatories-<u>See</u>: **Exhibit 6**-, and to which the Court in **ECF
No. 57**, at page 17, made reference as follows: "***A party should
[be allowed to] discover the organization of the responding
party's information technology department, the hardware and***

**14**

*software it uses, as well as its policies and practices for information processing.*"

36. Likewise, Nalco's objection to the interrogatory as: "*vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.*" is a stereotyped boilerplate objection which, besides being untimely, preserves nothing. In any event, Nalco's continues to be unresponsive to a discovery request served upon them on August 25th, 2009.

**B. <u>NALCO'S OBJECTION OF APRIL 6TH, 2011</u>**

37. As to Nalco's objection of <u>April 6th, 2011</u>, being untimely, baseless, and in default with the Courts order in **ECF No. 93**, as first made reference to at paragraph **15**, *supra*, Plaintiffs submit to the Court the following:

38. At the outset, Nalco's objection is untruthful where it starts off by stating: "*After briefing and argument on January 14, 2011, the Court upheld Nalco's objections that Plaintiff's requests were overly broad and would not lead to relevant evidence. In the course of the hearing Plaintiff was advised to redraft and resubmit requests.*" <u>Firstly</u>, the Court did order Nalco to comply with Plaintiffs' requests as set forth in **ECF No. 93**, at 7, 9, 10, 11, and 13. <u>Secondly</u>, the language cited above by Nalco was never proffered by the Court in **ECF No. 93**. <u>Thirdly</u>, the Court's reference with a request being

"*too broad*" was circumscribed specifically **to the production in their entirety** of: "*Lotus Notes . . . container files, mail stores, mailboxes and calendars.*" The Court never ruled that the request would not lead to relevant evidence, nor did the Court object to the number and designation of the named custodians, but rather contrarily, the Court ruled that taking as a starting point the **Lotus Notes container files in their entirety**, Nalco would apply a set of agreed-upon key-words defined by the parties, in order to extract and produce from the containers the responsive electronic communications. The Court did in fact urge the parties to work cooperatively towards this endeavor where it stated: "*I hope that narrowing the scope of the requested discovery and continued exchanges between counsel for the parties may yet bring this case to a reasonably swift conclusion.*" **ECF 93**, at 13-14.

39. Moreover, Nalco is also untruthful in its objection where it asserts: "*Plaintiffs redrafted discovery requests suffers from the same deficiencies as the prior discovery in this case.*" As is patently evident from Plaintiffs' **Exhibit 2**, Redrafted Requests of March 7th, 2011, Plaintiffs did in fact narrow the scope of the request as ordered by the Court, and more tellingly, had to do so without the participation and cooperation of Nalco, which was also ordered by the Court.

40. In fact, Plaintiffs had signaled to Nalco early on the importance of defining search-and-retrieval key-words, as an aid for the parties to wrap their arms around the discovery process, as evidenced on January 11th, 2010, in **ECF No. 41** at 2. <u>See</u>: **Exhibit 8**. Plaintiffs further filed a proposed discovery protocol with the Court on October 25th, 2010, as part of their fourth motion to compel, **ECF No. 77-2** (<u>See</u>: **Exhibit 9**), which after being denied, the Court subsequently vacated said denial on January 25th, 2011(**ECF No. 91**). Nalco, on the other hand, never opposed Plaintiffs' proposed discovery protocol, nor did they propose any alternatives, other than an adamant and stubborn denial to cooperate and produce.

    **a. <u>CLAIMS OF BURDEN</u>**

41. Nalco's objection of April 6th, 2011 also claims that: "*Plaintiff's requests are overly broad, unduly burdensome, do not relate to any issue in this case, are not relevant, and will not lead to discovery of relevant information.*" This claim is equally hopeless, as they represent canned and boilerplate allegations, without any specificity as to where the requested information resided, what would be the process to retrieve it, and why it would be costly and burdensome. **Fed.R.Civ.P.26(b)(2)(B)** requires more than Nalco's bold and hollow assertion, it <u>**requires them to show**</u>: "*that the*

**17**

*information is not reasonably accessible because of undue burden or cost.*"

