IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DONATO APONTE NAVEDO, et. al.,

Plaintiffs,

v.                                              CIVIL NO.: 09-1232 (MEL)

NALCO CHEMICAL, INC., et. al.,

Defendants.

## OPINION AND ORDER

On March 10, 2009, Donato Aponte-Navedo ("Aponte" or "plaintiff"), his spouse, Belkis

I. Santiago-Martínez, and the conjugal partnership constituted between them ("plaintiffs") filed a

complaint against Nalco Chemical Company ("Nalco") and three of its employees, José Serrano,

Jorge Castillo,[1] and Ashok Paul Duggal, and the employees' respective conjugal partnerships

("defendants"), alleging discrimination based on gender, national origin, age, and disability, in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII");

the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"); the Americans

with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213; and various provisions of

Puerto Rico law.[2]   (D.E. 1).   Pending before the court is defendants' motion for summary

judgment (D.E. 108, 110, 111, 112), plaintiffs' response in opposition (D.E. 169), and

defendants' reply (D.E. 171, 172).  Also pending before the court is defendants' motion to strike

---

[1] On January 19, 2012, all claims and causes of action against José Serrano, Jorge Castillo, and their respective spouses and conjugal partnerships were dismissed with prejudice.  (D.E. 199).

[2] Specifically, Aponte's complaint makes the following allegations: that Castillo subjected him to a hostile work environment claim due to his diabetes and a to "sexual and gender based" hostile work environment (¶ 25, 27-28); that Castillo "refus[ed] to provide Aponte with a minimum reasonable accommodation" (¶ 26); that he was subject to a hostile work environment based on his Puerto Rican nationality (¶ 29); that Nalco discriminated against its Puerto Rican employees via derogatory comments and demotions (¶ 32); and that he was replaced by a less-qualified, younger, non-Puerto Rican employee (¶ 33).

plaintiffs' response in opposition (D.E. 173), plaintiffs' reply (D.E. 183), and defendants' reply, (D.E. 195).  For the reasons set forth below, defendants' motion to strike is granted in part and denied in part, and defendants' motion for summary judgment is granted.

## I.   DEFENDANTS' MOTION TO STRIKE

In support of their opposition to defendants' motion for summary judgment, plaintiffs submitted a response to defendants' statement of proposed facts as well as their own statement of additional proposed facts.  (D.E. 169).  In support of both their response and their additional facts, plaintiffs submitted Aponte's answers to defendant's interrogatories and an affidavit by Aponte, which is very similar to the statement of proposed facts.  (D.E. 169).[3]  Defendants move to strike Aponte's affidavit because they allege that its statements are not based on personal knowledge, lack foundation, are conclusory, speculative, contain hearsay, and recite what they consider to be Aponte's immaterial opinions and beliefs.  (D.E. 173, ¶ 7).  They further move to strike plaintiffs' additional statement of proposed facts because almost every one of those facts is supported by a citation to Aponte's affidavit.

Any affidavits submitted to support or oppose a motion for summary judgment "must be made on personal knowledge [and] set out facts that would be admissible in evidence . . . ."  Fed. R. Civ. P. 56(c)(4).   See also Vázquez v. López-Rosario, 134 F.3d 28, 33 (1st Cir. 1998) ("Evidence that would be inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment.").  Additionally, the Federal Rules of Evidence provide that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."   Fed. R. Evid. 602.   If a

---

[3] Plaintiffs also submitted copies of three e-mails as exhibits to support Aponte's declaration; however, none of the e-mails is accompanied by a certified English translation.  (D.E. 169-4).  Therefore, pursuant to Local Rule 5(g), which requires documents not in English to be submitted with a certified English translation, these documents are not part of the summary judgment record.  See Martínez v. Atlantic Coll., 2006 WL 3511596, at *2 (D.P.R. Dec. 5, 2006) (refusing to consider exhibits filed in the Spanish language in ruling on motion for summary judgment) (citing Aguiar–Carrasquillo v. Agosto–Alicea, 445 F.3d 19, 24 (1st Cir.2006)).

declaration fails to comply with these rules, the court may sanction the submitting party by striking it from the record.  Moreno Morales v. ICI Paints (Puerto Rico), Inc. 383 F. Supp. 2d 304, 313-314 (D.P.R. 2005).  However, when a party has at least partially complied with the Rules' mandates, striking the entire declaration is generally too harsh of a sanction.  Id.; Pérez v. Volvo Car Corp., 247 F.3d 303, 315-16 (1st Cir. 2001).  Rather, the court should approach the affidavit with "a scalpel, not a butcher's knife," disregarding the inadmissible portions and crediting the remaining statements.  Pérez, 247 F.3d at 315.  In deciding which parts of an affidavit are admissible at the summary judgment stage, "personal knowledge is the touchstone." Id.  However, a bare assertion that a statement is based on the affiant's personal knowledge will not suffice; rather, the affidavit must be factually specific and explain the basis for that knowledge.  Id. at 316.  Moreover, "the requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise."  Id.

Taking this approach to Aponte's affidavit, many, but not all, of its paragraphs must be stricken for their failure to conform to the Federal Rules of Evidence and Civil Procedure.  First of all, Aponte makes several assertions that do not indicate his basis of knowledge for that alleged fact.  For example, Aponte states that the decision by one of Nalco's clients, Abbot, to terminate its contract with Nalco "was a global, corporate-wide decision" which had nothing to do with the service that Aponte was providing to the client.  (D.E. 162-4, ¶ 31).  Aponte does not specify the source of his knowledge for this proposed fact, and because Aponte was not employed in a corporate decision-making capacity at either Nalco or Abbot, it cannot be inferred that he knew reasons for this decision as a function of his employment.  Therefore, this paragraph cannot be considered in ruling on defendant's motion, and is hereby stricken from the record.  The following additional paragraphs similarly fail to indicate Aponte's personal

3

knowledge and are also stricken: D.E. 169-4, ¶¶ 21 (fourth sentence), 24 (except for: "As an Application Engineer, I did not collect commissions"), 26, 28c, 32b (first sentence), 35c (second and last sentences), 37a, 41b (all sentences except for the first one), 42 (except for last sentence), 45 (second and fourth sentences), 46 (second, third, and fourth sentences), 51e (first sentence), 53 (second sentence), 60, 61.

Additionally, Aponte's affidavit contains several assertions that, in addition to lacking a foundation of personal knowledge, are conclusory and/or speculative.[4]  For example, Aponte states that he was "the regional expert" in a certain type of water-cooling technology called 3DTRASAR (D.E. 169-4, ¶ 16), but he does not explain who considered him to be such an expert and how he knew that they had this opinion of him, nor does he indicate by what standards he measures being a "regional expert" or any specific qualifications, awards, or recognition he may have obtained to achieve this status.  Another example is a paragraph in which Aponte states that he "had very good relationships with his clients."  (D.E. 169-4, ¶ 28b). Without any specific factual knowledge to support this statement, it is a mere conclusion that cannot serve as probative evidence.  See Santiago-Ramos v. Centennial P.R. Wireless Corp.  217 F.3d 46, 53 (1st Cir. 2000) (deeming affidavits that do not provide "specific factual information" insufficient to support an opposition to a motion for summary judgment) (citations omitted).

Other statements in Aponte's affidavit are declaredly based only on his own convictions or beliefs, and thus must be stricken as speculative.  See, e.g., (D.E. 169-4, ¶ 28c) ("It is my conviction that if these clients had been aware [that Nalco fired me], Nalco would have had problems with these clients . . . .").  Some of these statements merely assert that his performance at Nalco was satisfactory and that any client dissatisfaction Nalco was not due to any failures in

---

[4] Indeed, speculative statements will inevitably violate the requirement in Fed. R. Civ. P. 56(c)(4) that affidavits be based on personal knowledge, because if an assertion is based wholly on an individual's own speculation, it is, by definition, not based on specific factual knowledge.  The same can be said for conclusory statements.

his work performance.  See, e.g., (D.E. 169-4, ¶ 47) ("There were two other Nalco employees servicing Amgen  . . . and any conduct reflected in the client's complaint is attributable to them, not to me."); (D.E. 169-4, ¶ 44) ("I am not to blame for the Warner Chilcott decision to cancel its contract with Nalco.").  In addition to being conclusory and speculative, Aponte's own opinions about the quality of his work are irrelevant to the ultimate question to be resolved in this case: whether he was terminated due to his employer's belief that his work was inadequate or due to impermissible discrimination.  See Calero-Cerezo v. U.S. Dep't of Justice,  355 F.3d 6, 13 (1st Cir. 2004) (declining to consider plaintiff's "occasional self-justifying suggestions that it was [her supervisor] not she, who was responsible for their ongoing problems.").[5]