42. Nalco's objection is also based on supposedly that: "***The words selected, however, do not appear to be related to any issue in the case . . . reviewing the results would be burdensome . . . The first 4 listings are e-mail domains without the identification of a pertinent person at thee-mail address . . . Other extremely broad terms include term No. 5 "6SS", term No 11 "Aponte", term No 13 "BR", term No 22 "Credit Card", term No. 31 "Donato", term No. 27 "DA", and term No. 34 "FPC" . . .***"

43. <u>Firstly</u>, the 16 identified custodians are derived primarily from individuals Nalco has identified as "***likely to have discoverable information***" (<u>See</u>: **Exhibit 10**, *Nalco's Disclosures*), and those individuals Plaintiffs identified as potentially being similarly situated to Aponte. <u>Secondly</u>, the words selected appear in e-mail communications which Nalco has produced within its disclosures, and which they intend to introduce into evidence at trial, purportedly because they support their defenses against Plaintiffs' claims. <u>Thirdly</u>, the e-mail domains specified are those that belong to the Nalco customers who purportedly complained about Aponte's performance, and on which Nalco purportedly based their decision to terminate Aponte.

**18**

44. Plaintiffs have therefore sufficiently shown the relevance of the proposed search terms, while Nalco has not made any effort to propose alternatives, or even show that they exerted a legitimate effort to comply with the request.

45. Moreover, the sheer volume of potential responsive records to be examined cannot be taken as an excuse by Nalco to deny Plaintiffs access to discovery. Nalco still needs to make a good-faith effort to locate and produce the potentially responsive material called for by the discovery request, and so far have failed to make such a showing. *Qualcomm, Inc. v. Broadcom Corp.,* 2008 WL 66932, at *9 (S.D.Cal., 2008).

46. Courts have routinely granted employment related plaintiffs access to an employer's electronic records, even when such data might not be live, active, on-line data, which is generally considered more accessible, as defined by *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y., 2003). In *Helmert v. Butterball, LLC,* 2010 WL 2179180 (E.D.Ark., 2010), the court granted plaintiffs' motion to compel, as it found the discovery requests as being sufficiently narrowly tailored to lead to the discovery of relevant information, and which included the following: **17 different search terms and phrases**, (*at *5*); **22 different mailboxes** belonging to an equal number of custodians (*Id.*); extending as far back in time as five (5) years (Id. *at *10*).

19

**47.** To permit Nalco to reap the business benefits of a substantial investment in information technology, and then simultaneously tolerate their claims -as a shield in litigation- that use of that technology results in an inordinate burden and expense, undoubtedly leads to incongruous and unfair results. *AAB Joint Venture v. U.S., 75 Fed.Cl. 432, 443 (2007)*.

**48.** Regardless, and in any event, under the discovery rules, the presumption is that the responding party must bear the expense of complying with discovery requests. *Peskoff v. Faber, 251 F.R.D. 59, 61 (2008)*.

**C. NALCO'S PRODUCTION OF APRIL 15TH, 2011**

**49.** Nalco's production of April 15th, 2011 is troubling at many levels. At the outset, Nalco had already admitted on November 12th, 2010 that it had destroyed the relevant electronic records as laid out in paragraph **9**, *supra*. All of the sudden, five (5)months later, without explaining how, they recovered some, but not all, of the records that had been previously destroyed.

**50.** Nalco should have been at a bare minimum, able to explain: Steps taken to search, retrieve, and restore any files which might have been improvidently deleted; Policies and procedures followed, and any related communications, designed to restore and recover the records; Audit trial and chain of

<u>custody</u> information to permit the identification of at least:
producing individual, Nalco internal or external organization
responsible for its production, Name or identity of the
specific server or computer system where the information was
originally created and maintained during the course of
normal business and from which the backup was produced or
copied from, name or identity of the specific database and
database, Management system where the information: was
originally created and maintained during the course of normal
business and from which the backup was produced or copied
from.

51. Nalco had been already ordered to produce the information
as laid out in **ECF No. 57**, together with the native file
format records and all of the original metadata. Without
the above information, any metadata that is produced is
totally useless, as there isn't anything against which
Plaintiffs analyze and evaluate the completeness and
authenticity of the data.

52. Nalco should be devastated, if not humbly ashamed, that
they have utterly failed to take notice of the importance
and value of metadata as an evidentiary issue.