Furthermore, as defendants allege, Aponte's affidavit contains statements that are hearsay; however, while these statements are inadmissible to prove the truth of the matter they assert, they are admissible for other non-hearsay purposes.  See, e.g., United States v. Cruz-Díaz, 550 F.3d 169 (1st Cir. 2008) ("Out-of-court statements offered not to prove the truth of the matter asserted but merely to show . . .  what effect the statement had on the listener—are not hearsay.") (citations omitted).  For example, Aponte states several times that he told Duggal that he was overwhelmed by his work schedule and thus needed support from co-workers or extra time to complete tasks.  (D.E. 169-4, ¶¶ 29a, 35a (first sentence only), 42b, 48a, 50a).  While

---

[5] The following additional conclusory and/or speculative statements are also stricken from the record: 169-4 ¶¶ 16 (conclusory), 21 (first sentence: conclusory), 25 (last sentence: conclusory), 25a (last sentence: conclusory), 30a (last two sentences: conclusory; except for the fact that Aponte worked Saturdays and Sundays), 32b (second sentence: speculative), 33b (conclusory, except "seminars in Mexico, Dominican Republic, Puerto Rico and Colombia"), 35c (last sentence), 35d (last sentence: conclusory), 36a (first sentence: speculative; second sentence: conclusory), 37 (last clause of last sentence: speclative), 40a (last sentence), 41a (second sentence: conclusory and speculative); 41c ("Morales understood and was in agreement with the explanations": conclusory); 42 (last sentence: conclusory), 42a (last three sentences: conclusory and speculative), 42c (conclusory and speculative), 42d (conclusory and speculative; except for "I deny that I did not submit all the monthly District Reports for January, February, March, or June"), 44 (first two sentences: conclusory), 45 (first and third sentences: conclusory), 47 (second half of first sentence: conclusory), 48b (conclusory), 50b (conclusory), 51 (third sentence: speculative; fourth sentence: conclusory); 51c (first sentence: conclusory), 51d (conclusory), 51e (second and third sentences: conclusory), 52 (speculative, last clause, beginning with "since it is clear to me…"), 54 (third sentence: speculative), 57b (first sentence: speculative), 59 (speculative); 59a (first sentence: speculative).

these statements are inadmissible to prove that Aponte was indeed overwhelmed or that his schedule was overwhelming, they may be considered in connection with their effect on Duggal's perception of Aponte's work performance.   But see (D.E. 169-4, ¶¶ 31a, 41c) (containing hearsay not admissible for any non-hearsay purpose, nor falling under any hearsay exception, and are thus stricken from the record).

Similarly, Duggal's affidavit, which defendants submitted to support their motion, also contains several statements which contain inadmissible hearsay; specifically, those regarding the complaints he received from Aponte's clients.   See, e.g., (D.E. 111, ¶ 29).   Similar to Aponte's statements, these are also inadmissible to prove their truth (i.e., that Aponte's performance was actually deficient), but they are admissible for the nonhearsay purpose of showing their effect on the listener, Duggal.   Therefore, these statements will be considered only for the limited purpose of showing that Duggal in fact received complaints about Aponte's performance from his clients, and for evaluating the effect this had on Duggal's decision to recommend that Aponte be fired.

The remaining statements in Aponte's affidavit are admissible under the Federal Rules. For example, Aponte states that he visited Baxter, a client of his, every week but that he sometimes could not visit at the scheduled time because he was providing technical assistance to the clients of other Nalco sales representatives.   (D.E. 169-4, ¶ 41).   While defendants argue that this statement is "conclusory, argumentative, and lacks foundation," (D.E. 172, p. 28), it is merely Aponte's recounting of his past behavior and thus, while it may be "argumentative," because it supports his contention that satisfactorily performed his duties, it is not inadmissible. Cf. Mojica v. El Conquistador Resort & Golden Door Spa, 714 F. Supp. 2d 241, 252 (D.P.R. 2010) ("a party can rely on a self-serving affidavit to oppose a motion for summary judgment if it contains relevant and specific factual information based on personal knowledge.").   Therefore,

statements such as these will be considered in evaluating the instant motion, whereas inadmissible statements will not be regarded as part of the record.  As such, defendant's motion to strike plaintiff's entire statement of additional proposed facts and accompanying affidavit is denied in part and granted in part.

As a final note, almost all of plaintiffs' denials and qualifications of defendants' statement of proposed uncontested facts are supported only by citations to Aponte's affidavit. Insofar as that citation is to a paragraph that has been stricken for failure to conform to the Federal Rules, that fact is deemed admitted.  See District of Puerto Rico Local Rule 56(c) ("Any fact that is supported by a record citation and is not properly controverted is deemed admitted."); see also Local Rule 56(e) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.").  With these limitations in mind, the undisputed material facts are as follows.  Unless otherwise indicated, all stated facts have either been admitted by the opposing party or unsuccessfully controverted.

## II.   FACTUAL BACKGROUND

### A.   Aponte's Professional Background

Aponte was born on November 17, 1964 in Bayamón, Puerto Rico.  (D.E. 111, ¶ 1; 169-5, ¶ 1; 172, ¶ 1).  He has a Bachelor of Science degree in chemical engineering from the University of Puerto Rico, Mayagüez.  (D.E. 111, ¶ 3; 169-5, ¶ 3).  Prior to working at Nalco, Aponte held two different jobs in the chemical engineering field during an approximately 8-year time period.  (D.E. 111, ¶ 4-6; 169-5, ¶ 4-6).  He first worked for nine months for the Puerto Rico Aqueduct and Sewer Authority as an engineer and was then hired by the Puerto Rico Electric Power Authority as a shift chemist.  (D.E. 111, ¶ 5-6; 169-5, ¶ 5-6; 169-4, ¶ 4).  In June

of 1996, Nalco hired plaintiff as an Applications Engineer.  In that position, his duties were technical and did not directly involve sales.  (D.E. 111, ¶ 10; 169-5, ¶ 10).  Nalco sells water treatment chemicals and provides technical services and solutions to its clients.  (D.E. 111, ¶ 7; 169-5, ¶ 7).

Approximately one year later, Aponte was transferred was to a position within Nalco as a District Representative.  (D.E. 111, ¶ 14; 169-5, ¶ 14).  In this capacity, he was responsible for sales as well as technical support.  (D.E. 111, ¶ 14; 169-5, ¶ 14).  District Representatives duties included calling on existing customers, servicing assigned accounts by analyzing needs and requirements and recommending solutions, establishing selling strategy and tactics, and establishing new accounts and achieving annual sales targets.  (D.E. 111, ¶ 14; 169-5, ¶ 14).  Ultimately, District Representatives at Nalco are expected to "ensure order and revenue growth of Company products and services assigned to customer and prospect accounts by analyzing and meeting customer needs."  (D.E. 111, ¶ 14; 169-5, ¶ 14).  Aponte understood that his position required him to maintain good client service and relationships, to cultivate new clients, to respond to client requests for information, and to produce different types of regularly-scheduled reports for both clients and management.  (D.E. 111, ¶ 15-17; 169-5, ¶ 15-17).

Aponte had no prior training or experience in sales, but attended an intensive two week sales training course at Nalco's corporate headquarters.  (D.E. 111, ¶ 3; 169-5, ¶ 3).  Aponte states that he also attended Nalco's sales force re-training (he does not indicate the date or duration of that training) and a Versatile Sales Person seminar in Cartagena, Colombia (he does not explain the content of the training or its duration).  (D.E. 169-4, ¶ 21; 169-5, ¶ 3).  Still, he was better at the technical aspect of his job and did not, in fact, generate sales.  (D.E. 111, ¶ 47; 169-5, ¶ 47).

In 2000, Aponte was transferred back to his prior position as an applications engineer, and in 2007 he became a District Representative again.  (D.E. 111, ¶¶ 20, 22; 169-5, ¶¶ 20, 22).  He was responsible for eight different client accounts, including Amgen, Warner Chilcott, Baxter-Guayama and Chevron-Phillips.  (D.E. 111, ¶ 24; 169-5, ¶ 24).

In that position, Aponte's immediate supervisor was defendant Paul Ashok Duggal ("Duggal"), to whom he had been reporting since 2005 when Duggal was promoted to Area Manager.  (D.E. 111, ¶ 21; 169-5, ¶ 21).  Jorge Castillo ("Castillo") worked in Nalco's Colombia office as a Sales Manager and was Duggal's immediate supervisor.  (D.E. 111, ¶ 21; 169-5, ¶ 21).  Castillo travelled to Nalco's Puerto Rico office approximately five times per year, remaining for about one week each time.  (D.E. 111, ¶ 60; 169-5, ¶ 60).  Neither Duggal nor Castillo is Puerto Rican—Duggal is Canadian and Castillo is Colombian.  (D.E. 111, ¶ 21; 169-5, ¶ 21).