53. *Aguilar v. Immigration and Customs Enforcement Division of
the United States Department of Homeland Security, 255 F.R.D.
350, 356 (S.D.N.Y. 2008).* provides a guidebook that explains

what every other litigant -except for Nalco- by now recognizes: the various types of metadata, the relationship between a record and its metadata, and most importantly the need to produce metadata that will enable the receiving party to have the same ability to access, search, and display the information as the producing party had.

54. Regardless of how unwittingly Nalco seems to be unable to discriminate between their paper-based disclosures, and the underlying electronic records from which they were produced, by now it is well accepted -if not indisputable- that metadata is generally considered to be an integral and inherent part of an electronic record, and that its removal or alteration -as is the case here with Nalco- ordinarily requires an affirmative act by the producing party that alters the electronic document to rectify, explain, and justify such alteration. See: *Williams v. Sprint/United Mgmt. Co., 230 F.R.D. 640, 652 (D.Kan.2005)*.

55. Also troubling, as well as questionable, is Nalco's ability to purportedly produce some, but not all, of the e-mail records.

56. It is a matter of record that Nalco employs a Lotus Notes electronic communications facility, and that Lotus Notes stores its records in a built-in database system in the format of **.NSF**. ***Database***, in turn, is defined as: "***a set of data***

22

***elements consisting of at least one file, or of <u>a group of</u>
<u>integrated files,</u> usually <u>stored in one location</u> and made
available to several users . . . which can be dispersed or
replicated among different points in a network . . . typically
contain <u>aggregations of data records</u> or files . . .*** " The
Sedona Conference, <u>Glossary - E.Discovery & Digital</u>
<u>Information Management</u> (3rd Ed. 2010).

57. Consequently, databases are considered <u>**documents**</u> which must
be produced as such when a discovery request is made for them.
Such is their definition under **Fed. R. Civ. P. 34(a)**: "***any***
***designated documents . . . including . . . data compilations***
***from which information can be obtained, translated, if***
***necessary by the respondent through detection devices into***
***reasonably usable form.***" <u>See</u>: <u>*Tulip Computers Intern. B.V. v.*</u>
<u>*Dell Computer Corp.,*</u> *52 Fed. R. Serv. 3d 1420 (D. Del. 2002).*

58. It follows from the above definitions that the records Nalco
did effectively produce were sitting right together with those
it elected to conceal and not produce in the same database.
Nalco very tellingly is unable –and unwilling- to explain how
it was able to get some of the records within the database,
but not the others.

**D. <u>SUMMARY</u>**

59. To this date, Nalco is in default of the following discovery

   order issued by the Court on May 20th, 2010, pursuant to **ECF**

   **No. 57**:

"*As to the documents produced in the initial disclosures, the
defendants have to **identify the computer program and/or software
in which they were created, or electronic messaging system that
was used to transmit them**. Also, for each document produced, the
defendants must provide **a soft-copy in its native format in
order and original metadata**. See Dahl v. Bain Capital Partners,
LLC., 655 F. Supp. 2d 146, 150 (D. Mass. 2009).*". [emphasis
added] **ECF No. 57**, at 18.

60. To this date, Nalco is in default of the following discovery

   order issued by the Court on January 28th, 2011, pursuant to

   **ECF No. 93**:

"***Interrogatory No. 14 is to be answered***". **ECF No. 93**, at 7,

which refers to **ECF No. 77**, *Pls'.2nd.Mot.Comp.*, at 11:

"*From January 2007 until the present day, and in support of the
organizations to which belong the same delimited and narrowly
defined reference group as laid out for **Interrogatory 5**, above:
List names, titles, contact information, and job description
duties for all individuals or organizations responsible for
maintaining electronic processing systems, networks, servers,
and data security measures.*".