**B.    Events Leading to Aponte's Termination from Employment**

As early as February of 2007, the year that Aponte returned to the District Representative position, Duggal received the first of a series of client complaints about Aponte's performance. (D.E. 111, ¶ 25; 169-5, ¶ 25).  Duggal says he told Aponte that several clients had reported that they were dissatisfied with the service he was providing.  (D.E. 111, ¶ 25).  Aponte claims, however, that Duggal only discussed a complaint from one client, Baxter, and that Aponte "explained and put into context for Duggal each one of the customer's complaints," and that he and Duggal agreed to a plan to improve his performance and monthly meetings.  (D.E. 169-5, ¶ 25; 169-4, ¶ 34a).  Aponte further states that a few months later, Duggal told him that he had

cancelled the meetings because Baxter had expressed their satisfaction with Aponte's performance, eliminating the need for follow up.  (D.E. 169-4, ¶ 34a).[6]

Regardless of the factual dispute over this incident, it is uncontested that Duggal received complaints from more of Aponte's clients over the course of the following year and a half.  In March 2007, Chevron Phillips indicated that it was displeased with Aponte's services, citing a lack of consistency, failure to submit timely reports, and a lack of attention to special products. (D.E. 111, ¶ 27).  On March 24, 2007, Duggal thus e-mailed Aponte to notify him that Nalco was at "high risk" of losing the Chevron Phillips account.  (D.E. 111, ¶ 27; 169-5, ¶ 27).  Duggal also said that he was concerned because many of Aponte's clients "were weak" and he asked Aponte to send surveys to the clients to figure out how to remedy the situation.  (D.E. 111, ¶ 28; 169-5, ¶ 28).  Defendant claims that Aponte never responded to Duggal's invitation to comment or suggest how to address these issues, while Aponte claims that he did in fact respond.  (D.E. 111, ¶ 28; 169-5, ¶ 28).

In May of 2007, Warner Chilcott informed Duggal that they were also dissatisfied with Aponte's service and, also, that they were being "aggressively approached" by Chemtreat, a Nalco competitor.  (D.E. 111, ¶ 29 169-5, ¶ 29).  Aponte claims that he had carried out a series of suggestions from Duggal in order to "stabilize the account," yet defendants state that he failed to address several of the points that Duggal had raised.  (D.E. 111, ¶ 31; 169-5, ¶ 30-31).  A few months after Duggal's suggestions, Warner Chilcott complained that Aponte's visits were inconsistent, that he failed to submit reports on time, that chemical inventories were low, and that Aponte had "taken an excessive amount of time" to resolve a certain technical issue.  (D.E. 111,

---

[6] Defendants incorrectly argue that Aponte's statement about what Duggal told him is inadmissible hearsay and should therefore be stricken from the record.  (D.E. 172, p. 18).  Because Duggal is a defendant in this case, and his out of court statement is being used to oppose his motion for summary judgment, it is not hearsay and is admissible. See Fed. R. Evid. 801(d)(2)(A) ("Statements that are not hearsay: . . . The statement is offered against an opposing party and was made by that party in an individual or representative capacity.")

¶ 31).  Thereafter, on an unspecified date in 2007, Warner Chilcott cancelled its contract with Nalco in favor of a competitor.  (D.E. 111, ¶ 36; 169-5, ¶ 36).  The lost account was worth $60,000.  (D.E. 111, ¶ 36; 169-5, ¶ 36).

In or about mid-2007 another of Aponte's clients, Baxter, made similar complaints to Duggal about Aponte's service, stating that he did not visit consistently, did not submit routine reports on time, took too long to resolve a certain technical issue, and that chemical inventories were low.  (D.E. 111, ¶ 32).  Then, a fourth client, Amgen, complained about Aponte's service quality in May of 2008.  A report in the record from Jorge Ortiz ("Ortiz"), a Nalco Account Manager, to Duggal, provides a summary of Amgen's complaints including: that Amgen did not perceive that Aponte provided "a professional level of service at the high standard that Nalco is supposed to deliver," poor communication and reporting from Aponte, Aponte's failure to follow up on certain requests, late submissions of reports and requested solutions to problems, and that "they feel that [they] are only buying from Nalco chemical products, not solutions or the level of sevice they would expect to receive."  (D.E. 112-4).  Duggal discussed the complaints with Aponte in May and made suggestions for improvement.  (D.E. 111, ¶ 37; 169-5, ¶ 37).  In June 2008, at the conclusion of his report, Ortiz recommended that Aponte be removed from the Amgen account, which Duggal did.  (D.E. 111, ¶ 3; 169-5, ¶ 3).  It was this incident that precipitated Duggal's decision to recommend that Aponte be terminated.  (D.E. 111, ¶ 44).

Apart from these client complaints, Duggal pointed out other performance issues to Aponte.  For example, on February 17, 2007, Duggal told Aponte that he was two weeks late in submitting a monthly report that was two weeks overdue, and that he was therefore being placed on probation.  (D.E. 111, ¶ 26; 169-5, ¶ 26).  There are also eight e-mails in the record requesting that Aponte submit overdue reports.  (D.E. 112-3, pp. 17, 29, 32, 34; 112-4, pp. 12, 26, 28, 30).

Other e-mails from Duggal to Aponte evidence his concern about Aponte's attitude as a sales representative, advising him to "refrain from discussing personal problems," complaining, and appearing negative and to maintain a "positive can-do attitude at all times."  (D.E. 111, ¶ 37; D.E. 169-5, ¶ 37).  Aponte's response indicates that he perceived this advice as "mixed signals," because Nalco encouraged its representatives to build friendships with their clients, which meant that the clients "were aware of his diabetic condition" and asked him about it.  (D.E. 169-4, ¶ 47a).

Additionally, in August of 2007, Duggal placed Aponte on a Performance Improvement Plan in response to the performance issues discussed above.  (D.E. 111, ¶ 33; 169-5, ¶ 33).  The plan indicates that Aponte's performance was deficient in the areas of customer satisfaction and overall sales increase.  (D.E. 112-3, p. 10).  It also describes Duggal's concerns about Aponte's performance in detail and outlines several objectives, such as "zero lost accounts," and a minimum 10% net sales growth.  (D.E. 112-3, pp. 10-11).  At its conclusion, the plan indicates that Aponte's failure to meet the listed objectives "will result in further disciplinary action up to and including termination."  The Performance Plan indicates that Warner Chilcott was still a Nalco client at that time.  (D.E. 112-3, pp. 10-11).

On June 21, 2008, Duggal sent plaintiff an e-mail stating that he was displeased with his recent performance and indicating that he had sent several emails during the past few weeks asking for "an action plan" to improve the quality of his service.  (D.E. 112-4, p. 32).  Shortly afterwards, on July 1, 2008, Duggal sent an e-mail to an employee in the Human Resources office at Nalco's corporate headquarters explaining, in detail, his reasons for recommending that Aponte be fired, which included: customer dissatisfaction, untimely reports, loss of the Warner Chilcott account, performance problems with Amgen causing Aponte's removal from that

account, and failure to meet sales targets.  (D.E. 112-4, p. 38).  On July 23, 2008, Duggal and Ortiz met with Aponte to inform him that the company had decided to terminate his employment. (D.E. 111, ¶ 45; 169-5, ¶ 45).  They informed him that the decision was due to his poor performance, as Duggal had explained in the e-mail to Human Resources, "including losing client business, putting half a million dollars in business at risk, not following up on client requests, and failure to timely submit reports. (D.E. 111, ¶ 46; 169-5, ¶ 46).  Additionally, his sales as of June 2007 were 11% lower than the prior year.  (D.E. 111, ¶ 47; 169-5, ¶ 47).  During that meeting, neither Duggal nor Ortiz said anything to Aponte regarding his age, national origin, health conditions, or male stereotypes.  (D.E. 111, ¶ 49; 169-5, ¶ 49).

All of the other Nalco District Representatives in 2007 and in 2008, at the time Aponte was terminated, were Puerto Rican.  (D.E. 111, ¶ 70; 169-5, ¶ 70; 112-4, p. 8, ¶ 23).  Aponte does not know how many hours they worked nor does he believe that any were treated more favorably than he based on their age or nationality.  (D.E. 111, ¶ 70; 169-5, ¶ 71).  Aponte alleges that he was replaced by a younger, Colombian employee, Jaime Suárez ("Suárez").  (D.E. 111, ¶ 72; 169-5, ¶ 72).  Duggal testified, however, that Suárez was hired two weeks prior to Aponte's termination and did not replace him; rather, Aponte's duties were assumed by the remaining District Representatives.  (D.E. 111, ¶ 73).

After his termination from Nalco, Aponte was hired by Compañía Cervecería India de Puerto Rico, Inc., a former Nalco client.  (D.E. 169-2, ¶ 18; 172, ¶ 18).  He recently began working in a new position with Johnson Controls, Inc. because he received a better employment offer there.  (D.E. 169-2, ¶ 19-20; D.E. 172, ¶ 19-20).  Plaintiff does not state whether his jobs at either of his two most recent employers involved sales or only technical work.