61. To this date, Nalco is in default of the following discovery

   order issued by the Court on January 28th, 2011, pursuant to

   **ECF No. 93**:

"***Document request Nos. 7, 8, 9, 10, 11, 12, 13 and 23 are to be
complied with*** *but also limited to Puerto Rico and limited to the
period 2007 through 2009 inclusive*". **ECF No. 93**, at 13.

which refers, *inter alia*, to **ECF No. 93**, at 11:

"***Document request No. 9***: *From January 2007 until the present
day, and in support of the organizations to which belong the*

*same delimited and narrowly defined reference group as laid out for Interrogatory 5, above: For all individuals for which a record is produced in response to the request above, and who work or have worked under an employment visa, provide also their corresponding Labor Certification package and Visa application package."*

"***Document request No. 10****: From January 2007 until the present day, and in support of the organizations to which belong the same delimited and narrowly defined reference group as laid out for Interrogatory 5, above: Any and all documents which NALCO CHEMICAL, INC. is required to file or has filed with any state or federal agency dealing with race, color, gender, age, national origin, or disability of its employees."*

62. Although not a discovery order, to this date, Nalco is in default of the order issued by the Court on <u>July 9th, 2010</u>, pursuant to **ECF No. 58**, to pay Plaintiffs $250 for failure to appear at a Pre Trial Conference.

63. Nalco's discovery abuses in this case were egregious. Court orders were disobeyed, documents were intentionally and irretrievably destroyed. Were the court to ignore such behavior, it could not "administer orderly justice, and the result would be chaos." One who anticipates that compliance with discovery rules and the resulting production of damning evidence will produce an adverse judgment, will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment [it] is tempted to thus evade." Willful spoliation of evidence deserves the harshest sanctions because it is antithetical to our system of

justice. The evidence is sufficient to show such willfulness here.

64. Nalco's behavior in this case can be characterized as willfulness because it is reckless conduct that is so unreasonable that harm is likely to occur. Willful, wanton, and reckless conduct such as Nalco's laid out above, depicts an actor who has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences. *Pension Committee of University of Montreal Pension Plan v. Banc of America*, 685 F.Supp.2d 456, 463-64 (S.D.N.Y. 2010). As discussed above, failing to timely issue a litigation hold, failing to follow up on that litigation hold, failing to request discovery documents from key employees, and so forth, reveal Nalco's intentional failure to meet discovery obligations and its flagrant disregard of the obvious great risk that it was highly probable the destruction of relevant documents would result from its behavior, and Nalco's conscious indifference to the consequences of that risk.

65. In observing behavior such as Nalco's in the instant case, the 10th Circuit has held:

"*How many times can a litigant ignore his discovery obligations before his misconduct catches up with him? . . .* **failed to produce documents in response to a discovery request***.* **Then they proceeded to violate not one but two judicial orders** *compelling production of the requested materials.*" [emphasis added]. *Lee v. Max Intern., LLC, 638 F.3d 1318, 1319 (10th Cir. 2011).*

"**But a party's thrice repeated failure to produce materials that have always been and remain within its control is strong evidence of willfulness and bad faith,** *and in any event is easily fault enough, we hold, to warrant dismissal or default judgment.*" [emphasis added] *Id.*, at 1321.

"*And where, as here, the record shows that* **a party failed to comply with a document request and two court orders compelling production of materials within the party's control***, we are convinced a district court does not abuse its discretion by dismissing the case or entering default as sanction . . .*" [emphasis added] *Id.*, at 1324.

## V. NALCO'S DATA DOWNGRADING

66. In disobeying the Court's order as laid out above, by failing to provide a soft-copy of disclosures in native format with their original metadata -**ECF No. 57**, at 18-, Nalco failed to produce metadata for Bates Numbered 10 - 11, 145, 146, and 332 - 372.

67. Bates Numbered 10 – 11 hold a critical piece of evidence, Ashok Duggal's *Recommendation for Performance Related Termination* of Aponte. Said document, in its face, contains contradictory fields of information, which constitute material misstatements of fact.

68. For instance, the date of the desired timing for termination, and the dates on the signature section, are crossed-out and otherwise defaced:



69. <u>Bates Numbered 145</u> also holds a critical piece of evidence, Nalco's HR representative Stephanie Glashagel communication to Duggal, where she "suggests" to Duggal what the good pretexts for termination of Aponte could be. For instance, Glashagel suggests: "*I would like a more detailed summary of the last 3-4 months and* ___*how you are now at the conclusion of terminating Donato due to the Amgen request*___." The above statement hardly seems like an even-handed observation from an uninterested HR representative who is evaluating a supervisor's opinion of a subordinate. Contrarily, Duggal is not being asked to comment on Aponte or his performance, but rather it seems like Duggal is being "*coached*" as to what a proper termination justification would like. Furthermore, and more tellingly, Glashagel is unable to instruct Duggal to include the actual

document containing the "**Amgen request**" that Aponte be removed from servicing them, namely because none exists, but rather she is feeding Duggal what his own "**conclusion**" is, as well as feeding him how he reached his own conclusion.