### C.       Aponte's Harassment Claim Against Castillo

Aponte claims that Castillo created a hostile work environment based on his comments about plaintiff's weight and his encouragement of drinking and womanizing.  Aponte testified that Castillo asked him about his weight when he would visit Puerto Rico and, in doing so, would touch Aponte's stomach for approximately four to five seconds.  (D.E. 111, ¶ 62; 169-5, ¶ 62).  Castillo was concerned about all of the District Representatives' weight because he wanted them to have a certain image.  (D.E. 111, ¶ 62; 169-5, ¶ 62).  Aponte states that this comment made him feel inadequate and inferior; because of his "health conditions . . . it was extremely difficult for Aponte to reduce his girth."  (D.E. 169-5, ¶ 64).  Additionally, Castillo once asked Aponte about his age, saying that despite being older than Aponte, he had more energy than Aponte did.  (D.E. 111, ¶ 64; 169-5, ¶ 64).  Castillo encouraged Nalco's District Representatives generally to maintain a positive and energetic attitude with their clients.  (D.E. 111, ¶ 64; 169-5, ¶ 64).

Aponte also felt that Castillo encouraged sexual behavior and "partying" that was anathema to Aponte's values.  Specifically, he testified that Castillo talked to him about going out dancing, drinking, and going out with different women.  (D.E. 111, ¶ 65; 169-5, ¶ 65).  On several occasions, Castillo asked him "if this hot girl put it in his face, wouldn't he just eat it up." (D.E. 111, ¶ 64; 169-5, ¶ 64).  On these occasions Aponte, who was married at the time, told him that he was not interested and changed the topic.  (D.E. 111, ¶ 64; 169-5, ¶ 64).  Aponte also states that he was deeply offended by Castillo's comments and felt "angry, upset, and demoralized."  (D.E. 111, ¶ 65; 169-5, ¶ 65).

In Aponte's declaration, he indicates that a lot of drinking occurred at Nalco company events and that he felt pressured by Castillo to drink alcohol.  (D.E. 169-4, ¶ 57).  However, no

one at Nalco ever ordered Aponte to drink alcohol, and Aponte would sometimes have a few drinks at a company event and sometimes he would not drink at all.  (D.E. 111, ¶ 66; 169-5, ¶ 66).  Castillo told Aponte that he wanted him to become more a part of the organization so that he could network with people (D.E. 111, ¶ 68; 169-5, ¶ 68), but Aponte understood this to mean that he needed to spend time with his colleagues "after hours, drinking excessively, looking for women . . .  and displaying conduct equivalent to being at worse [sic] unfaithful towards his own family . . . ."  (D.E. 169-5, ¶ 68).

### III.  STANDARD OF REVIEW

Summary judgment shall be granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1]  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it has the potential of determining the outcome of the litigation.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant presents a properly focused motion "averring an absence of evidence to support the nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug., Inc., 895 F.2d 46, 48 (1st Cir. 1990).

---

[1] Rule 56 was amended effective December 1, 2010, after the present suit was filed.  However, "[t]he substantive standard for summary judgment remains unchanged." Tropigas De P.R. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 n.5 (1st Cir. 2011).  Therefore, since the application of the amended rule to the present case would be "feasible" and would not work an "injustice," Rule 56, as amended, shall govern the determination of the parties' motions.  Farmers Ins. Exch., 632 F.3d at 777 n.4 (citing 28 U.S.C. § 2074(a)).

For issues where the nonmoving party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific facts" in the record "that demonstrate the existence of an authentic dispute."   McCarthy 56 F.3d at 315.  The plaintiff need not, however, "rely on *uncontradicted* evidence . . . .  So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." Calero-Cerezo, 355 F.3d at 19 (emphasis in original).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (citations omitted).  There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ."  Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).  The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation."   Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

## IV.   ANALYSIS

### A.    Plaintiffs' ADA Claims

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  A qualified individual is defined as one "with a disability who, with or without reasonable accommodation, can perform

the essential functions of the employment position that such individual holds or desires."   42 U.S.C. § 12111(8).   An individual is considered disabled under the ADA if he either (1) has a physical or mental impairment which substantially limits one or more major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment.   § 12111(2). While Aponte's complaint does not indicate how he fits within the ADA definition of "disabled," his memorandum of law in support of his opposition to the summary judgment motion clarifies that his claim falls under the first option.   (D.E. 169, pp. 9-10).[7]   He claims that he is disabled because his diabetes substantially limits his major life activity of eating.   Id.   Eating is included in the ADA's listing of "major life activities."   42 U.S.C. § 12102(2)(A).

While the ADA does not define the term substantial, the Supreme Court has interpreted it to mean "considerable" or "specified to a large degree."   Sutton v. United Airlines, Inc., 527 U.S. 471, 491 (1999), superseded on other grounds by Pub. L. No. 110-325, 122 Stat. 3553 (2008). Further, EEOC regulations codifying this provision of the ADA have interpreted the phrase "substantially limits" as "[u]nable to perform" or "[s]ignificantly restricted."   Id. (quoting 29 C.F.R. §§ 1630.2(j)(1)(i),(ii)).   Additionally, the Court has held that the degree of limitation should be measured taking into account any corrective or ameliorative measures that the plaintiff can employ to mitigate his impairment.   Id. at 482.[8]   Therefore, the effect of Aponte's diabetes

---

[7] With regard to his alleged disability, plaintiffs' complaint alleges only that Aponte "qualifies as a protected individual under the statutes cited in the paragraphs above, as he is . . .  A Type II diabetic (ADA)."   (D.E. 1, ¶ 5). This single fact, without any allegations as to how Aponte is limited by his diabetes, does not give rise to a plausible inference that Aponte is "disabled" under the ADA.  Plaintiffs' statement that Aponte "qualifies as a protected individual" under the ADA is thus conclusory, and does not state a claim upon which relief can be granted.  See Ashcroft v. Iqbal (holding that a plaintiff's complaint must plead a plausible claim for relief).

[8] Although the ADA Amendments Act of 2008 superseded Sutton's holding that an ADA plaintiff's must be evaluated in its corrected state, Pub. L. No. 110-325, 122 Stat. 3553 (2008), the First Circuit has held that the Act "does not apply retroactively to govern conduct occurring before the Act became effective" on January 1, 2009. Thornton v. United Parcel Svc., 587 F.3d 27, 35 n.3 (1st Cir. 2009) (citing Milholland v. Sumner County Bd. Of Educ., 569 F.3d 562, 565 (6th Cir. 2009)).  Because Aponte's termination, and all other alleged acts of discrimination occurred before this date, the Sutton standard applies in this case.

on ability to eat must be evaluated together with the effect of any medications or dietary restrictions that are available to him.

Evaluating whether diabetes is a disability under the ADA is "a matter of degree . . . An individual living with diabetes may or may not experience a substantial limitation in his or her ability to eat as contrasted with the rest of the population." Carreras v. Sajo, García & Partners, 596 F.3d 25, 34 (1st Cir. 2010) (citations omitted). In Carreras, the plaintiff was able to control his diabetes by taking two insulin shots per day and eating fairly often, thus preventing it from substantially limiting any of his major life activities, including eating. Id. Based on the First Circuit's holding in Carreras, it is clear that Aponte does not qualify as a disabled individual under the ADA.

Aponte was diagnosed with Diabetes Type II on August 26, 2005. (D.E. 111, ¶ 54; 169-5, ¶ 54). The uncontested facts indicate that Aponte controls his diabetes by taking medication, following a diet, eating snacks, and having sufficient rest. (D.E. 111, ¶ 55; 169-5, ¶ 55). Moreover, he is able to participate in his regular life activities, such as cleaning the house, cooking, shopping, working on the computer, gardening, and playing with his children. (D.E. 111, ¶ 56; 169-5, ¶ 56). The extent of the effect his diabetes on his life is that he "sometimes gets tired," he has to eat at regularly scheduled times, and he is restricted in the types of foods he can eat. (D.E. 111, ¶ 57-58; 169-5, ¶ 57-58). Aponte has not shown that his limitation is any more severe than that of the plaintiff in Carreras. The undisputed facts show that Aponte controls his diabetes via his medication and diet, and plaintiffs point to no other facts indicating that his condition imposes any further limitations on his eating, or any other life activity.

Moreover, even if Aponte could show that he is disabled, he has not shown that Nalco failed to provide him a reasonable accommodation, nor even what kind of accommodation he

requested.  To make out a reasonable accommodation claim, a Aponte would have to establish 1) that he is disabled under the ADA, 2) that he can perform the essential functions of his job, and 3) that his employer knew of his disability, but did not reasonably accommodate it upon his request.  Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 (1st Cir. 2010).  Assuming *arguendo* that Aponte could establish the first two prongs, his only evidence regarding the third prong are vague or conclusory statements from his affidavit.