70. Also, questionable and telling is Glashagel's instruction that Duggal "**also give the reasons** *why Donato can no longer stay on* **because he does not have business to call on** *at this point*.", which sounds more than disingenuous, and a rather blatant attempt of "**sandbagging**" against any potential claims that Aponte might make questioning his termination.

| Stephanie P Glashagel | To: Ashok P Duggal/USA/Latin/Nalco@NALCO |
|---|---|
| NALCO  06/27/2008 02:10 PM | cc: |
| | Subject: Information on Donato |

Ashok,                                        .

Sorry I missed your phone call back.  Here's what I need from you:

A summary of Donato's performance since you gave him the Performance Improvement Plan last year.  I don't need a lot of detail of the 2007/early 2008 timeframe but I would like a more detailed summary of the last 3-4 months and how you are now at the conclusion of terminating Donato due to the Amgen request. You can refer to the email examples you sent me - which I can include as part of the termination recommendation - but also give the reasons why Donato can no longer stay on because he does not have business to call on at this point. Please copy Jose Castillo and Jose Ortiz on this email.

I also need the term date from you - per my voicemail - it should be July 9, 10 or 11.  I need that to make the termination recommendation early next week.

Let me know if you have other questions.  I will review what you send me and make sure I have all I need to put the recommendation through.

Thanks.

Stephanie Glashagel
HR Business Partner

Nalco Company
630-305-1490 office
630-305-2896 fax
sglashagel@nalco.com

71. Bates Numbered 146 also holds a critical piece of evidence; Aponte's purported sales report of June 25th, 2008. Nalco, within all the pretextual reasons it gives to justify Aponte's termination, it includes Aponte's failing revenue and sales numbers and metrics, which it has never supported with a single piece of Nalco official business documents.

72. Bates Numbered 332 - 372, which Aponte has pointed out earlier fails substantively to comply with the Court's discovery order issued on January 28th, 2011, pursuant to **ECF No. 93**, "***Document request Nos. 7, 8, 9, 10, 11, 12, 13 and 23 are to be complied with*** *but also limited to Puerto Rico and limited to the period 2007 through 2009 inclusive*". **ECF No. 93**, at 13.

73. Here they are further in default of a Court Order in another dimension, as they were not produced in compliance with the order issued by the Court on May 20th, 2010, pursuant to **ECF No. 57**:

". . . ***identify the computer program and/or software in which they were created, or electronic messaging system that was used to transmit them . . . provide a soft-copy in its native format in order and original metadata. . .***". [emphasis added] **ECF No. 57**, at 18.

74. Nalco, besides falling short in producing documents which even purported to contain the information requested, failed once again, in recalcitrant disobedience of the Court's

orders, to produce anything in native electronic format with all of its original metadata.

75. Nalco has no reasonable objective basis on which to justify its downgrading of electronic documents in their native electronic format, to printed or printed format emulation ("**PDF**"). Contrarily, it begs the question: What benefit is there for Nalco, to engage in a cumbersome, convoluted, fragmented, and unreliable data-conversion process, whereby information originally stored electronically is converted to printed-emulation format before being handed to Aponte?

76. The above practice is an inordinately time consuming and fundamentally improper practice that divorces documents from their contextual original and authentic background. It is also undoubtedly more burdensome on Nalco itself, to disclose and produce information in a converted format, than it is to simply produce it in its native electronic file format.

77. Nalco's electronic document conversion efforts –and data downgrading– highlighted above is not only unjustified, but is also suspect. Printing or disclosing in print-like format documents and e-mails that could have been easily produced in native format, has been held to serve no other purpose than to make searching their content much more difficult than it would have been had they been produced in native format, and concealing relevant and material details about the documents

**31**

that are held in its metadata. *Covad Communications Co. v. Revonet, Inc.,* 267 F.R.D. 14, 18 (D.D.C. 2010).