For example, Aponte twice repeats: "It was Nalco who assigned Aponte's extremely exigent workload schedule. Aponte had repeatedly requested Mr. Duggal for a reasonable accommodation and he was always ignored or ridiculed instead of receiving a proper consideration of his needs."  (169-5, ¶¶ 48b, 50b); see also (169-5, ¶¶ 51d, 48a) (containing similar statements that use the phrase "reasonable accommodation" without defining the requested accommodation).  Because Aponte does not specify what kind of accommodation he requested, his assertion that he requested an accommodation and that it was, in fact, "reasonable" is entirely conclusory.  The closest that Aponte comes to delineating exactly what type of accommodation he requested is this statement: "I always indicated to Duggal that my work load and my medical conditions, due to which I repeatedly made to Duggal requests for accommodation, including regularly scheduled office time, were the valid reason for the occasional delays with the monthly reports." (D.E. 169-5, ¶ 35b).  However, this statement (and there are no further explanatory statements), fails to explain how the regularly scheduled office time, if granted, would have accommodated his diabetes and its alleged impact on his ability to eat.  See Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) ("The employee's request must be sufficiently direct and specific . . . [and] [a]t the least, the request must explain

how the accommodation requested is linked to some disability.") (internal citations and quotations omitted).

Aponte's chief complaint about the effect of his work on his diabetes, insofar as it affected his life activity of eating, is that he would have to leave long meetings to eat and that he also had to take his medication on time. (D.E. 169-3, p. 13). He further states that when food was brought into meetings, "they would always bring the things that precisely [he] couldn't eat, and [he] had to eat them because it was going to be worse if [he] didn't eat anything." (D.E. 111, ¶ 58; 169-5, ¶ 58). There is no indication, however, that Aponte was penalized for leaving meetings to eat and take his medicine, nor that he was prevented from bringing his own food into the meetings to comply with his dietary restrictions.

Aponte's remaining complaint about the interplay between his work and his diabetes is that he was required to work long hours, which was difficult because his diabetes made him tired. However, he provides absolutely no information as to the relationship between his illness and his feelings of tiredness. For example, he does not detail exactly how seriously or how often his diabetes affects his energy level, nor if it can be ameliorated with medication or diet. Further, Aponte does not indicate what major life activity, if any, is limited by his diabetes-induced tiredness. And finally, Aponte does not specify what kind of accommodation he required with respect to his tiredness, for example, whether he asked to work fewer hours or to handle fewer client accounts. Therefore, even if Aponte's claim were to reach the reasonable accommodation stage of the analysis, he has not pointed to evidence that would support it.

Because there is no issue of material fact as to whether plaintiff qualifies as disabled under the ADA, his claims that Castillo harassed him because of his diabetes and that Nalco did

not provide him a reasonable accommodation cannot proceed.  Defendants are thus entitled to summary judgment on both of plaintiffs' ADA claims.

### B.     Plaintiffs' Title VII & ADEA Claims[9]

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  Similarly, Title VII prohibits employers from discharging an employee or taking any other adverse employment action based on, *inter alia*, the employee's gender or national origin. 42 U.S.C. § 2000e-2.  In both ADEA and Title VII cases, a plaintiff can prove the employer's motive by using direct evidence of discrimination or via the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

The first step requires the plaintiff to establish a prima facie case by demonstrating four elements, each by a preponderance of the evidence:  (1) he is within the class protected by the statute; (2) he was qualified for the job and his performance was sufficient to meet his employer's legitimate job expectations; (3) he experienced an adverse employment action; and (4) the employer continued to have a need for the services of the position the plaintiff occupied. Moreno Morales, 383 F. Supp. 2d at 308 (setting forth standard in ADEA context); Rivera-Aponte v. Restaurant Metropol #3 Inc., 338 F.3d 9, 11 (1st Cir. 2003) (setting forth standard in Title VII context).[10]

If the employee makes out a prima facie case, a presumption of discrimination is created, which is rebutted if the employer articulates "some legitimate, nondiscriminatory reason" for the

---

[9] Before reaching the merits of Aponte's Title VII and ADEA claims, the court hereby dismisses both claims as to Duggal because individual employees cannot be held liable under either of those statutes.  See Fantini v. Salem State Coll., 557 F.3d 22, 31 (1st Cir. 2009) (holding that "there is no individual employee liability under Title VII); Birbeck v. Marvel Lighting Corp., 30 F.3d 507, 501-11 (1st Cir. 1994 (holding that "the ADEA limits civil liability to the employer).
[10] Under the ADEA, a plaintiff is within the protected class if he or she is forty years of age or older.  De la Vega v. San Juan Star, Inc., 377 F.3d 111, 117 (1st Cir. 2004).

adverse employment action.  McDonnell Douglas, 411 U.S. at 802.  The defendant's burden at this stage is merely one of production, not persuasion, and thus it need only "set forth, through the introduction of admissible evidence, the reasons for the [adverse action]," which must be "clear and reasonably specific."  Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255, 258 (1981).  If the employer's explanation "raises a genuine issue of fact as to whether it discriminated against the plaintiff," it has met its burden.  Id. at 255.

If the employer meets that burden, then "it falls to the plaintiff to show *both* that the employer's proffered reason is a sham, *and* that discriminatory animus sparked its actions." Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000) (emphasis added); see also Vega v. Kodak Caribbean, 3 F.3d 476, 479 (1st Cir. 1993) ("[T]he plaintiff must ordinarily do more than impugn the legitimacy of the employer's asserted justification; he must also adduce evidence of the employer's discriminatory animus.").  At this stage, "the ultimate burden is on [the plaintiff] to persuade the trier of fact that [he was] treated differently because of his [membership in a protected class]."  Zapata-Matos v. Reckitt & Coleman, 277 F.3d 40, 45 (1st Cir. 2002) (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999)).  In the summary judgment context, "the question is whether plaintiff has produced sufficient evidence that he was discriminated against due to his [membership in a protected class] to raise a genuine issue of material fact."  Id.  Unlike the defendant's burden in rebutting the prima facie case, the plaintiff's burden at this stage remains one of persuasion, not merely production.  Burdine, 450 U.S. at 256.

While the same burden shifting analysis can be used to prove both ADEA and Title VII claims, the standard for proving discrimination is higher in ADEA cases.  Mojica, 714 F. Supp. 2d at 253.  In an ADEA case, the plaintiff must show that discrimination was *the* motivating

factor for the employer's decision, whereas in Title VII cases it need only be *a* motivating factor. Id.  In other words, to make out an ADEA claim, the plaintiff must prove "that age was the 'but-for' cause of the challenged employer decision."  Gross v. FBL Financial Svcs., 557 U.S. 167, 129 S. Ct. 2343, 2351 (2009).  Under Title VII, mixed motive claims are cognizable, and the plaintiff may thus prevail by showing that membership in a protected class was one of multiple factors motivating the employer's decision.  Id. at 2349 (citing 42 U.S.C.§ 2000e-2(m)).

### 1.    Plaintiffs' Prima Facie Case

Aponte easily establishes the first and third prongs of his prima facie case: it is uncontested that he is Puerto Rican, is over 40 years old, and was terminated from his employment at Nalco.  Plaintiffs have also met prong four of the prima facie case because his duties were assumed by the other four District Representatives, his former co-workers, indicating a continuing need for the services he had provided.  (D.E. 111, ¶ 73); see Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 449 (1st Cir. 2009) (finding that plaintiff had established fourth prong of prima facie case where two other employees carried out the duties of his position after his departure) (citing Loeb v Textron, Inc., 600 F.2d 1003, 1013 (1st Cir. 1979)).

Defendants argue that Aponte fails to establish prong two of his prima facie case because his supervisors did not believe that Aponte met Nalco's legitimate job performance expectations. (D.E. 108, p. 6-8).[11]  However, the First Circuit has clarified that "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case."  Vélez, 585 F.3d at 448 (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003)).  Rather, the employee need only tender "some evidence which, if believed, prove[s] that he was doing his chores proficiently."  Id.

---

[11] The parties do not dispute that Aponte was qualified for the job; indeed, he has a bachelor's degree in chemical engineering and decades of experience working in that field.  (D.E. 169-2, ¶¶ 3-4; 172, ¶¶ 3-4).

(quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1335 (1st Cir.1988)); see also Zapata-Matos, 277 F.3d at 45 (noting that the standard for establishing a prima facie case is a low one).

Aponte has presented sparse evidence from which a jury could conclude that he was performing his duties satisfactorily when he was terminated in 2008.  It is undisputed that that four of Aponte's clients (Chevron Phillips, Baxter, Warner Chilcott, and Amgen) complained that Aponte was providing poor service and that Aponte was repeatedly late in submitting required reports.  (D.E. 111, ¶¶ 27-37; 169-5, ¶¶ 27-37).  Aponte counters that he made efforts to implement the suggestions in Duggal's Performance Improvement Plan (D.E. 169-5, ¶ 30), and he suggests that there could be alternative explanations for client accounts that he lost, for example, declining economic conditions.  (D.E. 169-5, ¶¶ 29, 33).  Moreover, Aponte claims that other District Representatives were also late in turning in reports.  Additionally, Aponte argues that his performance suffered because he was required to provide technical support to the clients of other District Representatives, which left him with less time to attend to his own clients.  Therefore, a trier of fact could potentially find that Aponte's performance may have been deficient, but that he did the best that he could considering his workload.