78. Permitting the downgrading of data to a less accessible form-which systematically hinders future discovery by making the recovery of the information more costly and burdensome-is a violation of the preservation obligation. *Treppel v. Biovail Corp.,* 233 F.R.D. 363, 372 n. 4 (S.D.N.Y. 2006).

## VI. NALCO'S UNDEFENSIBLE SEARCH

79. Nalco responded to the last order of production issued by the court, namely the search and retrieval of electronic documents delimited in scope by a set of key-words, restating the boilerplate objections with which it had challenged the discovery requests from the outset of the litigation. Nalco failed, however, to explain the basis of the search strategies, the rationale as to why they are believed to yield or to have yielded quality results, which files were searched, what people were told about how to go about conducting the search, and how the search was supervised. All of the above constitute an indefensible search, which amounts to not having made an attempt to comply with the Court's discovery order. 11 Sedona Conf. J. 229, 235, (2010), *A Nutshell On Negotiating E-Discovery Search Protocols*.

80. **See also**: *Victor Stanley, Inc. v. Creative Pipe, Inc.,* 250 F.R.D. 251, 261-263 (D. Md. May 29, 2008), seminal electronic

discovery case collecting cases on the proper search and retrieval in response to discovery requests.

### VII. <u>AUTHENTICATION</u>

81. Pursuant to **Fed. R. Evid. 901(a)**, no document can be introduced into evidence unless it meets the condition precedent of being authenticated. That is, the party seeking introduction of the document must present evidence "*sufficient to support a finding that the matter in question is what its proponent claims.*" ***Id.***; <u>*U.S. v. Panaro*</u>, *266 F.3d 939, 951 (9th Cir. 2001)*. The proffered evidence must be "*accurate, authentic, and generally trustworthy*". **Fed. R. Evid. 901 (b)** sets forth a non-exhaustive list of methods by which a document can be authenticated, including the testimony of a witness with knowledge.

82. In general, "*the Federal Rules of Evidence apply to computerized data as they do to other types of evidence.*" **Manual For Complex Litigation (Fourth) § 11.446 (2004)**. However, computerized data raises "*unique issues concerning accuracy and authenticity*" because, "*accuracy may be impaired by incomplete data entry, mistakes in output instructions, programming errors,... data conversion, or mishandling.*" ***Id.*** A party seeking to authenticate electronic data bears a higher burden where the data at issue was not simply gathered and

stored, but rather – as is the case here - was actively created. *United States v. Duncan, 30 M.J. 1284, 1288 (1990).*

83. Where a party seeks to use a witness to authenticate a document, the witness must "*provide factualspecificity about the process by which the electronically stored information is created, acquired, maintained, and preserved without alteration or change, or the process by which it is produced if the result of a system or process that does so . . .* " *Lorraine v. Markel Am. Ins. Co., 241 F.R.D. 534, 545-46 (D. Md. 2007).*

84. Nalco has not identified any witness with personal knowledge of the steps taken to collect, identify, extract, store, process, or create the documents which originally were in electronic format, and converted to paper format for disclosure and production. **Fed. R. Evid. 901;** *Indianapolis Minority Contractors Assoc., Inc. v. Wiley, 1998 WL 1988826, at *6-7 (S.D. Ind., 1998).* **Fed. R. Evid. 803(6),** alternatively, requires that the records offered be authenticated by a custodian or other qualified witness.

85. Nalco has not identified their custodian of all electronic records. No Nalco witness who will appear to testify at trial, therefore, has personal knowledge of the facts surrounding the production of documents which they intend to present at trial.

*Cooper v. Southern Co.*, 213 F.R.D. 683, 687-88 (N.D. Ga., 2003).

86. *In re Vee Vinhnee*, 336 B.R. 437, 449 (2005), establishes that a company cannot introduce its own business record on the strength of a record custodian's declaration that fails to provide "*basic informationthat would provide assurance that the record reproduced from the electronic media is identical to the record that was originally stored.*" Consequently, an e-mail, purported to be an individual document, or a discrete part of a **.NSF** database, cannot be authenticated by simply claiming that it is a "***summary***" of documents provided by Nalco in discovery. <u>See</u>: *In re Homestore.com, Inc. Securities Litig.*, 347 F. Supp. 2d 769, 780 (C.D. Cal., 2004); *Harris v. Marsh*, 679 F. Supp. 1204, 1275 (E.D.N.C. 1987); *Indianapolis Minority Contractors*, 1998 WL 1988826 at*6-7 (S.D.Ind., 1998).