Aponte's evidence lies at the outer limits of what is sufficient to carry his burden in establishing prong two of his prima facie case.  Courts have reiterated, however, that a plaintiff's burden at the prima facie stage is not an onerous one.  Burdine, 450 U.S. at 254.  At this juncture, Aponte's burden is merely to produce "enough evidence to permit the trier of fact to infer the fact at issue."  Id. at 254 n.7.  Based on the evidence he has adduced, it is not impossible that a jury could find for plaintiff on prong two.  Therefore, plaintiffs have established a prima facie case—albeit a weak one.  Nevertheless, Aponte's claim fails at the third stage of the burden-shifting analysis.

### 2.      Defendants' Explanation for Aponte's Termination

Defendants have undoubtedly produced sufficient evidence to rebut plaintiff's prima facie case with a legitimate, nondiscriminatory explanation of Nalco's decision to terminate Aponte.  Several of Aponte's clients reported that they were not satisfied with the level of service that he was providing.  Additionally, one of his clients (Warner Chilcott) canceled their contract with Nalco and another, Amgen, was close to doing the same.  Moreover, the client complaints, Aponte's late submission of reports, and Duggals repeated efforts to counsel him about his performance are well-documented in the record.  Aponte argues that the inadequate service his clients received was due to factors beyond his control, including his heavy workload and his colleagues' failure to support him.  Regardless of any such alternative explanations from Aponte, however, at this stage the question is merely whether defendants have produced sufficient evidence which, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."   Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).   The evidence here is sufficient to allow a finding that Aponte was terminated due to his employer's perception of his poor performance, not due to discrimination.

### 3.      Plaintiffs' Claim of Pretext

Plaintiffs' evidence, by contrast, is insufficient to permit a trier of fact to find that defendant's proffered explanation was a pretext for discrimination based on age or national origin.[12]  While there is some evidence that raises a question as to whether Aponte's performance was *actually* deficient, it does not refute the evidence showing that Aponte's supervisors at Nalco *legitimately perceived* his performance to be inadequate, which is what matters when

---

[12] Aponte's Title VII claim with respect to his allegedly wrongful termination does not allege that he was terminated based on his gender, but only due to his national origin.  Aponte's gender discrimination claim is only alleged as to his claim of hostile work environment.  See, supra, note 2 (describing the allegations in plaintiffs' complaint).

analyzing an allegation of pretext.  See Gray v. New Eng. Tel. & Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986) ("[I]n assessing pretext, our focus must be on the perception of the decisionmaker . . . and whether this perception was credible and reasonable.").  Moreover, the record is devoid of evidence of discriminatory animus that calls into question the credibility of Nalco's proffered reason for Aponte's termination.

Aponte suggests several reasons why his clients may have been dissatisfied with Nalco's services that do not fault his performance.  For example, regarding the Chevron Phillips complaint in March 2007, Aponte states that this was because one of Chevron Phillips's engineers "was able to search in the market for new water treatment technology." (D.E. 169-5, ¶ 27).  He does not elucidate, however, what relation this had to the client's or Nalco's perception of his services.

Similarly, in response to one of Warner Chilcott's complaints that chemical inventories were low, Aponte counters that it could take up to three weeks for a product to be delivered after he ordered it, and that inventories sometimes ran low while waiting for the delivery.  (D.E. 169-2, ¶ 40a; 169-4, ¶ 40-40a).  He argues that he was not responsible for the delay in product delivery, and therefore this complaint was caused by factors beyond his control.  (D.E. 169-4, ¶ 40-40a).  Regardless of whether Aponte was actually at fault for the low chemical inventories, it is evident that Warner Chilcott perceived that he was, and reported this to Duggal.  Aponte does not state whether or not he told Duggal about the product delivery delays, or if Dugggal agreed that this was a valid reason for the low inventories at Warner Chilcott.  When determining whether an employee's performance met the employer's legitimate expectations, "an employee's perception of himself is not relevant. Rather, it is the perception of the decision maker which is relevant."  Torrech–Hernandez v. Gen. Elec. Co., 519 F.3d 41, 49 (1st Cir. 2008) (quoting

Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 338 (7th Cir. 1991)) (internal quotation and alteration omitted).   Therefore, Aponte's own belief that he was not at fault for the low inventories does not advance his pretext claim.   Additionally, Aponte states that the reason Warner Chilcott eventually cancelled the account was because a competitor offered them a better price (D.E. 169-5, ¶ 36; 169-4, ¶ 46); however, he does not indicate his basis of knowledge for this assertion.   Additionally, Duggal states that he asked Aponte to create a plan to "counter attack" the competitor's proposals, but that Aponte failed to do so.  (D.E. 111, ¶ 33).

Aponte also states that for two of his clients, Baxter and Warner Chilcott, he used a log book to communicate instead of the usual personal service reports, in what appears to be an attempt to disprove the clients' complaints that he failed to submit reports and that his communication was poor.  (D.E. 169-4, ¶¶ 38, 40c, 41a).  He further states that his predecessor had used the logbook to communicate and that the clients wanted to keep using that method. (D.E. 169-4, ¶¶ 38, 40c, 41a).   However, it is uncontested that both clients did complain to Nalco, saying that Aponte's reports were late and that his communication was poor, regardless of whether Aponte was actually at fault for this.   (D.E. 111, ¶¶ 31, 32; 112-4, pp. 3, 17, 35).[13] Additionally, Aponte has not shown that he explained the log book method to Duggal. Therefore, it would be reasonable for Duggal to view Aponte's performance as deficient based upon the clients' complaints about the reports and lack of communication.

There are also eight e-mails in the record, from Duggal and others, requesting that Aponte submit overdue reports, indicating that Nalco saw this as a persistent problem.  (D.E. 112-3, pp. 17, 29, 32, 34; 112-4, pp. 11, 22, 26, 28, 30, 32).  Aponte responds that his field work

---

[13] Aponte denies this in his answers to defendants' proposed facts (D.E. 169-5, ¶¶ 31-32), but he cites only to paragraphs in his declaration that discuss the logbook method and explain why Aponte believes he was not at fault for the customers' complaints.  (D.E. 169-4, ¶¶ 40, 40a, 41b, 41c).  None of these statements refute the fact that Baxter and Warner Chilcott complained to Nalco about Aponte's service performance.

schedule was so demanding that he did not have enough time for administrative tasks such as reports.  He states that his "work load, medical conditions, and the fact that [he] was not afforded office time by Nalco . . . were the valid reasons for the occasional lateness with some of the reports."  (D.E. 169-4, ¶ 50a).  Additionally, Aponte asserts that "differently from the others, [he] did not have a day of the week to tend to administrative tasks."  (D.E. 169-4, ¶ 35b).  On the other hand, Aponte does not present evidence other than his own opinion showing that his work load was more onerous than that of other Nalco employees.  Aponte also claims that other district representatives submitted late reports, but does not provide any specific facts about these employees, who they were, how often they submitted late reports, and how overdue the reports were, or whether any disciplinary action was also taken against these employees.  He merely states that he "was not the only District Representative with monthly reports problems due to the work load."  (D.E.  ¶ 35).

Additionally, there are multiple e-mails in the record from Duggal to Aponte, expressing his concerns about Aponte's performance and suggesting tactics for improvement, as well as the Personal Performance Improvement Plan, which indicate that Duggal viewed Aponte's performance as problematic.  (D.E. 112-4, pp. 13, 15, 17-18, 20, 32).  Aponte argues that his client service suffered because his technical skills were especially good, so he was asked to provide technical support to other District Representatives' clients, creating an overwhelming work load.  (D.E. 169-2, ¶ 51c; 172, p. 41).  He further states that when he was traveling for work or helping with other Representatives' client accounts, his colleagues who were supposed to "cover him" failed to visit his clients.  (D.E. 169-2, ¶ 51c; 172, p. 41).  Aponte fails, however, to provide examples of specific incidents when this happened, nor does he indicate whether he brought this problem to Duggal's attention during their meetings to discuss his performance.

Furthermore, the parties do not dispute that Aponte did not have a background in sales and he was more successful in performing technical duties.  Aponte argues that his technical expertise was valuable to Nalco, and that he generated sales indirectly by assisting other sales representatives in providing technical support to their clients.  (D.E. 169-4, ¶ 42a).  The fact remains, however, that the District Representative job *was* a sales position, and thus Aponte was expected to achieve sales targets, cultivate customer relationships, and obtain new customer accounts.  (D.E. 112-3; 111, ¶ 14; 169-5, ¶ 14).  Aponte admits that he did not generate sales. (D.E. 111, ¶ 47; 169-5, ¶ 47).  This supports defendants' claim that they actually and reasonably viewed Aponte's performance as inadequate in two key areas of his job: sales and customer service.