87. Documents which in their natural and original state are electronic and computer-based, when converted to anextraneous and unreliable media, such as paper, are deemed inadmissible as hearsay. *Doe v. U.S.*, 805 F.Supp.1513,1517(D.Hawaii,1992); *U.S. v. Catabran*, 836 F.2d 453, 457 (9th Cir. 1988).

88. An original is the writing or recording itself, or, " . . . *For electronically stored information*, ' original' means any printout--or other output readable by sight--*if it accurately reflects the information.*". **Fed. R. Evid. 1001(d)**. Where the

35

rule applies, the proponent must produce the original or a duplicate, or explain its absence. "*An original is not required . . . if: (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith.*" **Fed. R. Evid. 1002, 1004**; *United States v. Bennett, 363 F.3d 947, 953 (9th Cir. 2004).* "*the best evidence rule requires not, as its common name implies, the best evidence in every case but rather the production of an original document instead of a copy.*" *United States v. Diaz-Lopez, 625 F.3d 1198, 1201 (9th Cir. 2010).* "*Under the Federal Rules of Evidence, '[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required . . . The purpose of the rule is to prevent inaccuracy and fraud when attempting to prove the content of a writing [or recording].*" . *United States v. Armstrong, 626 F. Supp. 2d 229, 236 (D.P.R. 2009).*

89. Secondary evidence, as that Nalco intends to introduce at trial to support their defenses, in the form of incomplete, **paper copies of the original electronic documents**, cannot be allowed to be used to establish or prove the content of the electronic documents when the original document is or should have been reasonably available. *Lorraine v. Markel American Ins. Co., 241 F.R.D. 534 (D.Md., 2007).* Nalco first had every opportunity to produce its disclosures in native electronic

format with all of its original metadata, thus giving its disclosures some indicia of authenticity, but chose not to. Nalco was further ordered by the Court to produce disclosures in electronic format with corresponding metadata, and then admitted to having unlawfully destroyed the evidence as their best –albeit lame- pretext to excuse non-compliance. Finally, Nalco attempts to introduce their disclosures all of which originated within the same single Lotus Notes **.NSF** database, but never explain, one, how and when they recovered the spoliated data, or two, why they were able to recover some records, and not others, within the same single integrated stand-alone-file.

## VIII. <u>CONCLUSSION AND PRAYER FOR RELIEF</u>

90. Inasmuch Nalco's failure to comply with the Court's discovery orders are related to the production of their disclosures in native electronic format, together with all its original metadata, they are in violation of **Fed. R. Civ. P. 26(a)**. **Fed. R. Civ. P. 37(c)(1)** provides that when a party without substantial justification fails to disclose information required by **Rule 26(a)** the party is not permitted to use as evidence any witness or information not so disclosed. The sanction of exclusion "***is automatic and mandatory . . .***" <u>NutraSweet Co. v. X-L Eng'g Co.</u>, 227 F.3d 776, 785-86 (7th Cir. 2000).

91. A *Spoliation instruction*, allowing an adverse inference, is commonly appropriate in civil and criminal cases where there is evidence from which a reasonable jury might conclude that evidence favorable to one side was destroyed by the other. *United States v. Laurent, 607 F.3d 895, 902-903 (1st Cir. 2010).* A defendant is not entitled to an instruction on a defense when the evidence in the record does not support that defense. *United States v. Lopez-Lopez, 282 F.3d 1, 18 (1st Cir. 2002).*

92. "*A wide array of sanctions are imposable for spoliation*". Joseph, <u>Sanctions: The Federal Law of Litigation Abuse</u> § 52—(4th Edition). Sanctions available include drawing **adverse evidentiary inferences**, and even **preclusion of the admission of the evidence** at issue.[emphasis added] *D'Onofrio v. SFX Sports Group, Inc., 2010 WL 3324964 (Facciola, MJ); Shepherd v. Am. Broad. Cos., 62 F.3d 1469, 1475 (D.C.Cir.1995).*

93. An adverse inference is not limited to trial, it may be applied on summary judgment as well. "*The Court will take these adverse inferences into account when deciding the parties' summary judgment motions.*" *Nursing Home Pension Fund v. Oracle Corp., 254 F.R.D. 559, 567 (N.D.Cal. 2008).* Inferences of spoliation, on the other hand, can allow the plaintiff to survive summary judgment. *Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001); Wood*

*v. Pittsford Cent. Sch. Dist.*, 2008 WL 5120494 at 2 (2nd Cir. N.Y.); *Rattray v. Lippmann-Milwaukee, Inc.*, 2009 WL 565070 at 11.