Defendants' proffered reason is also consistent with contemporaneous documents setting forth the reasons for Duggal's decision to recommend termination, for example, e-mail from Duggal to the Human Resources Department, and the warnings set forth in the Performance Improvement Plan.  (D.E. 112-4, pp. 17-18, 38); see Zapata-Matos, 277 F.3d at 47 (finding probative of employer's credibility the fact that their explanation was not contradicted by contemporaneous documents or statements made at termination).  Additionally, the copy of the Performance Improvement Plan in the record explicitly indicates that Aponte would be subject to termination if he did not meet the objectives set out in the plan.  See Meléndez-Ortiz v. Wyeth Pharmaceutical Co., 775 F. Supp. 2d 349, 368 (D.P.R. 2011) (granting employer's summary judgment motion on ADEA claim because plaintiff failed to show that reason for termination— his deficient performance—was pretext; employee had been warned that "he risked termination if his work did not improve").  One of the goals in the plan was "zero lost accounts."  Because the plan indicates that Warner Chilcott was still a Nalco client at that time, it must be inferred

that Aponte lost that account after the plan was created, and that Aponte thus did not meet one of the plan's objectives, subjecting him to termination.  (D.E. 112-3, pp. 10-11).  These factors further point to the legitimacy and credibility of Nalco's stated reason for Aponte's termination.

Taking the most generous view of the evidence, as the court must do on summary judgment, a jury could find it possible, but not probable, that Aponte was terminated because his employer unfairly blamed him for his clients' dissatisfaction, while the inadequate service they received was in fact due to his overly burdensome work schedule and lack of assistance from colleagues.  A mere possibility, however, does not amount to a preponderance, which is the evidentiary burden on plaintiffs' shoulders at the third stage of the burden-shifting test.  See Zapata-Matos, 277 F.3d at 47 (granting summary judgment for employer where a jury could reasonably conclude that there were possible alternative explanations for the plaintiff's termination, but "could much more readily conclude that the employer's explanation was not a pretext [and] was quite true . . . .").  More importantly, however, even assuming *arguendo* that Nalco's justification for Aponte's termination was false, he has not presented evidence that could lead a jury to show that it was a pretext created to disguise unlawful discrimination.  See Ronda-Pérez v. Banco Bilbao Vizcaya, 404 F.3d 42, 44 (1st Cir. 2005) ("The question to be resolved is whether the defendant's explanation of its conduct, together with any other evidence, could reasonably be seen by a jury *not only to be false but to suggest [discriminatory] animus*.") (emphasis added).  Indeed, even if Aponte did produce enough evidence to call into question the legitimacy of Nalco's proffered reason for his termination, he would also need to adduce some evidence to show his termination was actually motivated by age and/or national origin discrimination.  See Vélez, 585 F.3d at 453 ("It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a

jury to find that the reason given is . . . a sham intended to cover up the employer's real motive of discrimination." ).

With respect to Aponte's Title VII claim, the record reflects only the most minimal anti-Puerto Rico remarks, as discussed in further detail below.  See, infra, § IV.C.3.  Aponte has not shown that any other similarly situated employees who were not Puerto Rican were treated more favorably than he was.  The closest he came to doing so was at his deposition, when he claimed that two other District Representatives, Edward Bray and Francisco Casanova, had received more favorable treatment.  (D.E. 112-2, pp. 198-206).  He stated that both Bray and Casanova had lost client accounts and that Casanova was not terminated, while Bray was permitted to resign and form his own company that provides services to Nalco.  Id.  Aponte also stated, however, that both Bray and Casanova are Puerto Rican, id., which nullifies any support this might provide to his national origin claim.  Additionally, Aponte admitted that he has no personal knowledge of either employee's performance.  Id.  And finally, Aponte admitted, that he "does not believe that Bray or Casanova were treated more favorably on account [of] their age or nationality."  (D.E. 111, ¶ 71; D.E. 169-5, ¶ 71).

Aponte has not pointed to any other evidence in the record that could allow a jury to find that his Puerto Rican national origin had anything to do with his termination.  Much like the plaintiff in Zapata-Matos, Aponte has "at best" created "a weak issue of fact," as to Nalco's justification for his termination and pointed to only one offensive anti-Puerto Rico comment.  277 F.3d at 47.  In such cases, the question is "whether the slight suggestion of pretext present here, absent other evidence from which discrimination can be inferred, meets plaintiff's ultimate burden."  Id.  As the First Circuit held in Zapata-Matos, the answer to the question is no.

Similarly, Aponte has not pointed the court's attention to any evidence of discriminatory animus based on age.  Aponte claims that he was replaced by Suárez, a younger Colombian engineer, but Duggal testified that Suárez did not replace Aponte, and that his duties were in fact assumed by the remaining District Representatives.  (D.E. 111, ¶ 72-73; 169-5, ¶ 72-73). Aponte's attempt to deny defendants' proposed fact is a mere assertion that Suárez did in fact replace him, but he indicates that he has no personal knowledge surrounding Suárez's hiring, nor does he know the date of Suárez's hire.  (D.E. 169-5, ¶ 72-73).  This evidence is not only inadmissible, as it is based only on Aponte's speculation, but it does not controvert defendants' statement that Suárez did not replace Aponte.  Aponte has presented no other evidence regarding his age, except that Castillo once asked him about his age.  This evidence is even weaker than Aponte's national origin discrimination evidence (which at least involved an offensive comment), yet plaintiffs' burden here is higher.  Unlike Title VII, the ADEA does not recognize mixed motive claims and Aponte must show that age was the "but for" reason for his termination.  He has presented no evidence that age even played a role in his firing, much less that it was the sole reason.

 "When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law."  Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994). Plaintiffs have failed to meet their burden to adduce evidence from which a jury could find that the reason for Aponte's termination was pretextual and that he was actually fired due to his age

or national origin.   Defendants are therefore entitled to summary judgment on plaintiffs'
wrongful termination claims under both Title VII and the ADEA.[14]

###   C.      Aponte's Hostile Work Environment Claim

To make out a hostile work environment claim, a plaintiff must demonstrate harassing behavior that is "sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment." Rosario v. Dep't of Army, 607 F.3d 241, 246 (1st Cir. 2010) (internal citations and quotations omitted).  That work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive . . . ." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).  "The factors relevant to this inquiry include the severity of the conduct, its frequency, and whether it unreasonably interfered with the victim's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  Of course, the plaintiff must also show that he was subject to the harassing behavior on account of "a characteristic protected by a federal anti-discrimination statute." Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); Lee-Crespo v. Schering-Plough del Caribe, Inc., 354 F.3d 34, 43 n.5 (1st Cir. 2003)).  Additionally, simple teasing, unpleasantness, or offensive comments will not suffice; rather, the plaintiff must show that the "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe to alter the conditions of [his] employment and create an abusive working environment.'" Id. (internal citations and quotations omitted).

---

[14] Defendants are also entitled to summary judgment on plaintiff's Law 100 claim with respect to age discrimination, because, "[o]n the merits, age discrimination claims asserted under the ADEA and under Law 100 are coterminous." Dávila v. Corporación de Puerto Rico Para La Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007). Therefore, when a plaintiff has "adduced no significantly probative evidence that his discharge was motivated by age," summary judgment on a pendent Law 100 claim is appropriate. Id.

### 1.      Nalco's Faragher-Ellerth Defense

At the outset, any hostile work environment claim that Aponte may allege relies solely on Nalco's vicarious liability for Castillo's acts, as all facts Aponte alleges regarding offensive behavior pertain to Castillo's actions only.  See D.E. 199 (dismissing all claims against Castillo); see also, Fantini v. Salem State Coll., 557 F.3d 22, 31 (1st Cir. 2009) (holding that "there is no individual employee liability under Title VII"); Birbeck v. Marvel Lighting Corp., 30 F.3d 507, 501-11 (1st Cir. 1994) (holding that "the ADEA limits civil liability to the employer").  An employer may be "subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  Faragher, 524 U.S. at 807.  However, the employer is not strictly liable; rather, the plaintiff employee "must show that the employer is responsible for either creating or tolerating the harassing behavior."  Wilson v. Moulison North Corp., 639 F.3d 1, 7 (1st Cir. 2011).  The Supreme Court has held that when an employer maintains an anti-harassment policy and complaint procedure of which the employee is aware, and the employee unreasonably fails to utilize that procedure, then the employer has an affirmative defense against any vicarious liability for a supervisor's harassing behavior.  Faragher, 524 U.S. at 808; Burlington Indust., Inc., v. Ellerth, 524 U.S. (1998).  Here, Aponte knew that Nalco maintained an Equal Employment Opportunity and Harassment Policy, which provides a procedure for reporting any discriminatory or harassing behavior.  (D.E. 111, ¶¶ 51-52; 169-5, ¶¶ 51-52).  Aponte never submitted a report of discrimination or harassment pursuant to that policy.  (D.E. 111, ¶ 53; 169-5, ¶ 53).  Therefore, if Aponte could establish the element of a hostile work environment claim, Nalco would be entitled to this affirmative defense.  Regardless, the evidence Aponte has presented does not support a cognizable hostile work environment claim.