94. "**A fraud on the court** *occurs where it is established by clear and convincing evidence that* **a party has sentiently set in motion some unconscionable scheme** *calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ...* **unfairly hampering the presentation of the opposing party's claim or defense.**" *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F.Supp.2d 378, 393 (S.D.N.Y. 2010).

95. All of the above instances of discovery abuse perpetrated by Nalco are punishable by **Fed. R. Civ. P. 37**, and Aponte hereby seeks any and all available remedies through a timely motion in limine, within the time frame set by the Court. Joseph, Sanctions: The Federal Law of Litigation Abuse § 49—(4th Edition).

96. Furthermore, evidence of spoliation is, therefore, admissible to show consciousness of guilt under **Fed. R. Evid. 404(b)**, and Aponte hereby seeks the corresponding instructions to the jury regarding the applicable adverse inferences to be had against Nalco. *United States v. Anderson*, 2009 U.S. App. LEXIS 12532, at \*\*14-\*\*15 (6th Cir. May 26, 2009).

97. There is overwhelming authority justifying the imposition of different types of preclusion orders upon Nalco for their uncontested behavior in the instant litigation: "*willful disobedience or gross indifference to the rights of the adverse party, deliberate callousness or intended negligence*

*[sic]."* *Harper House, Inc. v. Thomas Nelson Pub'rs, Inc., 8 Fed. R. Serv. 3d 1081, 1084 (C.D. Cal. 1987). See: Ferrara v. Balistreri & DeMaio, Inc., 105 F.R.D. 147, 151 (D. Mass. 1985); Penk v. Oregon State Bd. of Higher Educ., 816 F.2d 458, 466 (9th Cir. 1987); BankAtlantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1049 (11th Cir. 1994)*

98. An order by this Court precluding Nalco from asserting their defenses in the instant case is appropriate on account of their failure to disclose and discover evidence. See: *Libbi v. Sears, Roebuck & Co., 107 F.R.D. 227, 229 (E.D. Pa. 1985); Lammers v. Conrad, 601 F. Supp. 1543, 1548 (E.D. Wis. 1985); Bergman v. United States, 565 F. Supp. 1353 (W.D. Mich. 1983); Update Art, Inc. v. Modiin Pub'g, Ltd., 843 F.2d 67, 71–72 (2nd Cir. 1988); Monaghan v. SZS 33 Assocs., L.P., 154 F.R.D. 78, 81 (S.D.N.Y. 1994).*

99. An order by this Court precluding Nalco from introducing evidence in the instant case is also appropriate on account of their failure to disclose and discover evidence. See: *Melendez v. Illinois Bell Tel. Co., 79 F.3d 661, 670–672 (7th Cir. 1996); Penk v. Oregon State Bd. of Higher Educ., 816 F.2d 458, 466 (9th Cir. 1987); Hull v. Eaton Corp., 825 F.2d 448, 452 (D.C. Cir. 1987); Werbungs v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027 (2nd Cir. 1991).*

40

**WHEREFORE**, for all of the above, Plaintiffs pray that this Honorable Court enter:

**ORDER** Precluding Nalco for raising any defenses at trial, and

**ORDER** Precluding Nalco from entering evidence at trial.

In San Juan, Puerto Rico, on this date of January 25th, 2012.

<u>**s://Juan J. Martínez Rodríguez**</u>

JUAN JOSE MARTINEZ RODRIGUEZ
USDC PR BAR NO. 128706
ATTORNEY FOR PLAINTIFFS
PMB-570, 1353 Luis Vigoreaux Ave
Guaynabo, Puerto Rico 00966
Tel. 787-368-0310
Email: jjmartrod@yahoo.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on January 25th, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of interest, if any, at this stage of proceedings.

<u>**s://Juan J. Martínez Rodríguez**</u>
USDC PR Bar No. 128706