## 2.     Aponte's Gender-Based Hostile Work Environment Claim

Aponte's claim that Castillo harassed him due to his failure "to conform to Castillo's stereotype of acceptable male behavior," (D.E. 1, ¶ 28), fails because he cannot show that Castillo perceived him as insufficiently masculine, or that the harassment was pervasive enough to amount to a hostile work environment.  The Supreme Court has recognized that discrimination based on gender stereotypes is actionable under Title VII.  Hopkins v. Price Waterhouse, 490 U.S. 228 (1989).  In Price Waterhouse, a female employee had been passed over for a promotion because her superiors were of the opinion that she was not "feminine" enough.  Id.  They described her as "macho," too aggressive," stating that she "overcompensated for being a woman" and should "take a course at charm school."  Id. at 235.  The supervisor who informed plaintiff of the decision not to promote her suggested that she "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."  Id. The court thus held that "an employer who acts on the basis of a belief that woman cannot be aggressive, or that she must not be, has acted on the basis of gender."  Id. at 250.

The Court subsequently held that same-sex sexual harassment is actionable, Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998), and courts have therefore recognized that gender stereotyping may be actionable when an employer acts on the basis of a perception that a male plaintiff does "not match the social stereotypes associated with" his gender.  Higgins v. New Balance Athletic Shoe, 194 F.3d 252, 261, n.4 (1st Cir. 1999) ("[J]ust as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity . . . a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity.") (in

dicta) (citing Oncale, 523 U.S. at 75; Price Waterhouse, 409 U.S. at 250-51); see also Centola v. Potter, 183 F. Supp. 2d 403, 410 (D. Mass. 2002) (noting that gender stereotypes are measured by "what most people in our society would consider to be [] masculine."). If an employer "allows the use of these stereotypes in the creation of a hostile or abusive work environment, then the employer opens itself up to liability under Title VII's prohibition of discrimination on the basis of sex." Centola, 183 F. Supp. 2d at 409.

In Aponte's case, he has shown that Castillo encouraged him (and other employees) to drink heavily and spend time socializing in bars and nightclubs, that he made vulgar comments about sex, and that he encouraged infidelity. There is no evidence—or even allegations—in the record, however, suggesting that Castillo perceived such behavior as stereotypically male, or that he thought Aponte was insufficiently masculine for his rejection of these activities. More importantly, though, even if Aponte could establish a cognizable gender stereotyping claim, he has not shown that Aponte's behavior was sufficiently severe or pervasive so as to alter the conditions of his employment. First of all, Castillo and Aponte saw only each other approximately five times per year for about one week at a time. (D.E. 111, ¶ 60; D.E. 169-5, ¶ 60). Therefore, even if Castillo's comments made Aponte feel uncomfortable, they did not occur often enough to affect his day to day employment. Additionally, Aponte's chief allegation regarding Castillo's drinking and womanizing was that he felt pressured to take part in these activities because if he did not, Castillo made him feel like he was not "part of the [Nalco] team." This claim necessarily fails because "ostracism, standing alone, is usually not enough to support a hostile work environment claim." Meléndez-Ortiz, 775 F. Supp. 2d at 374-75 (quoting Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005)).

3.      **Plaintiffs' Hostile Work Environment Claim Based on Age and National Origin**

While plaintiffs' complaint alleges that Aponte was subject to a hostile work environment based on his Puerto Rican national origin, their opposition to the summary judgment motion does not point to any evidence in the summary judgment record of anti-Puerto Rican comments or behavior, nor do they discuss this claim in their memorandum of law, nor does Aponte mention it in his affidavit.  (D.E. 169).  Though the court need not consider any further evidence, see Local Rule 56(e) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."), Aponte does state in his answers interrogatories that Castillo "would always say that the people from Puerto Rico did not have a selling and working culture" and that "in Latin America, people live to work but in the United States (including Puerto Rico), people worked to live."  (D.E. 169-3).  This is comment, standing alone, falls short of that needed to support a hostile work environment claim.

First of all, Aponte's statement that Castillo "would always say" this is too vague to determine how frequently he made the alleged comment; however it is uncontested that Castillo spent approximately five weeks out of the year at Nalco's Puerto Rico office.  (D.E. 111, ¶ 60; D.E. 169-5, ¶ 60).  Therefore, even if Castillo uttered these words every day during his visits, five weeks out of the entire year is too little to create an atmosphere "permeated" with that allegedly discriminatory comment.

Moreover, while Castillo's comment may be offensive, obnoxious, and employ "uncultured stereotypes of Puerto Rico, and its inhabitants," it is not, standing alone, sufficient to create an abusive or hostile environment.  See Ortiz-Ortiz v. Univ. of Puerto Rico, Civil No. 06-2152 (SEC), 2009 WL 1767683, at *7 (D.P.R. Jun. 16, 2009) (finding no hostile work

environment where supervisor allegedly "malign[ed] Puerto Ricans when he became frustrated" about problems at work, and once made a comment directly to plaintiff that "made use of obnoxious language and uncultured stereotypes of Puerto Rico, and it's inhabitants"); <u>Laboy v. Dick Corp. of P.R., Inc.</u>, Civil No. 05-1782 (HL), 2006 WL 3098756, at *4 (D.P.R. Oct. 30, 2006) (Denying hostile work environment claim where "derogatory remarks based on national origin" were "offensive" but only "episodic"), and "[t]here is no indication . . . that it interfered with [plaintiff's] work performance." <u>Marrero v. Schindler Elevator Corp.</u>, 494 F. Supp. 2d 102, 110 (D.P.R. 2007) (finding evidence that supervisor called plaintiff "viejo," "viejito," and "viejo pendejo" on a daily basis "too mild to form the basis of a[n] [ADEA] hostile work environment claim").

Aponte additionally points to the fact that Castillo said to him, approximately seven times over a 4-5 year period, "*no seas hueva*," a Spanish phrase that Aponte interpreted to mean "don't be an asshole." (D.E. 111, ¶ 63, D.E. 169-5, ¶ 63). While Aponte indicates that this is a slang phrase used in Colombia that is not used in Puerto Rico, he fails to illuminate how it evidences any anti-Puerto Rican sentiment. Additionally, while Aponte's complaint does not allege a hostile work environment based on age, the court notes that such a claim would also fail, as the only relevant fact in the record is that Castillo once asked Aponte about his age, and said that Castillo had more energy than Aponte even though he was older than Aponte. (D.E. 111, ¶ 64; D.E. 169-5, ¶ 64). <u>Compare with</u> Meléndez-Ortiz, 775 F. Supp. 2d at 374-75 (holding evidence that plaintiff's supervisor called him "old man" and "old fart" on a daily basis, and yelled and swore at him insufficient to establish hostile work environment claim.)

### D.      Plaintiffs' Supplementary Puerto Rico Law Claims

Federal courts may decline to exercise supplemental jurisdiction over a plaintiff's state law claims when the federal claims that gave it original jurisdiction are dismissed. See 28 U.S.C. § 1367(c)(3); Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir.1998).  If all federal claims are dismissed prior to trial, then the state law claims should be dismissed as well. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966); Rodríguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir.1995).  Accordingly, plaintiffs' state law claims against defendants shall also be dismissed.

### V.     CONCLUSION

Based on the foregoing analysis, defendants' motion to strike (D.E. 173) is GRANTED IN PART AND DENIED IN PART.  Defendants' motion for summary judgment (D.E. 108) is GRANTED. Plaintiffs' federal law claims are thus DISMISSED WITH PREJUDICE,[15] plaintiffs' Law 100 claim with respect to age discrimination is dismissed WITH PREJUDICE, and plaintiffs' remaining claims under Puerto Rico law are DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

In San Juan, Puerto Rico this 30th day of January, 2012.

s/Marcos E. López
U.S. Magistrate Judge

---

[15] Plaintiffs have also alleged that defendants' conduct violates 42 U.S.C. § 1981 ("Section 1981"), which prohibits discrimination based on race.  (D.E. 1, ¶ 41).  Plaintiffs' complaint does not allege discrimination based on race, which is a required element of a Section 1981 claim.  Fantini v. Salem State Coll., 557 F.3d 22, 33-34 (1st Cir. 2009).  Therefore, plaintiff's Section 1981 claim is hereby dismissed pursuant to Fed. R. Civ. P. 12(b)(6).